## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## BALTIMORE DIVISION

| | | |
|---|---|---|
| SEDRIC CATCHINGS, CHARLES COUSER, COLLIN DAVIS, ALLEN LAMIN, SIRRON LITTLE, TAIWO MOULTRIE, JOSEPH SPEED, and HOWARD THOMAS, Individually and on behalf of a class of similarly situated persons, | * <br><br> * <br><br> * <br><br> * | Case No.: |
| Plaintiffs, | * | |
| v. | * | |
| CALVIN WILSON, In his official capacity as Warden, Chesapeake Detention Facility Department of Corrections, | * <br><br> * | |
| ROBERT L. GREEN, In his official capacity as Secretary of Public Safety and Correctional Services (Maryland), Department of Public Safety and Correctional Services, | * <br><br> * <br><br> * | |
| Defendants. | * | |
| | * | |

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE FIFTH / FOURTEENTH AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION AND 42 U.S.C. § 1983, AND PETITION FOR WRITS OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241**

## INTRODUCTION

1.      There is an uncontrolled outbreak of COVID[1] at the Chesapeake Detention Facility ("CDF").  In less than one month, according to Defendants' own statistics, one-third of current residents[2] (156 of approximately 400 residents) and approximately one-third of staff members (78 of approximately 220 employees) have tested positive for COVID. Expert Declaration of Dr. Jaimie Meyer (February 18, 2021) ("Meyer Decl.") ¶ 26 (relying on documentation from DPSCS, CDF, and communications concerning current conditions at CDF).

2.      Defendants' actions have fueled this outbreak, and they also have failed to take appropriate action in response.

3.      CDF is a facility operated by the Maryland Department of Public Safety and Correctional Services ("DPSCS") located at 401 East Madison Street, Baltimore, Maryland 21202. CDF was previously known as the Maryland Correctional Adjustment Center ("MCAC").

4.      CDF houses approximately 400 residents and has approximately 220 staff. CDF houses residents who are in pretrial federal criminal detention, as well as individuals who have been sentenced in federal criminal cases. Since 2010, CDF has been leased under an agreement with the Office of Federal Detention Trustee, United Stated Department of Justice, on behalf of the United States Marshals Service, for the primary purpose of housing federal detainees awaiting trial. Agreement Number ODT-10-0001 (DUNS Number 879016178, effective 9/1/2010). Under this contract between the United States Department of Justice and DPSCS, MCAC (now CDF), DPSCS is required to "provide for the safe, secure, and humane confinement for male and female

---

[1]      Severe acute respiratory syndrome coronavirus 2, or SARS-CoV-2, commonly called the "novel coronavirus" or "coronavirus" is the highly contagious and transmissible virus underlying this cause of action and the event described in this Complaint. The virus frequently results in a disease, COVID-19. Plaintiffs refer to both the virus and disease as "COVID" or "COVID-19."

[2]      The plaintiffs use the term "residents" to refer to individuals detained at CDF and other facilities.

population" in accordance with federal standards outlined in the Contract, as well as "the U.S. Constitution; all applicable federal, state, and local laws and regulations; applicable Presidential Executive Orders (E.O.); all applicable case law; and Court Orders and Consent Decrees. Should a conflict exist between any of the aforementioned standards, the most stringent shall apply." Agreement Number ODT-10-0001 at 3-4.

5.      CDF was originally designed as a state facility, with single-person cells. CDF now operates at double its original capacity, with two-person cells. This has resulted in overcrowding in tight spaces.

6.      As presently operated, CDF housing units are spread over three "towers" or "pods" connected by corridors, broken into six units, A to F. Each housing unit is divided into "quads" or "tiers" referred to by a housing unit letter (A to F) and a number (1 to 4). Each quad, in turn, comprises 12 cells. Each cell now holds two residents. Double-celling has increased CDF's maximum capacity.

7.      Some residents who tested positive for COVID were removed from CDF. They have been placed in a dormitory facility in the Jail Industries Building ("JI"), located at 531 East Madison Street, Baltimore, Maryland, 21202. That building has the appearance of a former warehouse, with broken windows and temperatures around 55 degrees Fahrenheit. Residents who have been quarantined there are often denied access to medication. Built in 1922 as an office building and retrofitted as a jail in the 1980s, JI was closed in 2017 due to what public safety officials called a "security nightmare." Jayne, Miller, "I-Team looks inside closing jail facility in Baltimore," WBALTV (Sept. 1, 2017), https://www.wbaltv.com/article/i-team-looks-inside-closing-jail-facility-in-baltimore/12139786 (containing a video tour of the then-closed facility).

8.      The residents housed at CDF are under a constant and substantial threat of contracting COVID.

9.      Some residents who have contracted COVID receive grossly substandard medical treatment (if they receive treatment at all).

10.     Because jails, prisons, and other detention and correctional facilities are particularly vulnerable to COVID, the U.S. Centers for Disease Control and Prevention (CDC) has recommended basic measures these facilities should take to control the spread of the virus and treat infected prisoners—for example, requiring the use of face masks, implementing social distancing practices, and providing sufficient quantities of cleaning materials including soap and hand sanitizer. Ex. JJ ("Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," Centers for Disease Control and Prevention, updated Jan. 19, 2021 (last visited on Feb. 20, 2021)), also available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

11.     Defendants[3] have ignored these and other public health recommendations.

12.     Residents lack the means to clean their cells. CDF staff does not clean—or arrange for the cleaning of—common areas in between recreation sessions, when up to 12 residents are out in the common areas at a time.

13.     CDF does not require or enforce the wearing of masks for residents. CDF staff do not consistently wear their masks or wear them properly.

---

[3]      Since Defendants Wilson and Green are being sued in their official capacities, "Defendant Wilson," "Defendant Green," and "CDF" are used interchangeably in this Complaint except where an individual defendant is specifically named.

14.     Residents who have tested negative for COVID are forced into the cells formerly occupied by residents who have tested positive, without any cleaning of these cells.

15.     CDF places some COVID-positive male residents in the "cadre," a unit inside the facility. CDF *also* places new admissions to the facility inside the "cadre," in cells next to the COVID-positive residents.

16.     Confoundingly, CDF has recently placed two women who were recently admitted to CDF in the "cadre," next to *positive male residents who were actively exhibiting symptoms of COVID.*

17.     CDF ignores some sick calls altogether. CDF delays responding to many other sick calls. CDF also fails to respond to, or delays its response to, residents' health complaints and to residents exhibiting of COVID-like symptoms.

18.     CDF has exposed resident after resident to the virus. CDF has intermixed different groups of residents—COVID-positive residents, residents who should be quarantined because of potential exposure, newly admitted residents, and COVID-negative residents—and thereby dramatically increased the risk of exposure across the facility. CDF can have no excuse for these mistakes, particularly not after the nation has been living with this virus for nearly a year.

19.     Unsurprisingly, some residents who were intermixed with COVID-positive residents went on to test positive for COVID themselves.

20.     The nearly 400 residents now detained at CDF continue to be denied even the minimal precautions necessary to mitigate against the risks of COVID.

21.     Among the health services being denied to CDF residents are access to vaccines against COVID. Under the Phased COVID Vaccine Distribution Plan of the State of Maryland and the Maryland Department of Health, "high-risk incarcerated individuals" were supposed to be

offered access to COVID vaccines in Phase 1B of the plan. *See* "Maryland's Phased COVID-19 Vaccine Distribution," The Office of Governor Larry Hogan, updated Jan. 14, 2021 https://governor.maryland.gov/wp-content/uploads/2021/01/Phases-One-Pager-1.pdf.    Although Maryland has reached Phase 1B (currently the state is in Phase 1C of the Plan, *see* Maryland Department of Health, Maryland moves into Phase 1C of its COVID-19 vaccine distribution plan, opens eligibility to all residents 65 and up (Jan. 25, 2021) https://health.maryland.gov/newsroom/Pages/Maryland-moves-into-Phase-1C-of-its-COVID-19-vaccine-distribution-plan,-opens-eligibility-to-all-residents-65-and-up.aspx), there is no indication that "high-risk incarcerated individuals" at CDF are being offered vaccinations. The Maryland COVID Vaccination Plan does not specifically define the term "high risk individuals" but includes within that category: "Persons at highest risk of developing complications from COVID (ACIP high risk conditions), including persons 65 and older, staff and residents of nursing homes (SNFs), long-term care facilities (LTCFs), assisted care facilities, and clients of senior daycare facilities *or similar*." https://phpa.health.maryland.gov/Documents/10.19.2020_Maryland_COVID-19_Vaccination_Plan_CDCwm.pdf, at 13 (emphasis added). It is clear the Plan intends to include at least a portion of the detainees at CDF within Phase 1 because it goes on to estimate the population to be vaccinated in Maryland under the Plan in Phase 1 as including approximately 54,460 "People in Prisons, Jails, Detention Centers and Staff." *Id.*

22.     This outbreak is a tragedy. It was entirely foreseeable, given the failure of Defendants to act, and it was preventable. This outbreak will recur absent intervention from this Court.

6

23.     The nation has been living with the pandemic for nearly a year. There are well-established guidelines and procedures that prevent the type of disaster that has unfolded at CDF. CDF has failed to follow those guidelines and procedures.

24.     By maintaining these conditions, the Defendants have needlessly exposed the people detained there to a highly infectious and potentially fatal disease. This violates Plaintiffs' Fifth / Fourteenth and Eighth Amendment rights. (The Fifth Amendment protects federal pretrial detainees. *See, e.g.*, *Cunningham v. Wilson*, 326 F. App'x 948, 949 (7th Cir. 2009). The Fourteenth Amendment protects state pretrial detainees. *See*, *e.g.*, *Hill v. Nicodemus*, 979 F.2d 987, 990 (4th Cir. 1992). Because the pretrial detainees in this case are detained in *federal* cases at a *state*-run facility, Plaintiffs refer to these claims as "Fifth / Fourteenth Amendment" claims throughout.)

25.     Plaintiffs seek class-wide relief requiring CDF to take the necessary steps to safeguard residents' health and safety—on behalf of all CDF residents. A subset of Plaintiffs also requests a writ of habeas corpus pursuant to 28 U.S.C. § 2241 for residents whose age or underlying medical conditions make them particularly vulnerable to severe illness and death from COVID (the "Medically Vulnerable Subclass").

## JURISDICTION AND VENUE

26.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), and 2241(a). This Court has jurisdiction over the Medically Vulnerable Subclass's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.

27.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this District.

## PARTIES

28.     Plaintiff SEDRIC CATCHINGS is detained pretrial at CDF. Mr. Catchings has not yet tested positive for COVID. Mr. Catchings has a preexisting medical condition that makes him more vulnerable to COVID, and he has been unnecessarily exposed to positive or potentially positive residents of CDF on multiple occasions. Mr. Catchings' recreation time is on a unit in which neither masks nor social distancing are encouraged, let alone enforced. It is only a matter of time before he contracts COVID, absent intervention.

29.     Plaintiff CHARLES COUSER is detained pretrial at CDF. Mr. Couser recently tested positive for COVID for the second time in the last year. Mr. Couser was transferred to the JI building down the street from CDF after he tested positive in CDF in 2021. At the JI building, Mr. Couser suffered from severe symptoms of COVID. Since being transferred back to CDF, Mr. Couser has gone without cleaning supplies, and has observed individuals continue to walk around the facility without masks.

30.     Plaintiff COLLIN DAVIS is detained pretrial at CDF. Mr. Davis has a preexisting medical condition that makes him more vulnerable to COVID. He has tested positive for COVID twice at CDF: first in September and again in January. Mr. Davis was unnecessarily exposed to positive residents in January after a negative test; he then tested positive again himself shortly after. Mr. Davis has been denied prescribed medications since testing positive again and was told to take *another resident's* medications on multiple occasions—ones to treat diabetes and hypertension, neither of which Mr. Davis suffers from. Mr. Davis' health has been put into jeopardy again and again.

31.     Plaintiff ALLEN LAMIN is detained pretrial at CDF. Mr. Lamin has a preexisting medical condition. He recently tested positive for COVID. Mr. Lamin started exhibiting symptoms

of COVID in January, prior to the facility locking down. Mr. Lamin was fatigued and couldn't get out of bed. CDF transferred Mr. Lamin to JI, where there were only intermittent checks on his vital symptoms. Mr. Lamin was then transferred back to CDF, to a unit where neither masks nor social distancing are required or enforced.

32.     Plaintiff SIRRON LITTLE is detained pretrial at CDF. Mr. Little has a preexisting medical condition that makes him more vulnerable to COVID. He has not yet tested positive for COVID. Mr. Little has a preexisting condition that makes him more vulnerable to COVID. Mr. Little has been locked in a cell with another resident for days, during which time his cellmate was suffering from obvious symptoms of COVID. His cellmate was later rushed to the hospital because of COVID symptoms—after days of being locked in a cell with Mr. Little. Mr. Little is not given cleaning supplies to sanitize his cell and must use ripped up towels to clean—towels that he uses for showering.

33.     Plaintiff TAIWO MOULTRIE is detained pretrial at CDF. Mr. Moultrie has a preexisting medical condition that makes him more vulnerable to COVID. He recently tested positive for COVID after being unnecessarily exposed to two positive residents when CDF was moving Mr. Moultrie around the facility. Mr. Moultrie has preexisting conditions that make him more vulnerable to COVID. Mr. Moultrie then tested positive himself. As of February 11, Mr. Moultrie's unit is on 23-hour per day lockdown. During the one hour when residents are out of their cells, residents intermingle and are not wearing masks.

34.     Plaintiff JOSEPH SPEED is detained at CDF pending sentencing. Mr. Speed has a preexisting medical condition that makes him more vulnerable to COVID. He recently tested positive for COVID. Mr. Speed has preexisting medical conditions that make him more vulnerable to COVID. Prior to testing positive for COVID, Mr. Speed was given two inhalers to treat his

preexisting condition. CDF transferred him to JI, but they did not bring his inhalers; instead, Mr. Speed went multiple days without them. Mr. Speed was subjected to indoor temperatures of 55 degrees or below while at JI.

35.     Plaintiff HOWARD THOMAS is detained post-conviction at CDF. Mr. Thomas has a preexisting condition for which he requires medical care. CDF has delayed or denied Mr. Thomas care. Mr. Thomas has been unnecessarily exposed to COVID on multiple occasions and was moved into a unit in which positive residents were moving around the common areas and touching the same surfaces (including phones) as Mr. Thomas. When Mr. Thomas was moved into the unit and the positive residents moved out, nobody from CDF cleaned or sanitized the positive residents' cells before new residents moved in. Mr. Thomas has also been subjected to multiple 23-hour a day lockdowns, without any explanation why these lockdowns were taking placing.

36.     Defendant CALVIN WILSON is the Warden of CDF. He is sued in his official capacity.

37.     Defendant ROBERT L. GREEN is the Secretary of DPSCS. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A.  COVID Is Highly Infectious and Dangerous

38.     Dr. Carlos Franco-Paredes and Dr. Meyer have detailed at length the ramifications of COVID on the circumstances of this case. *See generally* Expert Declaration of Carlos Franco-Paredes, M.D., M.P.H. (February 15, 2021) ("Franco-Paredes Decl."); Meyer Decl. Their opinions are grounded primarily in the guidelines of the Centers for Disease Control and Prevention for detention facilities, which were distributed at the beginning of the pandemic. *See* Ex. JJ.

39.     Dr. Franco-Paredes is an Associate Professor of Medicine at the University of Colorado and Director of the Infectious Diseases Fellowship Program there. He served as a

consultant with the World Health Organization, Geneva, Switzerland, where he participated in the development of a global action plan for the deployment of pandemic influenza vaccine. Curriculum Vitae of Carlos Franco-Paredes, M.D., M.P.H, appended to Franco-Paredes Decl.

40.     Dr. Meyer is an Associate Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing in New Haven, Connecticut. She is board-certified in Internal Medicine, Infectious Diseases and Addiction Medicine. She has worked for over a decade on infectious diseases in the context of jails and prisons and has written and published extensively on the topics of infectious diseases among people involved in the criminal justice system.  *See* Curriculum Vitae of Dr. Jaimie Meyer, appended to Meyer Decl.

41.     As set out in the attached declaration by Dr. Carlos Franco-Paredes, the novel coronavirus, SARS-CoV-2, is the causal pathogen that causes COVID-19, which is an extremely infectious and potentially deadly virus. The United States has the largest number of cases and deaths in the world, with more than 27 million cases and close to 500,000 deaths as of mid-February 2021. Franco-Paredes Decl. ¶ 7; *see also* COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU), https://coronavirus.jhu.edu/map.html (containing an interactive map with data updated daily). COVID has created a global health crisis that has led to the adoption and implementation of unprecedented mitigation strategies around the world, including the canceling of public events, closing schools and businesses, and lockdowns across the world. Franco-Paredes Decl. ¶ 7. See also Meyer Decl. ¶¶ 8-12.

42.     The catastrophic consequences of the current COVID pandemic is due to two major factors: (a) the transmissibility of the infection and (b) the severity of the disease in the human population. Franco-Paredes Decl. ¶ 8.

43.     The CDC has promulgated guidance on the individuals who are most likely to become severely ill, meaning that they require hospitalization, intensive care, use of a ventilator to help them breathe, and/or heightened risk of death. Coronavirus Disease 2019 (COVID-19), *People at Increased Risk and Other People Who Need to Take Extra Precautions*, Centers for Disease Control and Prevention, updated Jan. 4, 2021, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited Feb. 20, 2021). This higher risk group includes old adults and people with underlying medical conditions (i.e., "medically vulnerable" individuals). Franco-Paredes Decl. ¶ 9. *See* Ex. JJ; *see also* Coronavirus Disease 2019 (COVID-19), *Older Adults at Greater Risk of Requiring Hospitalizations or Dying if Diagnosed with COVID-19*, Centers for Disease Control and Prevention, updated Feb. 19, 2021, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Feb. 20, 2021); Coronavirus Disease 2019 (COVID-19), *People with Certain Medical Conditions*, updated Feb. 3, 2021, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Feb. 20, 2021).

44.     People with the following underlying medical conditions are considered at increased risk of severe illness and death should they be infected with SARS-CoV-2 (Franco-Paredes Decl. ¶ 10):

       a.  Cancer;
       b.  Chronic kidney disease;
       c.  Chronic obstructive pulmonary disease (COPD);
       d.  Immunocompromised from solid organ transplant;
       e.  Obesity (with a body mass index (BMI) of 30+);
       f.  Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies;
       g.  Sickle cell disease;
       h.  Type II diabetes mellitus.

45.     People with the following underlying medical conditions may be at an increased

risk for severe illness from COVID-19 (Franco-Paredes Decl. ¶ 11):

      a.   Asthma (moderate to severe);
      b.   Cerebrovascular disease (affecting blood vessels and blood supply to the brain);
      c.   Cystic fibrosis;
      d.   Hypertension;
      e.   Immunocompromised from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or other immune-suppressing medications;
      f.   Neurologic conditions, such as dementia;
      g.   Liver disease;
      h.   Pregnancy;
      i.   Pulmonary fibrosis (having damaged or scarred lung tissue);
      j.   Smoking;
      k.   Thalassemia;
      l.   Type I diabetes mellitus.

46.     The cumulative rate of COVID infection in the United States is 8,201 cases per

100,000 people with an overall case fatality rate of 142 per 100,000. *See* Franco-Paredes Decl. ¶

12; Coronavirus Disease 2019 (COVID-19), CDC COVID Data Tracker, *Compare Trends in*

*COVID-19 Cases and Deaths in States in the US*, Centers for Disease Control and Prevention,

https://covid.cdc.gov/covid-data-tracker/#compare-trends (as of February 12, 2021).

47.     In the United States, the COVID-associated hospitalization rate among patients

identified through the Coronavirus Disease 2019 (COVID-19)-Associated Hospitalization

Surveillance Network (COVID-NET) has been as high as 4.6 per 100,000 population.

Hospitalization rates increase with age, with a rate of 0.3 in persons aged 0-4 years, 0.1 in those

aged 5-17 years, 2.5 in those aged 18-49 years, 7.4 in those aged 50-64 years, and 13.8 in those

aged ≥ 65 years. Rates were highest among persons aged 65 years or older, ranging from 12.2 in

those aged 65-74 years to 17.2 in those aged 85 years or older. More than half (54.4%) of

hospitalizations occurred among men; COVID-19-associated hospitalization rates were higher

among males than females (5.1 versus 4.1 per 100,000 population, respectively). *See* Franco-

Paredes Decl. ¶ 13; Shikha Garg, Lindsay Kim, Michael Whitaker, et al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET*, 14 States, March 1-30, 2020. Morbidity and Mortality Weekly Report (MMWR) 2020, 69:458-464, http://dx.doi.org/10.15585/mmwr.mm6915e3.

48.     Approximately 90% of hospital admissions due to COVID have occurred among individuals with underlying medical conditions. The most commonly reported underlying medical conditions of patients with COVID-19 were hypertension (49.7%), obesity (48.3%), chronic lung disease (34.6%), diabetes mellitus (28.3%), and cardiovascular disease (27.8%). Among patients aged 18-49 years, obesity was the most prevalent underlying condition, followed by chronic lung disease (primarily asthma) and diabetes mellitus. Among patients aged 50-64 years, obesity was most prevalent, followed by hypertension and diabetes mellitus; and among those aged 65 years or older, hypertension was most prevalent, followed by cardiovascular disease and diabetes mellitus. *See* Franco-Paredes Decl. ¶ 14; Marie Killerby, Ruth Link-Gelles, Sarah Haight, et al. *Characteristics Associated with Hospitalization Among Patients with COVID-19 — Metropolitan Atlanta, Georgia, March–April 2020*, Morbidity and Mortality Weekly Report (MMWR) 2020. 69:790-794, http://dx.doi.org/10.15585/mmwr.mm6925e1.

49.     For people with risk factors, COVID can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause long-term respiratory dysfunction. There is preliminary evidence that persons with COVID, who are recovering from a severe version of the disease and who developed extensive pulmonary disease including Acute Respiratory Distress Syndrome (ARDS), may have long-term sequelae similar to other infectious pathogens evolving in a similar pattern including long-term cognitive impairment, psychological

morbidities, neuromuscular weakness, pulmonary dysfunction, and reduced quality of life. *See* Franco-Paredes Decl. ¶ 15.

50.     Dr. Meyer points out that most people (80%) who become infected with COVID-19 will develop a mild upper respiratory infection, but serious illness occurs in up to 16% of cases, including death. *See* Meyer Decl. ¶ 9.

51.     Dr. Franco-Paredes points out that, similar to influenza infection, acute lung injury and ARDS are most likely caused by the respiratory epithelial membrane dysfunction leading to ARDS. The resultant tissue hypoxia is responsible and potential concomitant bacterial sepsis contribute to multi-organ dysfunction and death. If a patient with COVID-19 develops myocarditis, cardiogenic shock caused by fulminant myocarditis may also contribute to the overall occurrence of multiple organ failure. *See* Franco-Paredes Decl. ¶ 17. Death in COVID-19 infection is usually due to pneumonia and sepsis. *See id.* ¶ 9.

52.     The care of people who are infected with COVID-19 depends on how seriously they are ill. *See* Meyer Decl. ¶ 10; *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, Centers for Disease Control and Prevention (updated Feb. 16, 2021),      https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html. People with mild symptoms may not require hospitalization but may continue to be closely monitored at home. People with moderate symptoms may require hospitalization for supportive care, including intravenous fluids and supplemental oxygen. People with severe symptoms may require ventilation and intravenous antibiotics. While over 420 clinical trials of treatments for COVID-19 have been conducted and reviewed by the FDA, just 8 have received emergency use authorization approval and a single treatment (remdesivir) has received regular FDA approval. *See* Meyer Decl. ¶ 10; *Coronavirus Treatment Acceleration Program (CTAP)*, U.S.

Food & Drug Administration (updated Jan. 31, 2021), https://www.fda.gov/drugs/coronavirus-covid-19-drugs/coronavirus-treatment-acceleration-program-ctap#dashboard (last visited Feb. 20, 2021). Only a single medication (bamlinivimab) is an option for people prior to hospitalization and this is given as an intravenous infusion. This means that, nearly one year into the global pandemic, we still have relatively few treatment options available for people who become seriously ill. *See* Meyer Decl. ¶ 10.

53.     The rapid development of highly effective vaccines against SARS-CoV-2 promises an end to the pandemic. To date, two mRNA vaccines (by Pfizer, BioNTech, and Moderna) have received FDA approval. *See* Meyer Decl. ¶ 11; Carl Zimmer, *Covid-19 Vaccine Tracker Updates: The Latest*, The New York Times, https://www.nytimes.com/interactive/2020/science/coronavirus-vaccine-tracker.html (containing interactive map with data updated daily (last visited Feb. 20, 2021).

54.     Until vaccination of the majority is achieved, required COVID-19 prevention strategies include containment and mitigation. Containment includes intensive hand hygiene practices, decontamination and cleaning of surfaces, identifying and isolating people who are ill and quarantining people who have had contact with people who are ill, and the use of personal protective equipment. Meyer Decl. ¶ 12.

55.     As described below, jails and prisons are often under-resourced to meet the demand for these strategies. As COVID-19 spreads in the community, public health demands mitigation strategies, which involves social distancing to protect those most vulnerable to disease. Jails and prisons, especially when conditions are crowded, are often unable to adequately provide social distancing or meet mitigation recommendations. Meyer Decl. ¶ 12.

**B.  Jails and Prisons Are Exceedingly Vulnerable to COVID Spread**

56.   The current outbreaks of the novel coronavirus SARS-CoV-2 inside of correctional facilities across the United States highlight the ease of transmission of COVID-19 inside these facilities. *See* Franco-Paredes Decl. ¶ 20.

57.   Detention and incarceration of any kind requires large groups of people to be confined together in a tight space. To contain the spread of the disease in such a setting, infection prevention protocols must be meticulously followed. *See* Franco-Paredes Decl. ¶ 21.

58.   The number of private rooms in a typical jail or prison facility is insufficient to comply with the recommended airborne/droplet isolation guidelines. These infection prevention protocols include "social distancing" measures, where individuals maintain a distance of at least six feet from each other, mask wearing, and frequent hand-washing and other good hygiene practices. These protocols apply to both incarcerated and non-incarcerated individuals. In the carceral setting, these protocols would require, for example, that individuals sleep one person per cell, rather than in shared cells. These measures are necessary to prevent spread of COVID-19 among otherwise healthy people and are imperative for high-risk individuals. *See* Franco-Paredes Decl. ¶ 22.

59.   Another consideration complicated by the carceral setting is the ability of the novel coronavirus to survive for extended periods of time on materials that are highly prevalent in prisons, such as metals and other non-porous surfaces. Current outbreak protocols require frequent disinfection and decontamination of all surfaces of the facility, which is exceedingly difficult given the large number of incarcerated individuals, frequent interactions between incarcerated persons and staff, and regularity with which staff move in and out of the facility. *See* Franco-Paredes Decl. ¶ 23.

60.     Responding to COVID-19 outbreaks in correctional facilities calls for highly trained staff to correctly and quickly institute and enforce isolation and quarantine procedures, and requires training on the appropriate utilization of personal protective equipment. It is essential that nursing and medical staff be trained in infection control prevention practices, implementing triage protocols, and the medical management of suspected, probable, and confirmed cases of coronavirus infection. This same personnel has to be prepared to initiate the management of patients with severe COVID-19 disease. *See* Franco-Paredes Decl. ¶ 24.

61.     According to the COVID-19 Prison Project, there are 383,183 cases of COVID-19 in jails and prisons with 2,311 deaths. Staff in correctional facilities also has been significantly affected including 92,281 cases and 144 deaths. *See* Franco-Paredes Decl. ¶ 13; *National COVID-19 Statistics*, The COVID Prison Project, https://covidprisonproject.com/data/national-overview/ https://covidprisonproject.com/data/national-overview/ (as of February 11, 2021). The risk posed by infectious diseases in jails and prisons is significantly higher than in the community, in terms of risk of transmission, exposure, and harm to individuals who become infected. To date, more than 612,000 people who are incarcerated have been infected with COVID-19 and at least 2,700 people who reside and work inside facilities have died. *See* Meyer Decl. ¶ 13; Zimmer, *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times, *supra*. Prisons and jails represent some of the largest clusters of cases in the U.S.

62.     Prisons and jails are not isolated from communities. Staff, visitors, contractors, and vendors pass between communities and facilities and can bring infectious diseases into facilities. Moreover, rapid turnover of jail and prison populations means that people often cycle between facilities and communities. People often need to be transported to and from facilities to attend court and move between facilities. *See* Meyer Decl. ¶ 14.

63.     Congregate settings such as jails and prisons enable rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share bathrooms, showers, and other common areas, the opportunities for transmission are even greater. When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community. For many in jail or prison, social distancing is a physical impossibility. Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and contracting infectious diseases. *See* Meyer Decl. ¶ 15.

64.     During an infectious disease outbreak, people can protect themselves by washing hands. Jails and prisons do not provide adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing (for at least 20 seconds) or use of alcohol-based sanitizers when handwashing is unavailable. Jails and prisons are often under-resourced and ill-equipped with sufficient hand soap and alcohol-based sanitizers for people detained in and working in these settings. High-touch surfaces (doorknobs, light switches, etc.) should also be cleaned and disinfected regularly with bleach to prevent virus spread, but this often is not done in jails and prisons because of a lack of cleaning supplies and lack of people available and trained to perform necessary cleaning procedures. *See* Meyer Decl. ¶ 16.

65.     Jails and prisons are often poorly equipped to diagnose and manage infectious disease outbreaks. Some jails and prisons lack onsite medical facilities or 24-hour medical care. The medical facilities at jails and prisons are almost never sufficiently equipped to handle large

outbreaks of infectious diseases because of space limitations. During an infectious disease outbreak, a containment strategy requires people who are ill with symptoms to be isolated and that caregivers have access to personal protective equipment, including gloves, masks, gowns, and eye protection (face shields or goggles). Jails and prisons are often under-resourced and ill-equipped to provide sufficient personal protective equipment for people who are incarcerated and caregiving staff, increasing the risk for everyone in the facility of a widespread outbreak. Resources will become exhausted rapidly and any beds available will soon be at capacity. This makes both containing the illness and caring for those who have become infected much more difficult. *See* Meyer Decl. ¶ 17.

66.     People incarcerated in jails and prisons are more susceptible to acquiring and experiencing complications from infectious diseases than the population in the community. *See* Meyer Decl. ¶ 19; *Active case finding for communicable diseases in prisons*, The Lancet , Vol. 391; 2186 (June 2, 2018), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(18)31251-0/fulltext. This is because people in jails and prisons are more likely than people in the community to have chronic underlying health conditions, including diabetes, heart disease, chronic lung disease, chronic liver disease, and lower immune systems from HIV that put them at risk of severe infection and death. *See* Meyer Decl. ¶ 19.

67.     Jails and prisons lack access to vital community resources to diagnose and manage infectious diseases. Jails and prisons do not have access to community health resources that can be crucial in identifying and managing widespread outbreaks of infectious diseases. This includes access to testing equipment, laboratories, and medications. *See* Meyer Decl. ¶ 20.

68.     Jails and prisons often need to rely on outside facilities (hospitals, emergency departments) to provide intensive medical care given that the level of care they can provide in the

facility itself is typically relatively limited. During an epidemic, this will not be possible, as those outside facilities will likely be at or over capacity themselves. *See* Meyer Decl. ¶ 21.

69.     As an outbreak spreads through jails, prisons, and communities, medical personnel become sick and do not show up to work. Absenteeism poses substantial safety and security risk to both the people inside the facilities and the public. Absenteeism also means that facilities can become dangerously understaffed with healthcare providers. This increases a number of risks and can dramatically reduce the level of care provided. As health systems inside facilities are taxed, people with chronic underlying physical and mental health conditions and serious medical needs may not be able to receive the routine care they need for these conditions. As supply chains become disrupted during a global pandemic, the availability of medicines and food may be limited. *See* Meyer Decl. ¶ 22.

70.     Prisons were designed to contain people, not diseases. When even the most sophisticated hospital systems in this country have been overwhelmed by the COVID-19 pandemic, it will be impossible for prison health systems to contain it. This is especially true when emergency preparedness plans are underdeveloped. These risks have all borne out during the current pandemic of COVID-19. *See* Meyer Decl. ¶ 23.

### C.  Lockdowns are an Inappropriate Response to COVID

71.     Dr. Meyer and Dr. Craig Haney have detailed at length how and why lockdowns and solitary confinement may harm, not protect, residents. *See generally* Meyer Decl.; Expert Declaration of Craig Haney, Ph.D. (February 18, 2021) ("Haney Decl.").

72.     Dr. Haney is Distinguished Professor of Psychology and UC Presidential Chair at the University of California, Santa Cruz, located in Santa Cruz, California, where he engages in research applying social psychological principles to legal settings including the assessment of the psychological effects of living and working in institutional environments, especially the

psychological effects of incarceration. He has a Ph.D. in psychology and a J.D. degree, both awarded by Stanford University. He was a co-founder and co-director of the UC Criminal Justice & Health Consortium—a collaborative effort of researchers, experts and advocates from across the University of California system working to bring evidence-based health and healthcare solutions to criminal justice reform in California and nationwide. *See* Curriculum Vitae of Dr. Craig Haney, appended to Haney Decl.

73.     Disciplinary segregation or solitary confinement is not an appropriate disease containment strategy. Beyond the known detrimental mental health effects of solitary confinement, isolation of people who are ill in solitary confinement results in decreased medical attention and increased risk of death. In addition, if solitary confinement is a carceral facility's response to COVID-19, people who are ill will be deterred from reporting their symptoms, resulting in their increased risk of severe disease and death and ongoing spread to others. *See* Meyer Decl. ¶ 18.

74.     As Dr. Haney explains, "[p]rocedures that impose extended periods of isolation or restrict hygiene options (such as showers) are inappropriate, ill-conceived, and counter-productive for several reasons. In fact, they could very likely exacerbate rather than limit or alleviate the spread of COVID-19. For one, housing units essentially turn into onerous lockdown units, which greatly increase the psychological stress under which prisoners live, potentially leading to mental and physical deterioration, interpersonal conflicts, and self-harm and suicidality. The fact that prisoners may be double-celled during these lockdowns does not mitigate the negative effects of their essentially around-the-clock in-cell confinement. In fact, double-celling may exacerbate these effects because of the interpersonal tensions and stressors that such unavoidably close around-the-clock contact generates." Haney Decl. ¶ 18.

75.     Lockdown units are often used in ways that are essentially identical to the solitary confinement-type housing that has been shown to place prisoners at significant risk of grave harm (including damage that is permanent, even fatal). Thus, there is a substantial literature on the adverse psychological and physical effects of this kind of isolation. This literature establishes a range of damaging consequences that come about when prisoners and others are subjected to the kinds of conditions that now prevail throughout this facility. *See* Haney Decl. ¶ 19.

76.     Although the adverse effects of isolated confinement are widespread, and jeopardize the physical and psychological well-being of everyone exposed to them, this is especially true for prisoners with pre-existing mental health conditions. They are particularly likely to decompensate, suffer worsening depression, and even engage in self-harming and suicidal behavior in response to social isolation. *See* Haney Decl. ¶ 21.

77.     According to Dr. Haney, "[f]or these reasons, psychologically vulnerable prisoners should be excluded from all forms of prison isolation (i.e., lockdowns and solitary confinement). This is particularly true for prisoners with serious mental illness, including major affective disorders (like bipolar disorders and major depressive disorder), schizophrenia, and other psychotic disorders. If they cannot be, then they must be given access to enhanced psychological services. Yet, based on his many years of studying correctional systems and practices across the country, ameliorative measures such as increased treatment and out of cell time are often among the first things that are suspended as the prison system diverts staff to address emergencies (such as the pandemic)." Haney Decl. ¶ 22

78.     According to Dr. Haney, "[i]nstead of preemptive lockdowns, jails and prisons should institute such lockdowns only where medically necessary to resolve discrete issues, such as sanitizing dorms or contact tracing of an infected prisoner. If such lockdowns are employed, for

these limited purposes, they should be reasonably time-limited. Staff also should communicate that time-limit to the prisoners who are affected. Moreover, in extreme cases in which lockdowns are employed, the jail or prison should ensure that inmates are given enhanced access to resources to protect their mental health, such as reading material and adequate access to phones. In addition, the jail or prison staff should regularly communicate with and monitor the physical and mental health of prisoners who are on lockdown." Haney Decl. ¶ 26.

### D. Defendants Have Been Given Multiple Warnings of the Dangers of Not Responding Swiftly and Appropriately

79.     The experiences of jails and prisons across the country have put Defendants on notice of the dangers of COVID in detention facilities.

80.     These experiences have also put Defendants on notice of the efficacy of vaccinating residents of detention facilities, particularly vulnerable residents.

81.     These Defendants also have actual knowledge from the multiple letters sent to them about the dangers of COVID and the necessary steps required to mitigate the risk of COVID.

82.     On March 19, 2020, a group of physicians and public health experts sent to local corrections departments in Maryland a letter outlining the risks of COVID in detention facilities and methods to mitigate this risk. *See* Ex. AA; also available at https://www.aclu-md.org/sites/default/files/field_documents/200319_-_public_health_experts_maryland_covid_jails_sign_on_letter.pdf.

83.     On March 25, 2020, faculty members from John Hopkins sent a letter to Governor Hogan (with a carbon copy to Defendant Green) highlighting the risks of COVID in detention facilities, warning against solitary confinement, urging the development of plans for prevention and management, ensuring the supply of soap and hand sanitizer, and procedures to limit the spread of COVID. *See* Ex. BB; also available at https://www.jhsph.edu/research/centers-and-

institutes/center-for-public-health-and-human-

rights/_pdf/Faculty%20Letter%20COVID%2019.pdf

84.     On May 6, 2020, the ACLU of Maryland sent to Governor Hogan and Defendant

Green a letter emphasizing the risk of COVID in detention facilities, outlining necessary testing

procedures to prevent an outbreak from spreading. *See* Ex. CC; also available at https://www.aclu-

md.org/sites/default/files/letter_to_gov_and_doc_secretary_re_testing_050620.pdf

85.     On February 2, 2021, the Lawyers' Committee for Civil Rights Under Law sent to

Defendants Wilson and Green a letter outlining the current problems at CDF after the current

outbreak, along with a concrete set of requests that CDF immediately implement. *See* Ex. DD; also

available   at   https://lawyerscommittee.org/wp-content/uploads/2021/02/210202-CDF-COVID-

LCCR-letter.pdf. The letter also noted that 22 clients of the Federal Public Defender for the District

of Maryland appeared to be eligible for vaccination. The letter requested a response from

Defendants. Neither Defendant responded.

86.     Warden Wilson personally walks around the facility and has witnessed residents

being moved and potentially intermixed with other cohorts. Resident Declaration J (February 8,

2021 Declaration of Sedric Catchings) ("Res. Decl. J") ¶ 12 ("On Tuesday, February 2, they came

to pack up the negative people to send back to the E unit, where I started quarantine when I got to

CDF. The people who were negative were moved. The warden was there when they were moving

us. I asked to use the phone to talk to my lawyer to talk about the situation. He told me no.").

87.     The CDC guidelines for detention facilities have also put Defendants on notice of

the deficiencies at CDF.

88.     Multiple residents have raised CDF's abject failures with staff and have been

ignored. A woman who was a new admission to CDF, for example, was placed in a unit with

*positive* male residents who were symptomatic. Two symptomatic male residents were on each side of her cell. When she objected to her being placed in the unit and questioned why it made sense for an apparently negative woman to be placed with positive, symptomatic men, CDF told her "not to worry." Resident Declaration M (February 18, 2021 Declaration of Juliet Cervellon) ("Res. Decl. M") ¶ 19.

89.      The resident was right to worry. CDF did not listen and in fact exposed *another* woman, newly arrested, to a unit full of COVID-positive men about a month later. Resident Declaration H (February 13, 2021 Declaration of Collin Davis) ("Res. Decl. H") ¶¶ 20, 22, 28 ("On February 9, they came back and told me I was positive. . . They moved me to a unit they called the 'cadre.' . . . CDF moved a new person into the cadre last night, on February 12. She's brand new to the facility. I know she's brand new because I spoke to her.")

### E. DPSCS and CDF Have Wildly Mishandled the COVID Pandemic and Thereby Caused a COVID Disaster Within the Facility

90.      The first case of COVID at the Chesapeake Detention Center ("CDF") was reported in the spring of 2020.

91.      Across all DPSCS facilities, over 50,000 residents are currently positive. COVID-19, Maryland Department of Health, available at https://news.maryland.gov/dpscs/covid-19/.

#### a. CDF's Failure to Plan for Introduction of Virus to the Facility

92.      As explained by Dr. Meyer, CDC guidelines recommend that facilities plan for different outbreak scenarios and instruct facilities to "consider how the facility's housing operations could be modified for multiple test result scenarios (e.g., if testing reveals that 10%, 30%, 50% or more of incarcerated or detained persons test positive for SARS-CoV-2)." Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities, CDC, available at      https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html.

26

These different scenarios enable rapid responses to contain and control COVID and to cohort individuals with different infection statuses appropriately. *See* Meyer Decl. ¶ 27.

93.    Although the pandemic has been ongoing since March 2020, and in spite of clear evidence that the risk posed by infectious diseases in jails and prisons is significantly higher than in the community, CDF has utterly failed to create a comprehensive approach—with plans for difference scenarios—to handle an increase in positive cases among the resident population. *See* Meyer Decl. ¶¶ 13, 25, 27.

94.    As explained by Dr. Meyer, this lack of planning is evident in CDF's rapidly changing response to the crisis from one day to the next. *See* Meyer Decl. ¶ 27(m); Ex. HH (Government's Response to Judicial Order, *United States v. Moore*, Case No. 1:20-cr-00430-RDB (D. Md. Feb. 1, 2021)).

95.    For instance, CDF had to abandon its plan to use one off-site facility (the "Health Monitoring Facility") for COVID-positive residents when bed space quickly ran out. This failure to create a comprehensive approach is in clear contravention of public health and scientific guidance for the appropriate management of a pandemic in a detention facility.

96.    This lack of planning has also resulted in intermixing between different groups of residents. As described by Dr. Meyer, and as recounted by multiple residents, COVID-negative residents have been forced into living quarters with COVID-positive residents. Meyer Decl. ¶ 27. COVID-negative residents have had to move into COVID-positive residents' cells moments after the COVID-positive resident departed, without any ability to clean or sanitize the clean. *E.g.*, Resident Declaration E (February 11, 2021 Supplemental Declaration of Taiwo Moultrie) ("Res. Decl. E") ¶¶ 9, 11 ("One of those two guys said, 'Be careful, I have COVID.' I asked what cell he was in. He said he was from cell 32. . . . They put me into cell 32 right after those two guys left.

Nobody cleaned it out before they put me in the cell. Nobody cleaned it or sprayed it or anything. I couldn't believe they were trying to put me in this cell.").

97.     CDF's complete lack of planning is also evident in the practices the facility engaged in during 2020, all of which have continued until today.

### b. Mismanagement in 2020

98.     In 2020, CDF housed COVID-positive residents in cells alongside COVID-negative residents in the intake unit. Resident Declaration D (August 14, 2020 Declaration of Taiwo Moultrie) ("Res. Decl. D") ¶¶ 3-6, 12.

99.     Upon removal of the COVID-positive residents, CDF not only failed to quarantine or test the residents who had been exposed to the virus; for several days, the facility did not even bother to take the temperatures of residents who were exposed. Res. Decl. D ¶ 8.

100.     Indeed, exposed intake residents were permitted to join regular recreation time without regard to the fact that they had been exposed to the deadly and highly contagious virus. Res. Decl. D ¶¶ 9-10, 18.

101.     Likewise, intake residents who were exposed to COVID-positive residents were transferred back into the general population less than 14 days after being exposed to the virus. Res. Decl. D ¶ 10.

102.     In 2020, two CDF residents in a unit within the facility who experienced symptoms were tested for COVID. After these individuals tested positive, they were permitted to use the shared telephones, during normal recreation time, *while* non-symptomatic residents who had not been tested for COVID were out of their cells, *before* being removed from the unit. CDF failed to clean or sanitize the telephones or other surfaces these COVID-positive residents touched *after* receiving positive test results. Res. Decl. D ¶¶ 15-16, 19.

103. Residents left in this unit—who were exposed to these two COVID-positive residents—were not given COVID tests, even when they requested them. Res. Decl. D ¶¶ 20-21.

104. Staff at CDF never tried to find out if residents on the unit who were exposed to these two COVID-positive residents were experiencing symptoms, nor did staff take temperatures of the exposed residents or engage in any attempt at contact tracing. *Id.*

105. CDF staff likewise failed to provide soap to exposed residents, even when residents requested soap. Res. Decl. D ¶¶ 25-27.

106. CDF's refusal to put into place protocols that were followed throughout the facility laid the groundwork for the disaster that overtook CDF in early 2021.

### c. Moving into 2021: Intermixing Among Cohorts and Other Individuals

107. One of CDF's biggest failings since this outbreak began is in its complete inability or unwillingness to separate residents into different groups and to reduce the risk of spreading COVID. This process is called "cohorting."

108. As described by Dr. Meyer (Meyer Decl. ¶ 27(l)), effective cohorting involves separating people into four homogenous groups based on their known disease status:

1) *Intake quarantine*: People entering the facility from the community or other facilities and without COVID symptoms comprise one cohort that needs to be actively monitored for symptoms (and ideally tested) for 14 days prior to joining the general population.

2) *Medical isolation*: People with confirmed COVID infection comprise a second cohort that needs to be medically isolated to receive medical attention.

3) *Post-exposure quarantine*: People at-risk for COVID disease because of a known exposure must be separately quarantined and actively monitored for symptoms (and ideally tested and re-tested) following exposure.

4) *General population* includes people not in quarantine for any reason or isolation, confirmed to be COVID-negative and/or has not had known recent exposure.

109.    But from 2020 and continuing to the present, CDF has—in direct contravention of best practices and scientific guidance—facilitated and encouraged the intermixing of cohorts.

110.    For instance, one *new intake* joined the unit under *post-exposure* quarantine. *See* Res. Decl. D ¶¶ 15-19.

111.    Residents who have not tested positive have been forced into the uncleaned cells of residents who tested positive and have even crossed paths with those positive residents in the hallway when moving cells. Resident Declaration C (February 12, 2021 Supplemental Declaration of Joseph Speed) ("Res. Decl. C") ¶ 11.

112.    One resident was forced to remain locked in his cell with his symptomatic cellmate, who "had basically every symptom of COVID." His cellmate reported his symptoms to CDF, but CDF kept the two residents in the same cell. CDF indeed never took action to remove the symptomatic cellmate. Instead, CDF waited until things got so bad that the cellmate was eventually taken out of the unit and taken to the hospital. Resident Declaration L (February 17, 2021 Declaration of Sirron Little) ("Res. Decl. L") ¶¶ 12-14, 17-18 ("A few days before January 16, 2021, my cellmate had symptoms. He started off with a sore throat. As the days went on, it got worse. He got a real bad cough and fever. He lost his appetite. He had basically every symptom of COVID. He told the guards that he had symptoms a few days before January 16. . . . I thought they would isolate him from me, but we both were kept in the same cell. . . . I was sleeping with my mask on. I tried to clean my cell. But I couldn't really sanitize it. . . .He finally left January 17. He had a real bad fever. They had to take him to the hospital because of the fever. He's still in the hospital, I think.").

113.    As another example, one resident was left in a cell with his cellmate for two full days *after* the cellmate had tested positive. This resident was then moved to another unit in the

30

facility, where he crossed paths with *another* resident who warned he had *also* tested positive for COVID. The resident was placed in the cell previously occupied by that positive individual. The cell was not cleaned, nor was the resident given any materials to clean the cell himself. Res. Decl. E ¶¶ 4-8.

114.    Another resident with a preexisting medical condition found himself sharing a cell with a cellmate who was experiencing COVID symptoms on February 1. Again, it took two full days to move that non-symptomatic resident with a preexisting medical condition: around February 3, the resident was moved to a different unit. When this resident arrived in his new unit, there were two COVID-positive individuals moving freely around the common areas—spending time in the common areas prior to leaving for their new unit. Once again, the COVID-positive individuals' cell was not cleaned before the non-positive resident was moved in. This resident— who had been exposed to multiple COVID-positive residents at this point—was not tested for COVID until February 13. He had not received the results of his test as of the time of this filing. Resident Declaration G (February 16, 2021 Declaration of Antonio Johnson) ("Res. Decl. G") ¶¶ 13-16, 24.

115.    The problem recurs again and again. Around February 6, CDF tested residents in a different unit of CDF. Results came back on February 9, with two individuals testing positive. Despite their positive results, CDF did not move those two positive residents immediately. Instead, they were permitted to wander the common areas of the cramped unit and were not removed until the following day, February 10. Other residents—who were exposed to the two COVID-positive individuals—were not asked whether they were experiencing symptoms. Instead, the unit was locked down on February 10. Resident Declaration K (February 18, 2021 Supplemental Declaration of Sedric Catchings) ("Res. Decl. K") ¶¶ 2-6.

31

116.     Another resident—who has a preexisting condition and had already tested positive for COVID one time while housed at the facility, in or around August 2020—was also tested on February 6. This resident left his cell with his cellmate to be tested. Two days later, he visited the medical area of the facility, before receiving his test results, to seek treatment for an unrelated wound to his finger. On February 9, the resident learned he had tested positive for a second time. That day, officers locked the positive resident in his cell and tried to *force* his cellmate, who had tested *negative*, to return to the same cell with him. Later that day, when a new officer shift started, the positive resident was released from his cell for recreation time. Officers on this shift did not know he had tested positive until other officers arrived later that night to move him to the "cadre," an area of CDF that has been prone to intermixing itself, as explained below. Moreover, the positive resident was never instructed to stay away from non-positive residents, who were released for recreation time while he was out of his cell. Resident Declaration H (February 13, 2021 Declaration of Collin Davis) ("Res. Decl. H") ¶¶ 4, 19-29.

117.     Staff reports corroborate resident reports. According to a corrections officer, "It was mass movement [February 3]. People were just walking around regularly." Ex. EE (Outbreak of COVID-19 at Baltimore federal jail prompts lockdown even as feds prepare to resume grand jury proceedings, Baltimore Sun, Feb. 3, 2020); also available at https://www.baltimoresun.com/news/crime/bs-md-ci-cr-federal-prison-coronavirus-20210203-trvhsshvtzgdvhj52l7dc5yn2a-story.html.

118.     CDF also failed to separate potentially positive staff from the rest of the facility. That same corrections officer indicated that although CDF knew he was exposed to COVID, management did not tell him about his exposure until forcing him to work a double shift. *Id.*

119.    The more recent failures at CDF are also the most striking. On February 12, 2021, CDF moved a female resident to the "cadre," which housed only males at the time. The woman was brand new to the facility, and at least one resident in the "cadre" had tested positive for COVID. Res. Decl. H ¶ 28. Beyond her potential risk of exposure to COVID, her placement in a male unit is inappropriate for health and safety in a jail. Meyer Decl. ¶ 27(l).

120.    This failure—placing a new admit around COVID-positive individuals—is not an isolated incident. CDF did the same exact thing in early 2021, placing a new admission, a woman, into the "cadre." A few days later, CDF moved multiple positive *male* residents into the unit. These positive residents were clearly symptomatic, with one "coughing a lot." Resident Declaration M (February 18, 2021 Declaration of Juliet Cervellon) ("Res. Decl. M") ¶¶ 6-7.

121.    As this woman recounted: "I asked the guards why a male was in my unit. That didn't make sense to me. That made me feel anxious and very uncomfortable . . . . The guards said there was nothing they could do. I told them I could hear that he was sick. They told me not to worry. I could hear him talking to his family members and saying that the reason he was in the 'cadre' was because he was having symptoms of COVID and that he had to be in that unit for 14 days. His cell was right next to mine—there was just a wall in between us." Res. Decl. M ¶¶ 4, 18-20.

122.    But CDF did nothing in respond to the female resident's pleas for human decency. It doesn't take a medical expert to know that CDF was putting her life at risk. But CDF turned the other cheek and repeated its approach of placing a new admit among COVID-positive men about one month later. Res. Decl. H ¶ 28. *See also United States v. Hodges*, 8:20−cr−00148−PX−1 (D. Md. Feb. 17, 2021) (hearing clarifying that Ms. Hodges was the woman moved into the "cadre" in mid-February).

33

123. The impacts of this intermixing—as well as CDF's denials that it was making these types of errors—is described in further detail below.

124. It should as no surprise that CDF has failed to meaningfully separate cohorts from one another. By its own admission, CDF struggles to track and record the movement of various residents around the facility. CDF's "'Dash Board' record[,] which contains daily statistical information for the facility[,] . . . has been historically unreliable . . . ." *See* Ex. KK (E-mail from Sean Wolcoff of the U.S. Marshals Service dated February 18, 2021, entitled "Today's DPSCS Meeting Notes").

125. In sum, cohorting is not being done effectively and poses the risk of ongoing exposure within the facility. Meyer Decl. ¶ 27(l).

### d. Failure to Contact Trace

126. CDF has also failed to meaningfully contact trace, often neglecting to ask residents exposed to positive residents whether they experienced any symptoms—let alone quarantine them from other residents. Meyer Decl. ¶ 29(d); *see also*, *e.g.*, Res. Decl. D ¶ 5 ("CDF did not make me quarantine or isolate after that man was removed from the unit. Nobody checked my temperature, or asked me if I had any symptoms.").

### e. Cleaning Deficiencies

127. According to Dr. Meyer, until vaccination of the majority is achieved, required COVID prevention strategies must include containment procedures. Meyer Decl. ¶ 12

128. Containment procedures include intensive hand hygiene practices and decontamination and cleaning of surfaces. Meyer Decl. ¶ 12. Indeed, current outbreak protocols require frequent disinfection and decontamination of all surfaces of the facility, since the COVID virus survives for extended periods of time on materials that are highly prevalent in prisons, such as metals and other non-porous surfaces. Franco-Paredes Decl. ¶ 23.

129.    According to the CDC, infection prevention for COVID therefore requires no-cost access to soap and water for handwashing, along with frequent cleaning and disinfecting of high-touch surfaces with products containing bleach or at least 60% isopropyl alcohol. Meyer Decl. ¶ 32.

130.    CDF has failed in employing effective containment policies.

131.    The facility has failed to provide essential personal hygiene products to residents, and has even restricted residents' access to running water for handwashing. Resident Declaration B (February 8, 2021 Declaration of Joseph Speed) ("Res. Decl. B") ¶ 33; Res. Decl. D; Resident Declaration F (February 17, 2021 Declaration of Allen Lamin) ("Res. Decl. F") ¶ 13. One resident recounts that even when she wanted to wash her hands, she had no ability to do so: "From January 12 to February 2, I did not have running water in my cell. I couldn't wash my hands in the cell. I told the guards. They didn't do anything." Res. Decl. M ¶ 35.

132.    CDF has been so abysmal in its provision of cleaning supplies that staff report that even they have to bring in their own cleaning supplies. Ex. EE.

133.    The facility has likewise failed to consistently provide soap to residents free of charge or on a regular basis. Res. Decl. B ¶ 43; Res. Decl. D ¶¶ 25-27; Res. Decl. F ¶ 26; Res. Decl. K ¶ 7. CDF has not provided hand sanitizer in place of soap, either. Res. Decl. D ¶ 33; Res. Decl. F ¶ 14; Res. Decl. H ¶ 14; Resident Declaration I (February 12, 2021 Declaration of Devin Dorsey) ("Res. Decl. I") ¶ 23; Res. Decl. J ¶ 21.

134.    Similarly, the facility has not only failed to clean cells after positive residents are relocated, CDF staff have outright denied residents—forced to move into those contaminated cells—access to cleaning supplies so that the residents can try to disinfect the space on their own. Res. Decl. C ¶ 11.

135.    Indeed, some residents who request cleaning supplies are either ignored or told no supplies are available. Resident Declaration A (February 18, 2021 Declaration of Charles Couser) ("Res. Decl. A"), ¶¶ 23-23; Res. Decl. B ¶ 36; Res. Decl. C ¶ 11.

136.    Likewise, surfaces in common areas are not cleaned between recreation shifts. Res. Decl. A ¶ 21; Res. Decl. B ¶ 34; Res. Decl. H ¶ 12. As described above, each unit houses up to 24 residents. CDF's approach to recreation during the pandemic—whereby half of a unit is permitted out of the cells for recreation for one shift, and the other half is permitted out for recreation in a second, separate shift, Res. Decl. D ¶ 28-29; Res. Decl. F ¶ 12; Res. Decl. H ¶ 12; Res. Decl. J ¶ 19—accomplishes virtually nothing in the way of disease prevention.

137.    It is difficult for residents to stay more than six feet apart during recreation time because the common areas are so small. Res. Decl. F ¶ 12; Res. Decl. H ¶ 13; Res. Decl. J; 25. CDF has also made no effort to clean the shared surfaces, like tables, microwaves, and telephones, between uses by separate groups of residents, Res. Decl. B ¶ 34.

138.    In the nightmarish environment of the "cadre"—where CDF mixes newly admitted female residents with COVID-positive, symptomatic male residents—CDF does nothing to clean down common areas after confirmed positive residents mill about and touch surfaces. Res. Decl. M ¶¶ 18-19, 22, 24-26, 28 ("On January 8, a male detainee came into the 'cadre' unit. He was coughing a lot. . . . The guards said there was nothing they could do. . . . Every time the guy used the phone, he didn't wipe down the phone. . . . After those four days, another guy came into the 'cadre.' This other guy was put on the other side of me. So I had a male detainee on both sides of me. This new guy was sick too. I could hear him coughing too. Then they put another guy on G6, two cells away. They then put another guy on G5, three cells away. These other two guys had symptoms too. . . . CDF staff never cleaned or sanitized any of the common areas on the 'cadre.'").

36

**f.   Failure to Provide Masks or Enforce Social Distancing**

139.    In community settings, the average infected person passes the virus on to 2-3 other people; and transmission—which can happen via respiratory droplets—occurs over a distance of 3-6 feet. In congregate settings, such as prisons and jails, the average infected person can transmit the virus to 7-8 others. Newer variants are rapidly emerging globally and throughout the US that are even more contagious. Meyer Decl. ¶ 8.

140.    When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing. Meyer Decl. ¶ 15.

141.    Social distancing, which has been a hallmark of the U.S.'s COVID mitigation efforts, requires heightened diligence in the carceral setting. Absent intentional intervention, incarcerated people share close living quarters and bunk beds, dining halls, bathrooms, showers, telephones, libraries, and other common areas, each presenting dangerous opportunities for transmission. Spaces within correctional facilities are poorly ventilated, further promoting the spread of the disease. Franco-Paredes Decl. ¶ 33.

142.    Thus, according to public health experts, the COVID pandemic requires *proactive* social distancing measures in correctional facilities to reduce the risk of transmission and death due to COVID within facilities. Franco-Paredes Decl. ¶ 43.

143.    CDF has not only failed to proactively adopt social distancing; the facility has neither required nor enforced any degree of social distancing among residents.

144.    Indeed, putting two people into most cells at CDF means that residents are physically unable to maintain six feet of distance from one another while inside their cells. According to one resident, he and his cell mate sleep approximately two feet apart from each other. Res. Decl. D ¶ 13; *see also* Res. Decl. B ¶ 14 ("JI has a dorm layout. There are 40 or so total beds. Each bed is about two feet from the next."); Res. Decl. J ¶ 26 ("I also have a cellmate. I can't stay

six feet away from him in the cell."). The residents in the cells next door are between two and four feet from this resident, such that "[w]hen the person in the next cell coughs, it's like he's coughing right next to" the resident. Res. Decl. D ¶ 12. Moreover, there is no apparent ventilation circulating clean air to the cells, such that all of these closely clustered residents are breathing "the same air." *Id.* In this setting, social distancing is impossible.

145.    When residents are allowed out of their cells for recreation, overcrowding (perhaps because the facility designed for single cells is now at twice its original capacity) again makes social distancing difficult, but not impossible. Due to the small size of the recreation areas, and in particular, the layout of the phone area, *see* Res. Decl. D ¶¶ 28-30, residents cannot remain six feet apart from one another during recreation, *see* Res. Decl. H ¶¶ 12-13; Res. Decl. I ¶ 20; Res. Decl. J ¶¶ 9, 26.

146.    CDF officers do not even attempt to encourage or enforce distancing among residents. *See* Res. Decl. A; Res. Decl. B; Res. Decl. D; Res. Decl. F; Res. Decl. J ¶¶ 25 ("CDF doesn't tell us to stay six feet apart from each other. Nobody comes over the speaker to tell us to socially distance. They don't tell us that on the speaker. COs don't tell us to stay six feet apart from each other."); Res. Decl. I ¶¶ 18-19. Indeed, in early February, despite the outbreak across the facility, CDF let out around 20 residents to watch the Super Bowl—a reckless decision given the positive numbers at CDF at the time. *Id.* ("During rec time at CDF, COs don't enforce masks. Not everybody wore masks, either. On Super Bowl Sunday, they had all 20 or so guys out on the unit. We all were watching the game. COs weren't enforcing masks during this time either.").

147.    According to Dr. Meyer, a key infection prevention strategy of this droplet-borne disease is the widespread use of masks. Masks should be regularly cleaned and sanitized to

optimize their effectiveness. Masks only work to protect people from infection when used and when worn correctly. Meyer Decl. ¶ 30.

148.    CDF's mask policies have been abysmal.

149.    Neither residents nor staff at CDF wear masks correctly and consistently. *See* Res. Decl. A ¶ 22 ("On rec time, not everyone is wearing masks. COs aren't telling people to wear masks."); Res. Decl. B ¶ 42 ("When I was at CDF in January, I saw COs not wearing their masks."); Res. Decl. D ¶ 41 ("The COs don't always wear their masks. I've seen COs come onto the unit without masks."); Res. Decl. F ¶ 12 ("During rec, a lot of guys are not wearing masks. When we're on rec, COs don't tell people to wear masks" and "I've seen COs not wearing masks.").

150.    In fact, when the absence of a mask on a staff member is noted by a resident, CDF officers have told residents that they do not need to wear a mask because they are "not sick." Res. Decl. D ¶ 41 ("I've asked COs where their mask is, and they tell me that they aren't sick so they don't have to wear a mask."). Corrections officers also wear their masks incorrectly, leaving their noses exposed and touch residents without wearing gloves. *See id.* ¶ 41 ("When COs do wear their masks, they sometimes don't cover their nose and mouth—they sometimes just cover their mouth[.]"); Res. Decl. B; Res. Decl. C; Res. Decl. D ("During rec time, some guys don't wear masks. CDF staff doesn't tell guys during that time that they should be wearing masks. If there is a policy, they don't tell us about it and they don't care to enforce it."); Res. Decl. E ¶ 19 ("When we come out for our hour a day for rec, they don't make us wear masks."); Res. Decl. G ¶ 25 ("When they let us out for that hour a day, nobody's telling us to wear masks."); Res. Decl. I ¶¶ 18-19 ("During rec time at CDF, COs don't enforce masks. Not everybody wore masks, either. On

Super Bowl Sunday, they had all 20 or so guys out on the unit. We all were watching the game. COs weren't enforcing masks during this time either.").

151.    When outside their cells, it is "optional" for residents to wear masks. Masks are only "mandatory" when residents leave their specific unit and move throughout the facility. Res. Decl. H ¶ 13 ("Not everyone wears masks during rec. It's not mandatory then. It's only mandatory when you move outside the unit."). Residents worried for their personal health and safety must try to police the mask-wearing of their fellow residents. Res. Decl. J ¶ 27 ("When people are out in common areas, I see them not wearing masks or not wearing them the right way . . . . On Friday, February 5, when I was on the phone, I saw two people on the tier with their masks pulled up, not covering their nose or mouth. COs didn't say anything to them. I called out to them to wear their masks right. I see people on the tier without their masks.")

152.    Likewise, residents are not given access to adequate personal protective equipment ("PPE"), even when they specifically request it. Res. Decl. A ¶¶ 28-30 ("I've had the same mask that I had at JI. They're not issuing new masks. I've asked for a new mask. I've asked for gloves. They said no, they don't have any."); Res. Decl. B ¶ 27 ("When I was at CDF, I didn't get a mask until the end of 2020 from CDF. I got an extra mask when I got my teeth cleaned at the end of November 2020.").

153.    Some residents have not been given a mask by CDF at all. Res. Decl. J ¶ 22 ("When I got to CDF, I had a mask from another jail. It was made of cloth. CDF didn't give me a mask.").

154.    CDF gives residents zero instructions on how to sanitize their masks. *See* Res. Decl. A, B, D, J.

155.    In any event, residents are also not able to clean the masks they do have. To clean their masks, residents would have send them out with laundry, which takes at least a day (leaving

the mask owner without protection while its gone) and requires that the mask owner be willing to risk having no mask at all, as laundry is routinely lost. Res. Decl. B ¶¶ 28-29. The mask CDF gave me was a cloth mask. . . . I didn't want to put my mask in the laundry. All of our laundry gets washed all together. Plus, I've lost stuff in the laundry before. They only pick up laundry once a week. Sometimes they skip a week. They've been skipping it a lot lately because someone who did the laundry had COVID. When they do pick up laundry, it would take a day or two to get laundry back."); *see also* Meyer Decl. ¶ 30(b).

### g. Inhumane Treatment of COVID-Positive Residents

156.    As appalling as CDF's inexplicable disregard for the risk of COVID exposure and spread is, the facility's treatment of residents who test positive is even more unconscionable. In fact, CDF residents who test positive for COVID are held in conditions that would befit not even cattle.

157.    According to Dr. Meyer, a majority (80%) of people with symptomatic COVID infection will develop mild symptoms, such as fever, nausea/vomiting/diarrhea, body aches, fatigue, cough, and headaches, and will be able to recover with supportive care (which involves rest, hydration, and acetaminophen as needed for fevers). Although these symptoms are not always life-threatening, they may still require medical care. Meyer Decl. ¶ 35.

158.    According to Dr. Meyer, during the course of COVID infection, approximately 20% of people will require hospitalization, 5% will require intensive care, and 1-2% will die. Severe disease and complications are more likely in individuals with predisposing risk factors, including age, chronic lung disease, chronic liver disease, chronic kidney disease, pregnancy, and suppressed immune systems. Meyer Decl. ¶ 35.

159.    According to Dr. Meyer, residents of detention facilities in general and those specifically at CDF are more likely than people in the general population to experience these

conditions and are therefore more likely to experience severe disease and death from COVID. Progression of respiratory symptoms in COVID can be extremely rapid, within 24 hours, requiring hospitalization, so people in medical isolation need to be diligently monitored for clinical worsening. Meyer Decl. ¶ 35.

160.    As described above, people with mild symptoms may not require hospitalization but should continue to be closely monitored. People with moderate symptoms may require hospitalization for supportive care, including intravenous fluids and supplemental oxygen. People with severe symptoms may require ventilation and intravenous antibiotics. Meyer Decl. ¶ 10.

161.    CDF has made a series of wildly inappropriate and dangerous decisions in addressing how to handle residents who test positive for COVID.

162.    Some COVID-positive CDF residents are removed from CDF and sent to the Jail Industries Building ("JI"), an affiliated facility down the street from CDF. *See* Jail Industries Building/Baltimore Pre-Release Unit, https://www.dpscs.state.md.us/locations/bpru.shtml. As described above, originally built in 1922 as an office building and retrofitted as a jail in the 1980s, JI was closed in 2017 due to what public safety officials called a "security nightmare." I-Team looks inside closing jail facility in Baltimore, Sept. 1, 2017, available at https://www.wbaltv.com/article/i-team-looks-inside-closing-jail-facility-in-baltimore/12139786 (containing a video tour of the then-closed facility).

163.    This facility, which is best described as a broken-down, pest-plagued warehouse, would be an inhumane detention space for healthy inmates. For individuals who have already tested positive for a potentially deadly virus, it is nothing short of horrifying.

164.    For instance, one COVID-positive resident who was recently housed at JI recently saw a thermostat in the building showing that the temperature was 55 degrees. Res. Decl. B ¶ 11

("It's really cold in JI. I can see the thermostat. It says 55. But it's even colder than that. I have a blanket on me right now."). This is unsurprising, given the number of broken or drafty windows at the facility and the fact that January and February are two of the coldest months in the year. Res. Decl. B ¶ 12 ("It looks like a warehouse in here. Some of the windows are busted out. I can feel cold air coming in.").

165.    Indeed, the dormitory-style housing, *see* Res. Decl. B ¶ 14 ("JI has a dorm layout. There are 40 or so total beds. Each bed is about two feet from the next."), has the COVID-positive residents at JI sleeping underneath these broken or drafty windows, despite the dangerously low outdoor temperatures, *see id.* ¶ 15 ("Our beds at JI are against the wall with the broken windows").

166.    Residents also are not given appropriate clothing for the temperature. Res. Decl. A ¶ 20 ("We had to use blankets to stay warm. It was really cold there."). According to two JI residents, upon their arrival at JI, they were forced to turn in their clothing in exchange for paper-material hospital shorts, a t-shirt, and shower shoes. *Id.* ¶ 19 ("When we got to JI, they took the clothes we came with from CDF. They put us in shower shoes. They tried to give us used underwear. We had to tell them we wouldn't put it on until they gave us new underwear and socks. They gave us paper shorts, like what paper masks are made of. They gave us a short sleeve shirt."); Res. Decl. B ¶ 13 ("When they moved me, they took all my clothes. They gave all of us at JI hospital shorts. We got a T-shirt and a pair of boxers.")

167.    Worse, these residents cannot even look forward to a hot meal for warmth. According to a CDF resident who was temporarily housed at JI, officers "pick up meal trays from CDF and bring them [down the street] to JI. The dinners are cold. There's no microwave at JI, either." Res. Decl. B ¶ 19.

168.     Cleanliness, too, is unattainable for COVID-positive JI residents. Not only is the facility itself dirty and not subject to regular cleaning, but the shower facilities are infested with flies. Res. Decl. A ¶ 16 ("When I was at JI, I never saw anyone clean anything.").

169.     Moreover, the water in the showers is not even hot. If these residents—who are enduring a deadly virus in near-freezing temperatures without adequate clothing—want to stay clean, they must also subject themselves to cold, or at best lukewarm, showers. Res. Decl. B ¶ 22 ("The showers here are really cold. The hot water doesn't work. It doesn't get hotter than a pool.")

170.     COVID-positive JI residents barely get to communicate with the world outside. Res. Decl. B ¶ 26 ("They cut off my phone calls from JI at 15 minutes.").

171.     When they are allowed to use the phones at the facility, they must do so within six to eight inches of the other COVID-positive JI residents. Res. Decl. B ¶ 18 ("There's no social distancing at JI at all. When we use the phone, the phones are 6 to 8 inches apart from each other.").

172.     COVID-positive JI residents have no access to a commissary and are stripped of all possessions when they leave CDF. Res. Decl. B ¶ 21 ("There's no commissary here at JI. I wasn't allowed to bring anything.").

173.     COVID-positive JI residents receive little medical care, *despite* the fact that they are only in JI because they have contracted a deadly virus. The entirety of the medical care provided at JI is the following: residents' vital signs and temperatures are checked once every five hours. Res. Decl. A ¶ 13; Res. Decl. B ¶ 20.

174.     Residents are not asked to report their symptoms. Res. Decl. B. ¶¶ 20-25. Nobody listens to the residents' lungs to be sure they are breathing normally. Res. Decl. A ¶ 14 ("Nobody ever put a stethoscope to my chest. Nobody tried to listen to my lungs.").

175.     According to Dr. Meyer, the primary manifestation of severe COVID disease is pneumonia, which produces distinct lung sounds that could herald severe disease and reflect people's subjective reports of shortness of breath. Simply marking down a patient's vital signs—even with oxygen readings—is not sufficient medical care for COVID disease. Meyer Decl. ¶ 35(b).

176.     COVID-positive JI residents are not even always given aspirin to help them manage the physical symptoms of COVID. Res. Decl. A ¶ 12 ("My first day at JI, I had really bad symptoms. I had diarrhea. I was using the toilet all the time. I had really bad headaches. I had a sore throat. I couldn't smell or taste. I asked for some aspirin. They said they didn't have any.").

177.     Even residents with preexisting conditions that make COVID notably more dangerous have been denied access to previously approved medical care.

178.     According to one of two COVID-positive residents who was recently housed at JI with a preexisting condition, he had to go multiple days without his inhaler to treat his condition, one that is exacerbated by COVID—because he was forced to leave it at CDF. Res. Decl. B ¶ 10 ("I went from Tuesday, February 2, to Saturday, February 6, without my inhalers at JI.").

179.     The treatment of COVID-positive residents is inhumane. There is no explanation for why CDF is shipping out its residents to a cold warehouse and then stripping them of the medical care and monitoring they so desperately need.

### h.  Other Serious Deficits with Medical Care, including the Failure to Offer Vaccinations to All Eligible Residents

180.     CDF does not sufficiently monitor for COVID symptoms in residents. Res. Decl. A ¶25 ("[N]obody is coming around asking me whether I have any symptoms"); Res. Decl. D ¶ 5 ("CDF did not make me quarantine or isolate after that man was removed from the unit. Nobody checked my temperature, or asked me if I had any symptoms."); Res. Decl. F ¶ 11 ("When I was

at JI, they didn't ask whether we had any symptoms. [But g]uys had symptoms [such as] coughing, [or they] couldn't really breathe.").

181.    One resident was denied his prescribed medication and instead given medication for diabetes and hypertensions—conditions from which he does not suffer. Had he taken those two medications, he may have suffered serious illness or death. Resident Declaration H (February 13, 2021 Declaration of Collin Davis) ("Res. Decl. H") ¶¶ 23, 25 ("[On February 9,] a nurse came by and told me to take my diabetes and hypertension medication. . . . I told the nurse I wouldn't take that medication. . . . On February 10, the same thing happened--a nurse came by and gave me medication that she said was for hypertension and diabetes. I called out for the captain and explained the situation and showed him my paperwork [showing the medication that resident did take, which he was not being given].")

182.    CDF does not respond to some sick calls at all. CDF is declining to take some residents to sick calls. Some residents don't even have the chance to file sick call requests. Res. Decl. B ¶ 44 ("CDF doesn't respond to sick calls. I put in a sick call . . . in the middle of January. I never got a response."); Res. Decl. E ¶ 20 ("CDF isn't letting people go down for sick calls."); Resident Declaration G (February 16, 2021 Declaration of Antonio Johnson) ("Res. Decl. G") ¶¶ 11, 21 ("I put in a lot of sick calls that nobody responded to . . . . There's not a sick call box on my [current] unit now. They don't come around with a sick call box, either.").

183.    On or about October 16, 2020, the Maryland Department of Health ("MDH") submitted to the CDC and released to the public its draft COVID-19 Vaccination Plan (the "Plan"). The Plan's purpose is to "provide a plan for the distribution, administration, recording, and communication of COVID-19 vaccines administered in the state of Maryland." Maryland Department of Health, COVID-19 Vaccination Plan, at 7, available at

https://phpa.health.maryland.gov/Documents/10.19.2020_Maryland_COVID-
19_Vaccination_Plan_CDCwm.pdf.

184.    Under the Plan's three-phased approach to vaccine administration, Maryland's
"initial COVID-19 vaccination efforts will target those at highest risk of developing complications
from COVID-19[.]" *Id.* at 13.

185.    The Plan's Phase 1 vaccination category identifies target populations in the
following six subcategories:  (1) high risk healthcare workers; (2) first responders; (3) older adults
in congregate or overcrowded settings; (4) members of the judiciary; (5) *"people in prisons, jails,
detention centers and staff"*; and (6) *"people with comorbid and underlying conditions that put
them at significantly higher risk." Id.* at 45-46, App. 3 (emphasis added).

186.    The Phase 1 subcategory of "people in prisons, jails, detention centers and staff"
expressly includes **"*incarcerated/detained individuals*"** and **"*correctional officers, jailers, support
staff." Id.*

187.    The Phase 1 subcategory of "people with comorbid and underlying conditions that
put them at significantly higher risk" expressly includes individuals who have chronic kidney
disease, COPD, organ transplant(s), obesity, serious heart conditions, diabetes type 2, or
comorbidity with any of these conditions. *Id.* at 46, App. 3.

188.    An informational bulletin published by Governor Hogan and MDH on January 14,
2021, specifies that "high-risk incarcerated individuals" are to be offered access to the COVID-19
vaccine in Phase 1B of the Plan, noting that the State "plans" to enter Phase 1B on January 18,
2021. Office of Governor Larry Hogan in partnership with the Maryland Department of Health,
Maryland's    Phased    COVID-19    Vaccine    Distribution    (Jan.   14,   2021),
https://governor.maryland.gov/wp-content/uploads/2021/01/Phases-One-Pager-1.pdf.  According

to MDH's public-facing "COVIDLink" website, the State did, in fact, enter Phase 1B on January

18, 2021. Maryland Department of Health "GoVAX," Maryland's Phased COVID-19 Vaccine

Distribution,   https://covidlink.maryland.gov/content/wp-content/uploads/2021/01/MDH017182-

01_VaccinePrioritizationGuidance_Flyer_HR.pdf

189.    Although Maryland is reportedly moving on to vaccinate persons in the general

population eligible under Phase 1C of the Plan, there is no indication that all "high-risk

incarcerated individuals" at CDF are being offered vaccinations. Maryland Department of Health,

Maryland moves into Phase 1C of its COVID-19 vaccine distribution plan, opens eligibility to all

residents 65 and up (Jan. 25, 2021), https://health.maryland.gov/newsroom/Pages/Maryland-

moves-into-Phase-1C-of-its-COVID-19-vaccine-distribution-plan,-opens-eligibility-to-all-

residents-65-and-up.aspx. The Plan does not specifically define the term "high risk individuals"

but includes within that category: "Persons at highest risk of developing complications

from   COVID-19   (ACIP   high   risk   conditions),   including   persons   65   and   older,

staff and residents of nursing homes (SNFs), long-term care facilities (LTCFs), assisted care

facilities,      and      clients      of      senior      daycare      facilities      *or*      *similar.*"

https://phpa.health.maryland.gov/Documents/10.19.2020_Maryland_COVID-

19_Vaccination_Plan_CDCwm.pdf, at 13 (emphasis added). It is clear the Plan intends to include

at least a portion of the detainees at CDF within Phase 1, because the Plan goes on to estimate the

population to be vaccinated in Maryland under the Plan in Phase 1 as including approximately

54,460 "people in prisons, jails, detention centers and staff." *Id.* at 13.

190.    Despite the acknowledgement that incarcerated and detained individuals, including

those held in detention centers like CDF, are at high risk of contracting COVID-19, Defendants

have violated Plaintiffs' rights by depriving them vaccines based on their incarceration or pretrial detention status.

### i. Overuse of Solitary Confinement

191.    As described above, disciplinary segregation or solitary confinement is not an appropriate disease containment strategy. Meyer Decl. ¶ 18.

192.    Beyond the known detrimental mental health effects of solitary confinement, isolation of people who are ill in solitary confinement results in decreased medical attention and increased risk of death. Meyer Decl. ¶ 18.

193.    In addition, if solitary confinement is a carceral facility's response to COVID, people who are ill will be deterred from reporting their symptoms, resulting in their increased risk of severe disease and death and ongoing spread to others. *Id.*

194.    Despite these clear incentives not to use punitive-style confinement as an effective means to control COVID, CDF is doing precisely that.

195.    During apparently COVID-related lockdowns, residents (negative and positive alike) were held in their cells for 24 hours a day and not even allowed out to shower for multiple days—a confounding restriction, given the necessity of sanitation and hygiene to stop the spread of this virus. Res. Decl. F ¶18 ("I was here at CDF when it locked down. It was at least a couple days. We couldn't get out to shower. It was 24 hours a day at some points."); Res. Decl. G.

196.    One resident recounts that "they didn't open our cell doors for 25 hours. During that time, I had no water to wash my hands or to drink." Res. Decl. M ¶¶ 38-39. The same resident recounts that "We got locked down a second time, and couldn't leave our cells. The guard brought me some ice [because my sink in my cell did not function]. He said he wouldn't bring me water. He told me to wait for the ice to melt." *Id.*

197.    Other residents have been held—without explanations or test results—in units where they are locked inside their cells for 23 hours a day. Res. Decl. E ¶ 13 ("On this unit, we have to stay in our cell 23 hours a day."); Res. Decl. A ¶ 29 ("They don't tell us why they lock down the units. That happened a few times this year. On a few of the times they locked down, I couldn't get out of my cell for any reasons, even to shower."); Res. Decl. L ¶ 19; ("They locked down CDF in late January. They didn't tell us why. They didn't tell us they locked down because of COVID.").

198.    When residents in these lockdown-type situations experience COVID symptoms, they are kept in their cells, with the only access to medical care being occasional visits to check the residents' vital signs. Res. Decl. E ¶¶ 14-15 ("I started to have breathing problems and major cramps in my stomach. I couldn't taste or smell anything. It felt like a bunch of needles were in my nose. I started having these symptoms two days after they moved me. Nobody asked me whether I had symptoms. They just take my vitals and leave.")

199.    For those not being held inside their cells for 23 or 24 hours every day, they are nonetheless confined to the cells for 20 hours every day. Res. Decl. J ¶ 19 ("As of February 8, they're letting us out of our cells for four hours a day--two hours in the morning and two hours in the afternoon.")

200.    One resident was told a member of the U.S. Marshal Service that the "bad conditions" at CDF (including, apparently lockdown measures) were because of their attorneys trying to get them out of jail. Res. Decl. D ¶ 51; Meyer Decl. ¶ 33. As recounted by Dr. Meyer, one resident reports perceiving this as punishment. Meyer Decl. ¶ 33.

201.    One resident recounts that CDF staff told residents that the unit was locking down because "there weren't enough guards to take care of us"—another example of a failure to

appropriately plan on CDF's part. Res. Decl. M ¶ 37. *See also id.* ¶ 38 ("[T]hey didn't open our cell doors for 25 hours. During that time, I had no water to wash my hands or to drink.").

202.    Nor does CDF provide any process to residents to challenge their placement in lockdown.

### j.   CDF's Mismanagement has Caused a Massive Outbreak

203.    CDF's catastrophic failure to employ even the most basic tenets of virus containment and mitigation strategies has predictably led to a massive COVID outbreak. As recounted by Dr. Meyer, based on her review of documents tracking the outbreak (which are attached as exhibits to this complaint):

a.  By January 13, "several" residents had tested positive, according to a memorandum from the Warden.[4] The memorandum does not indicate that the source of these positive cases was ever identified. These residents were all in the "working men housing[.]" . . . They potentially unknowingly transmitted the virus to others while working throughout the facility.

b.  As of January 21, 45 residents tested positive, according to the same memorandum. The decision was then made to put all remaining individuals in C and F pods on quarantine. The fact that individuals from multiple different housing units were testing positive suggests that transmission was already widespread throughout the facility by the time it was identified.

c.  Between January 1 and January 25, 73 residents and 20 staff tested positive, according to a public court filing in *United States v. Mohr*.[5] At this point, individuals who tested positive were then isolated in place from the general population in C and F pods. (It appears that C and F pods quickly switched from quarantine to isolation units.)

d.  Prior to January 25, "COVID-19 positive inmates were being isolated at a separate facility, the Health Monitoring Facility (HMF)," according to a public court filing, which was based on conversations with "senior administrative and medical officials of the Maryland Department of Public Safety and Correctional Services ("DPSCS") and the Maryland Attorney General's Office, including the Assistant Secretary of DPSCS, the Chief Medical Officer, and the warden

---

[4] Ex. FF hereto (Memorandum from Defendant Calvin Wilson, Warden, CDF, dated January 21, 2021) (originally filed in *United States v. Bivens*, Case No. 1:19-cr-00233-RDB (D. Md. Jan. 22, 2021), ECF No. 48-1).
[5] Ex. GG (Government's Response to Judicial Order, *United States v. Mohr*, Case No. 1:21-mj-00146-TMD (D. Md. Jan. 26, 2021))

of the Chesapeake Detention Facility."[6] By January 25, apparently, it was no longer practical to house positive residents at the "Health Monitoring Facility," despite the stated "preference to isolate COVID-19 detainees at HMF." CDF apparently had not identified any cases outside of C and F as of January 25, according to the public court filing in *United States v. Mohr*.[7]

e. As of January 25, CDF had still not identified "how the first . . . inmates were exposed," according to the same filing. This indicates deficits in the contact tracing process.

f. The outbreak in C and F pods prompted testing of the entire resident population and all medical staff on January 30. It is unclear whether custody staff were included in this surveillance effort. As of January 31, 81 residents had tested positive, according to a court filing in *United States v. Moore*.[8]

g. As of February 5, the number of positive residents had increased to 156, along with 77 staff, according to public DPSCS data.

h. Per an update on February 10 in *United States v. Cobb*, the number of positive residents had increased to 160, with 25 individuals remaining in quarantine and 134 test results still pending. Even if the current outbreak is found to be contained, future outbreaks are inevitable in the absence of fully implemented disease prevention and management strategies.[9]

i. At least two declarants report being re-infected with COVID-19 during this outbreak. One reported being diagnosed with COVID-19 in August 2020 and again in February 2021. Another reported being diagnosed with COVID-19 in May 2020 and again in January 2021. These re-infections speak to the high degree of exposure and risk to residents inside CDF during this period. . . .

j. This timeline of explosive growth of the virus, as well as CDF quickly abandoning plans to isolate or quarantine in particular areas, demonstrates a failure to plan.

k. The failure to plan is played out in residents' accounts of dangerous intermixing across different cohorts. Multiple residents report being put into close contact with positive residents, apparently as the facility was moving to create quarantine or isolation units. One resident also reports being left in a cell with his positive cellmate for multiple days before they moved the first resident out.

---

[6] *Id.*

[7] *Id.*

[8] Ex. HH (Government's Response to Judicial Order, *United States v. Moore*, Case No. 1:20-cr-00430-RDB (D. Md. Feb. 1, 2021)).

[9] Ex. II (Response in Opposition to Defendant's Motion to Reopen Detention Hearing and Order Pretrial Release, *United States v. Cobb*, Case No. 1:20-cr-00376-RDB (D. Md. Feb. 10, 2021)).

> There is also a report that after a positive resident was moved out of a cell, CDF permitted him to return to retrieve his belongings. This type of intermixing poses high risk of disease transmission and undermines the whole purpose of cohorting. It takes planning to ensure that different groups are appropriately separated—which appears to be absent here.

Meyer Decl. ¶ 27.

204.   The grave missteps of CDF were detailed at length at a detention hearing in *United States v. Hodges,* 8:20−cr−00148−PX−1 (D. Md. Feb. 17, 2021). Ms. Hodges—who is almost 70 years old, takes three medications a day for hypertension, and suffers from anxiety—was detained after an initial hearing on February 2, 2021. At that initial hearing, the United States Attorney's Office for the District of Maryland (USAO-MD) informed the District Court that Ms. Hodges would not be sent to CDF (presumably based on assurances from CDF itself, in light of the ongoing outbreak in the facility). Despite these assurances, Ms. Hodges was nonetheless placed at CDF pending her hearing on February 17. She was placed into a male unit at CDF, with a least four other residents who had tested positive for COVID—a wildly dangerous placement that intermixed different cohorts.

205.   Like many other residents, CDF also forced Ms. Hodges to go without medication for multiple days. Ms. Hodges' experience—also reflected in the declaration of another resident, *see* Res. Decl. H—shows the degree to which CDF has refused to change its practices in light of COVID.

206.   That CDF affirmatively told USAO-MD that Ms. Hodges would not be placed at the facility, and then soon after did so anyway, speaks to the facility's blatant disregard for the health and safety of residents—both new admits and existing residents.

207.   As described above, things have gotten worse since the outbreak, with units mixing men and women and positive residents and new intakes.

208.   All of the Exhibits cited in and attached to this Complaint are incorporated by reference.

## CLASS ACTION ALLEGATIONS

209.   Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, the individual named Plaintiffs seek to certify two classes, with one subclass as follows:

- The Pretrial Class is defined as "all people detained in the Chesapeake Detention Facility who are not detained pursuant to a judgment of conviction."

    o   The Medically Vulnerable Subclass is defined as "all Pretrial Class members whose medical condition renders them especially vulnerable to the coronavirus as determined by guidelines promulgated by the Centers for Disease Control and Prevention." *See* U.S. Centers for Disease Control and Prevention, *People Who Are At Higher Risk* (last reviewed Feb. 18, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

- The Post-Conviction Class is defined as "all people detained in the Chesapeake Detention Facility who *are* detained pursuant to a judgment of conviction."

210.   The class allegations and law are set forth in more detail in the accompanying motion for class certification.

211.   A class action is the only practicable means by which the individually named Plaintiffs and the class members can challenge Defendants' unconstitutional actions. Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit.

212.    The classes and subclass are so numerous that joinder of all members is impractical. There are about 400 people in the classes. Demographic data regarding the health of correctional populations, which is set forth above, indicates that the Medically Vulnerable Subclass likely consists of at least 50 of people (and likely many more). A sizeable percentage of the jail population is likely medically vulnerable to COVID. According to one study, "asthma prevalence is 30%–60% higher among individuals with a history of incarceration as compared with the general population." Elizabeth M. Vigilanto et al., *Mass Incarceration and Pulmonary Health: Guidance for Clinicians*, 15 Ann. Am. Thoracic Soc. 409, 409 (2019). Another study estimates that up to 15% of people who are in custody have asthma, 10% of people in custody live with a heart condition that requires medical care, 10% live with diabetes, and 30% have hypertension. *See* Laura M. Marushack et al., *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12*, U.S. Dept. of Justice (2014).

213.    There are questions of law and fact common to all class members and the subclass, including, among many others:

       a.  Do CDF's conditions create a substantial risk that the people in its custody will be infected with COVID?

       b.  Do CDF's conditions create a substantial risk that the people in its custody who are infected with COVID will face serious illness, long-term physical damage, or death?

       c.  Did Defendants know, or should Defendants have known, of these risks?

       d.  Are Defendants acting with deliberate indifference to these risks?

       e.  *For the subclass:* Is the risk of harm posed by CDF's conditions so severe and so immediate that the only adequate remedy is release?

214. The claims of the class representatives are typical of the claims of the classes and of the subclass. That typicality stems from their claim that Defendants have placed them at significant risk of serious harm by failing to take appropriate steps to address the risk of COVID in CDF. Every person at CDF faces a heightened risk of risk of contracting COVID and facing serious illness, physical injury, or death if Defendants do not adequately protect them.

215. The claims of the Medically Vulnerable Subclass representatives are typical of the subclass members as well, as each member is subject to increased risk of substantial harm or death due to their existing medical conditions.

216. The individually-named Plaintiffs will fairly and adequately represent the interests of the classes and subclass. The named Plaintiffs have no conflicts with the unnamed members of the proposed classes. In addition, their lawyers are experienced in federal court civil rights class actions, particularly those involving prisons and jails.

217. Defendants have failed to act in a manner that applies generally to the classes and subclass as a whole, rendering class-wide injunctive and declaratory relief appropriate.

## COUNT I
### 42 U.S.C. § 1983 (on behalf of all Class members)
### Fifth / Fourteenth and Eighth Amendments: Jail Conditions
### (against Defendants Wilson and Green)

218. Plaintiffs repeat and re-allege each of the preceding paragraphs as if fully set forth in this Count.

219. Plaintiffs and the classes they represent have been deprived and continue to be deprived by the Defendants of their rights under the Fifth / Fourteenth Amendments and Eighth Amendment to reasonably safe living conditions. Defendants Wilson and Green are aware of the substantial risk of harm that COVID poses to all individuals, and are further aware of the particular risks of severe illness and possible death that Plaintiffs face as a result of the conditions in CDF.

Despite this knowledge, Defendants have failed to take reasonable measures to mitigate these dangers.

220.    Defendants acted with deliberate indifference to the health concerns of the Plaintiffs.

221.    As a result of Defendants' actions and inactions, class members face a substantial risk of contracting COVID and sustaining a serious illness that could lead to death.

222.    Defendants' failure to take appropriate steps to curb the substantial threat posed by COVID to each person in his custody, as described more fully above, violates Plaintiffs' rights to unreasonable risk of death and bodily harm.

223.    Consequently, Defendants are in continuous violation of these Plaintiffs' rights and the rights of the members of the class under the Fifth / Fourteenth and Eighth Amendments to the United States Constitution.

224.    Plaintiffs seek injunctive and declaratory relief against Defendants Wilson and Green to prevent the continued violation of the rights of Plaintiffs and the classes they represent.

### COUNT II
### Petition for Writs of Habeas Corpus Pursuant to 28 U.S.C. § 2241
### (on behalf of Medically Vulnerable Subclass)
### (against Respondent Wilson)

225.    Plaintiffs repeat and re-allege each of the preceding paragraphs as if fully set forth in this Count.

226.    Petitioners are not in custody pursuant to a judgment of conviction of a court. They are all pretrial detainees, presumed innocent.

227.    Respondent Wilson is holding members of the Medically Vulnerable Subclass in custody in violation of the Due Process Clause of the Fifth / Fourteenth Amendments to the Constitution of the United States.

228.    Respondent Wilson acted with deliberate indifference to the health concerns of the Plaintiffs/Petitioners.

229.    Due Process forbids exposing Petitioners to a severe risk of death, pain, or permanent severe injury, and there are presently no options available to mitigate that risk quickly enough to protect this subclass other than immediate release from custody.

**COUNT III**
**42 U.S.C. § 1983 (on behalf of all Class members)**
**Fifth / Fourteenth and Eighth Amendments: Solitary Confinement**
**(against Defendants Wilson and Green)**

230.    Plaintiffs repeat and re-allege each of the preceding paragraphs as if fully set forth in this Count.

231.    Plaintiffs and the classes they represent have been deprived and continue to be deprived by the Defendants of their rights under the Fifth / Fourteenth and Eighth Amendments to reasonably safe living conditions.

232.    Defendants Wilson and Green are aware of the substantial risk of psychological and physiological harm that the Jail's indefinite lockdown policy imposes on prisoners but repeatedly implemented. Moreover, Defendants have done so despite the availability of other, more effective means of enacting social distancing.

233.    Defendants acted with deliberate indifference to the health concerns of the Plaintiffs.

234.    As a result of Defendants' actions and inactions, class members face a substantial risk of psychological and physiological harm.

235.    Consequently, Defendants are in continuous violation of these Plaintiffs' rights and the rights of the members of the classes under the Fifth / Fourteenth and Eighth Amendments to the United States Constitution.

236.     Plaintiffs seek injunctive and declaratory relief against Defendants Wilson and Green to prevent the continued violation of the rights of Plaintiffs and the classes they represent.

**COUNT IV**
**42  U.S.C. § 1983 (on behalf of all Class members)**
**Fifth / Fourteenth and Eighth Amendments: Due Process & Solitary Confinement**
**(against Defendants Wilson and Green)**

237.     Plaintiffs repeat and re-allege each of the preceding paragraphs as if fully set forth in this Count.

238.     Plaintiffs and the classes they represent have been deprived and continue to be deprived by the Defendants of their state-created liberty interests under the Fifth / Fourteenth and Eighth Amendments without due process.

239.     Residents have not given opportunities to challenge their placement in solitary confinement conditions.

240.     These conditions constitute an atypical and significant hardship relative to the ordinary incidents of life at a detention facility.

241.     CDF lacks any process for determining whether a particular resident must be placed in these conditions or when these conditions, as a general matter or in a particular housing unit, may end.

242.     Defendants acted with deliberate indifference to the health concerns of the Plaintiffs.

243.     Consequently, Defendants are in continuous violation of these Plaintiffs' rights and the rights of the members of the classes under the Fifth / Fourteenth and Eighth Amendments to the United States Constitution.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and the classes they seek to represent, request that this Court enter judgment in their favor and against Defendants and order the following relief, including issuance of a temporary restraining order, preliminary injunction, and final judgment for all Class members requiring Defendants to implement constitutionally sufficient procedures to protect their health and safety that are consistent with CDC guidelines and the expert judgment of correctional health specialists, including but not limited to:

a)      An inspection of CDF and its records (including medical records, movement records, and contact-tracing records) by an independent expert to be chosen by the Court with the parties' input;

b)      An order to CDF requiring the facility, its staff, and contractors to effectively communicate to all residents sufficient information about COVID, measures to reduce the risk of transmission, and any other information necessary to reasonably ensure that these individuals are aware of what precautions they can take to prevent infection (including information about the benefits and drawbacks of vaccinations);

c)      An order that CDF ensure each resident receives, free of charge: (1) an individual supply of liquid hand soap and paper towels sufficient to allow frequent hand washing and drying each day; (2) tissues; and (3) adequate access to a supply of cleaning and disinfectant products effective against COVID to allow for cleanings of frequently-touched surfaces several times per day;

d)      An order that CDF clean and disinfect frequently-touched surfaces in common areas several times per day, including phones;

e)      An order that CDF provide adequate medical care to residents, whether because of COVID symptoms, chronic health conditions, or any other medical issue;

f)      An order that CDF create and enact social distancing policies that allow for adequate spacing of six feet or more between residents;

g)      An order that CDF ensure that residents have adequate access to phones to contact counsel and/or family members such that residents need not congregate at the phones;

h)      An order that CDF provide appropriate Personal Protective Equipment (PPE) to residents and staff according to the CDC's recommendations, and receive appropriate instruction about how to wear and clean it;

i)      An order that CDF end preemptive lockdown procedures and instead impose appropriate time-limited quarantines, with that time limit clearly communicated to residents, only when necessary due to a known or suspected case of COVID, as recommended by medical and public health professionals;

j)      An order that CDF implement appropriate cohorting, including quarantining and medical isolation procedures, as recommended by CDC guidelines;

k)      To the extent a resident must enter lockdown or isolation to effectuate an appropriate quarantine or medical isolation procedure, an order that CDF provide appropriate mental health services, and, if that resident has a mental health condition, provide enhanced psychological services in these circumstances;

l)      An order that CDF offer appropriate mental health services to all residents;

m)      An order that CDF ensure that isolation, cohorted isolation, and quarantine cells are clean and sanitary, and that residents in them receive adequate medical monitoring, adequate

hygiene products, reading material, reasonable access to phones, a daily change of clothes, and the opportunity to shower once daily;

n)      An order that CDF immediately create and implement a plan that complies with CDC Guidance to minimize transmission to and provide adequate medical monitoring and care to residents who are medically vulnerable to COVID;

o)      To the extent it is necessary to ensure constitutionally sufficient procedures or to protect certain residents' constitutional rights, order the Warden to transfer residents to another appropriate facility;

p)      An order that CDF provide a list of all medically vulnerable residents, as defined by plaintiffs' expert declarations, to Plaintiffs' counsel within 24 hours;

q)      An order that CDF immediately offer vaccinations to all members of the Medically Vulnerable Subclass who qualify as "high risk," as defined by Maryland guidance (Currently, Maryland's vaccination phase includes "high risk" residents of jails and prisons. *See* https://coronavirus.maryland.gov/pages/vaccine);

r)      An order that CDF immediately release, pursuant to a writ or writs of habeas corpus, members of the Medically Vulnerable Subclass;

s)      If this Court does not immediately release the Medically Vulnerable Subclass, an order that CDF consider subclass members for release on non-monetary bond pending the outcome of their request for habeas relief;

t)      Issue an order and judgment granting reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988 and 28 U.S.C § 2241; and

u)      Grant such other relief as this Court deems just and proper.

Dated: February 20, 2021

Respectfully submitted,

*/s/ Alec W. Farr*
Alec W. Farr (Federal Bar No. 12513)
awfarr@bclplaw.com
Daniel C. Schwartz
(*pro hac vice* to be submitted)
dcschwartz@bclplaw.com
Adam L. Shaw
(*pro hac vice* to be submitted)
adam.shaw@bclplaw.com
Joscelyn T. Solomon
(Federal Bar No. 21555)
joscelyn.solomon@bclplaw.com
Brett R. Orren
(*pro hac vice* to be submitted)
brett.orren@bclplaw.com

BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street, NW
Washington, DC 20004
(202) 508-6000 Phone
(202) 508-6200 Facsimile

*/s/ Tianna Mays*
Tianna Mays (Bar No. 21597)
tmays@lawyerscommittee.org
Jon Greenbaum
(*pro hac vice* to be submitted)
jgreenbaum@lawyerscommittee.org
Arthur Ago
(*pro hac vice* to be submitted)
aago@lawyerscommittee.org
John Fowler
(*pro hac vice* to be submitted)
jfowler@lawyerscommittee.org
Rochelle F. Swartz
(*pro hac vice* to be submitted)
rswartz@lawyerscommittee.org

LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW Suite 900
Washington, DC 20005
Phone 202-662-8600
Fax 202-783-0857
*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I, Adam L. Shaw, an attorney, hereby certify that on February 20, 2021, I caused a copy of the foregoing to be filed using the Court's CM/ECF system. I further certify that I, or another one of Plaintiffs' attorneys, will promptly serve a copy of the same on the Attorney General of the State of Maryland via email at the address below.

Brian E. Frosh
Maryland Attorney General
200 St Paul Pl.
Baltimore, MD 21202
civil_service@oag.state.md.us

/s/ Adam L. Shaw
Adam L. Shaw