# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

SEDRIC CATCHINGS *et al.*, Individually
and on behalf of a class of similarly situated
persons,

   Plaintiffs,

v.

CALVIN WILSON, In his official capacity
as Warden, Chesapeake Detention Facility
Department of Corrections, *et al.*,

   Defendants.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

Case No.: 1:21-cv-00428-CCB


# MEMORANDUM IN SUPPORT OF
# PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER
# AND PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS ....................................................................................8

      A.    COVID Is Highly Infectious and Dangerous.............................8

      B.    Jails and Prisons Are Exceedingly Vulnerable to COVID Spread .............8

      C.    Lockdowns are an Inappropriate Response to COVID..............................8

      D.    Defendants Have Been Given Multiple Warnings of the Dangers of Not Responding Swiftly and Appropriately ................................................9

      E.    DPSCS and CDF Have Wildly Mishandled the COVID Pandemic and Thereby Caused a COVID Disaster Within the Facility......................9

            a.    CDF's Failure to Plan for Introduction of Virus to the Facility ...............................................................................9

            b.    CDF Mismanagement in 2020 .....................................................10

            c.    Moving into 2021: Intermixing Among Cohorts and Other Individuals....................................................................11

            d.    Failure to Contact Trace....................................................13

            e.    Cleaning Deficiencies ................................................13

            f.    Failure to Provide Masks or Enforce Social Distancing...............15

            g.    Inhumane Treatment of COVID-Positive Residents ....................16

            h.    Other Serious Deficits with Medical Care, including the Failure to Offer Vaccinations to All Eligible Residents ...............17

            i.    Overuse of Solitary Confinement ..................................18

            j.    CDF's Mismanagement has Caused a Massive Outbreak ............19

ARGUMENT.....................................................................................20

      I.    A Temporary Restraining Order Should Immediately Issue to Address CDF's Unconstitutional Conditions, with a More Comprehensive Preliminary Injunction to Follow.........................................................20

A.     Plaintiffs Are Likely to Succeed on the Merits of Their Eighth And Fifth / Fourteenth Amendment Claims. ......................................................21

B.     Plaintiffs Will Suffer Irreparable Harm Absent Immediate Relief............28

C.     The Balance of Equities and the Public Interest Favor the Requested Relief ..........................................................................................28

II.     This Court Should Order Release of the Medically Vulnerable Subclass of Pretrial Detainees Under 28 U.S.C. § 2241 ...........................................................29

III.     Additional Interim Remedies Are Available to This Court. ..................................31

A.     This Court Has and Should Exercise the Authority to Transfer Prisoners to Another Appropriate Facility to Remedy the Constitutional Violations or Protect Prisoners From Additional Constitutional and Physical Harms. ...........................................................32

B.     This Court Has and Should Exercise the Authority to Release Medically Vulnerable Subclass Members on Non-Monetary Bond Conditions Pending Review of Their Request for Habeas Relief Under § 2241 ...............................................................................................33

CONCLUSION .................................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullah v. Bush*,
945 F.Supp.2d 64 (D.D.C. 2013), *aff'd sub nom. Abdullah v. Obama*, 753
F.3d 193 (D.C. Cir. 2014)............................................................................................34

*Alderson v. Concordia Parish Corr. Facility*,
848 F.3d 415 (5th Cir. 2017) ......................................................................................22

*Avendano Hernandez v. Decker*,
450 F. Supp. 3d 443 (S.D.N.Y. 2020)..........................................................................34

*Banks v. Booth*,
459 F. Supp. 3d 143 (D.D.C. 2020) ..........................................................................3, 27

*Banks v. Booth*,
468 F. Supp. 3d 101 (D.D.C. 2020), *reconsideration denied sub nom. Banks*,
No. CV 20-849(CKK), 2021 WL 260112 (D.D.C. Jan. 26, 2021) ....................... 3-4

*Basank v. Decker*,
449 F. Supp. 3d 205 (S.D.N.Y. Mar. 26, 2020)..........................................................31

*Bolante v. Keisler*,
506 F.3d 618 (7th Cir. 2007) ......................................................................................33

*Brown v. Bargery*,
207 F.3d 863 (6th Cir. 2000) ......................................................................................23

*Brown v. N.C. Dep't of Corr.*,
612 F.3d 720 (4th Cir. 2010) ......................................................................................25

*Carranza v. Reams*,
No. 20-CV-00977-PAB, 2020 WL 2320174 (D. Colo. May 11, 2020) .............................4, 27

*Castillo v. Barr*,
449 F. Supp. 3d 915 (C.D. Cal. 2020) ........................................................................29

*Castro v. Cty. of Los Angeles*,
833 F.3d 1060 (9th Cir. 2016) (en banc) ....................................................................22

*City of Revere v. Mass. Gen. Hosp.*,
463 U.S. 239 (1983)......................................................................................................21

*Coreas v. Bounds*,
    451 F. Supp. 3d 407 (D. Md. 2020) ........................................................................5, 22, 23, 28

*Coreas v. Bounds*,
    457 F. Supp. 3d 460 (D. Md. 2020) ........................................................................................5, 23

*Coreas v. Bounds*,
    458 F. Supp. 3d 352 (D. Md. 2020) ........................................................................................5, 23

*Criswell v. Boudreaux*,
    No. 120CV01048DADSAB, 2020 WL 5235675 (E.D. Cal. Sept. 2, 2020) ..............................4

*Darnell v. Pineiro*,
    849 F.3d 17 (2d Cir. 2017) ...................................................................................................22, 27

*DeGidio v. Pung*,
    920 F.2d 525 (8th Cir. 1990) ....................................................................................................23

*Doe v. Barr*,
    No. 20-CV-02141-LB, 2020 WL 1820667 (N.D. Cal. Apr. 12, 2020) ....................................24

*Duff v. Potter*,
    665 F. App'x 242 (4th Cir. 2016) .............................................................................................22

*Estelle v. Gamble*,
    429 U.S. 97 (1976) ...................................................................................................................22

*Farmer v. Brennan*,
    511 U.S. 825 (1994) .................................................................................................................25

*Gray v. Cty. of Riverside*,
    No. 5:13-CV-0444-VAP-OPX, 2020 WL 4243484 (C.D. Cal. Apr. 14, 2020) .....................32

*Helling v. McKinney*,
    509 U.S. 25 (1993) ...................................................................................................21, 22, 23, 24

*Jimenez v. Wolf*,
    No. CV 18-10225-MLW, 2019 WL 7169413 (D. Mass. Dec. 24, 2019) ................................35

*Johnson v. Epps*,
    479 F. App'x 583 (5th Cir. 2012) .............................................................................................23

*Johnson v. Harris*,
    479 F. Supp. 333 (S.D.N.Y. 1979) ..........................................................................................33

*Johnston v. Marsh*,
    227 F.2d 528 (3d Cir. 1955) .....................................................................................................34

*Jones v. Wolf*,
 467 F. Supp. 3d 74 (W.D.N.Y. 2020) ...................................................................23

*Kingsley v. Hendrickson*,
 576 U.S. 389 (2015)............................................................................................22

*Landano v. Rafferty*,
 970 F.2d 1230 (3d Cir. 1992)..............................................................................34

*Makdessi v. Fields*,
 789 F.3d 126 (4th Cir. 2015) ..............................................................................26

*Malam v. Adducci*,
 452 F. Supp. 3d 643 (E.D. Mich. 2020)..............................................................30

*Maney v. Brown*,
 No. 6:20-CV-00570-SB, 2021 WL 354384 (D. Or. Feb. 2, 2021) ..........................3

*Mapp v. Reno*,
 241 F.3d 221 (2d Cir. 2001)...................................................................33, 34, 35

*Martinez v. Reams*,
 No. 20-CV-00977-PAB-SKC, 2020 WL 8474726 (D. Colo. Dec. 4, 2020) ...........4

*Martinez-Brooks v. Easter*,
 459 F. Supp. 3d 411 (D. Conn. 2020)...................................................4, 27, 30, 31

*McBride v. Deer*,
 240 F.3d 1287 (10th Cir. 2001) ..........................................................................24

*Miranda v. Cty. of Lake*,
 900 F.3d 335 (7th Cir. 2018) ..............................................................................22

*Nam Dang by and through Vina Dang v. Sheriff, Seminole Cty. Florida*,
 871 F.3d 1272 (11th Cir. 2017) ..........................................................................22

*Ortuno v. Jennings*,
 No. 20-CV-02064-MMC, 2020 WL 1701724 (N.D. Cal. Apr. 8, 2020)................29

*Plata v. Brown*,
 427 F. Supp. 3d 1211 (N.D. Cal. 2013) ..........................................................32, 33

*Porter v. Clarke*,
 923 F.3d 348 (4th Cir. 2019*), as amended* (May 6, 2019) ...............................24, 26

*Raynor v. Pugh*,
 817 F.3d 123 (4th Cir. 2016) ..............................................................................21

*Reaves v. Dep't of Corr.*,
  392 F. Supp. 3d 195 (D. Mass. 2019), *appeal filed* (1st Cir. Nov 4, 2019)............................33

*Robinson v. California*,
  370 U.S. 660 (1962).....................................................................................................21

*Ross v. Meese*,
  818 F.2d 1132 (4th Cir. 1987) ....................................................................................28

*Savino v. Souza*,
  459 F. Supp. 3d 317 (D. Mass. 2020) .........................................................................34

*Seth v. McDonough*,
  461 F. Supp. 3d 242 (D. Md. 2020) ..........................................................................4, 21

*Shakka v. Smith*,
  71 F.3d 162 (4th Cir. 1995) .........................................................................................22

*Thakker v. Doll*,
  451 F. Supp. 3d 358 (M.D. Pa. 2020) ..........................................................................30

*United States v. Perkins*,
  53 F. App'x 667 (4th Cir. 2002) .............................................................................33, 34

*United States v. Wallen*,
  177 F. Supp. 2d 455 (D. Md. 2001) ............................................................................33

*Weikert v. Elder*,
  No. 1:20-CV-03646-RBJ, 2021 WL 27787 (D. Colo. Jan. 4, 2021) ..........................4

*Whitney v. City of St. Louis*,
  887 F.3d 857 (8th Cir. 2018) .......................................................................................22

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).........................................................................................................20

*In re Wright*,
  826 F.3d 774 (4th Cir. 2016) .......................................................................................30

*Zepeda Rivas v. Jennings*,
  445 F. Supp. 3d 36 (N.D. Cal. 2020) ............................................................................5

## Statutes

28 U.S.C. § 2241 ................................................................................................. *passim*

42 U.S.C. § 1983..............................................................................................................3, 5

## INTRODUCTION

There is an uncontrolled COVID[1] outbreak at the Chesapeake Detention Facility ("CDF"). According to Defendants' own statistics, one-third of current residents[2] (156 of approximately 400 residents) and staff members (78 of approximately 220 employees) have tested positive for COVID. ECF No. 1-27 ¶ 26, Expert Declaration of Dr. Jaimie Meyer (February 18, 2021) ("ECF No. 1-27"); *COVID-19 Updates*, Maryland Department of Public Safety and Corrections Services, https://news.maryland.gov/dpscs/covid-19/) (last visited Feb. 21, 2021) (reflecting higher number since Dr. Meyer's review).

This outbreak, and CDF's failure to plan for and respond to it, is unconscionable. The nation is now nearly a year into the COVID-19 pandemic. Since March 2020, the CDC has promulgated, and then periodically updated, science-based guidelines and procedures designed to prevent the very type of uncontrolled COVID outbreak within jails and prisons that is now endangering the lives of hundreds of CDF residents. *Id.* ¶ 7; *see also* ECF No. 1-25, (*Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (updated Dec. 31, 2020)), available online at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. CDF has failed to implement the most basic of measures to protect residents and staff alike from COVID. ECF No. 1-27 ¶¶ 24-40.

Meanwhile, when residents test positive, meanwhile, some are sent to a warehouse setting—the Jail Industries, or "JI," Building—down the street from CDF with broken-out or drafty windows and a temperature near 55 degrees. Res. Decl. A, B, F (*see* ECF Nos. 1-2, 1-3, 1-

---

[1]   Severe acute respiratory syndrome coronavirus 2, or SARS-CoV-2, commonly called the "novel coronavirus" or "coronavirus," is the highly contagious and transmissible virus underlying this cause of action and the events described in the Complaint. The virus frequently results in a disease, COVID-19. Plaintiffs refer to both the virus and disease as "COVID" or "COVID-19."

[2]   Plaintiffs use the term "residents" to refer to individuals detained at CDF and other facilities.

7).[3] There, COVID-positive residents are stripped of their belongings and given paper shorts and a t-shirt to wear as they try to recover from their illness. ECF No. 1-2. To state the obvious, this is nothing close to the sort of environment suitable for recovery from COVID.

CDF's failures are legion. CDF does not sanitize cells when moving a COVID-positive resident out. CDF does not ensure that COVID-positive residents are moved prior to other residents entering a unit. *E.g.*, ECF No. 1-4. CDF violates CDC guideline upon guideline. Cleaning materials are in short supply, *e.g.*, ECF No. 1-2; residents cannot sanitize masks, *e.g.*, ECF No. 1-3; CDF does not enforce social distancing or masking, *e.g.*, ECF Nos. 1-3, 1-4, 1-5, 1-6; and some residents lack running water in their cells in order to maintain even a semblance of personal hygiene, *e.g.*, ECF No. 1-14. Staff reports confirm residents' accounts. ECF No. 1-20 (Tim Prudente & Phillip Jackson, *Outbreak of COVID-19 at Baltimore federal jail prompts lockdown even as feds prepare to resume grand jury proceedings*, Baltimore Sun, Feb. 3, 2020).

Named Plaintiffs and putative class members are currently and constantly in grave danger. CDF has demonstrated its inability to protect against the spread of COVID and to properly treat COVID-positive residents. During this most recent outbreak in January and February, two of the Named Plaintiffs have contracted COVID for the *second time*. ECF Nos. 1-2, 1-9. Many Plaintiffs have preexisting conditions that make them especially vulnerable to severe illness and death. Named Plaintiffs—along with approximately 400 other prisoners—are trapped in a detention facility that endangers the sick. Absent this Court's intervention, many will suffer; some will die.

Troublingly, CDF has indicated that it intends on again resuming new admissions to the facility by the middle of the week of February 21. ECF No. 1-26.

---

[3] For ease of reference, exhibits filed with the Complaint are hereinafter referred to by ECF number. A complete list of exhibits has been filed together with this brief in accordance with LR 105(5).

"[I]ndividuals placed at CDF are at a significantly higher risk of infection with COVID-19 as compared to the population in the community and that they are at a significantly higher risk of harm if they do become infected." ECF No. 1-27 ¶ 41. "Future outbreaks will happen at CDF without additional measures." *Id.* ¶ 42.

These conditions violate the named Plaintiffs' and putative class members' rights under the Eighth and Fifth / Fourteenth Amendments to the U.S. Constitution. Plaintiffs thus seek emergency relief under 42 U.S.C. § 1983 to bring CDF's conditions in line with basic public health standards. In addition, a putative subclass of medically vulnerable prisoners (the "Medically Vulnerable Subclass") seeks release under 28 U.S.C. § 2241.

Federal courts across the country, including this Court, have granted temporary restraining orders and preliminary injunctions in situations similar to, or even less life-threatening, than this. *See*, *e.g.*, *Maney v. Brown*, No. 6:20-CV-00570-SB, 2021 WL 354384, at *13, *16 (D. Or. Feb. 2, 2021) (granting preliminary injunction requiring that defendants offer vaccines to all residents of detention facilities statewide, such that individuals *living* in detention facilities are given the same priority as persons *working* in congregate-care and correctional settings); *Banks v. Booth*, 459 F. Supp. 3d 143, 162 (D.D.C. 2020) (granting TRO requiring (1) appropriate tracking and monitoring of new admissions when moved to general population, (2) consultation with public health experts, (3) additional staff training on temperature checks, (4) immediate steps to provide legal and personal calls, showers, and clean clothing, (5) social distancing, (6) clear communication to staff about personal protective equipment (PPE), (7), training of staff to ensure they wear masks correctly, (8) recommended consultation with a "sanitarian," and (9) provision of adequate cleaning supplies); *Banks v. Booth*, 468 F. Supp. 3d 101 (D.D.C. 2020) (granting preliminary injunction, including requirement that "conditions in

isolation units are non-punitive"), *reconsideration denied sub nom. Banks*, No. CV 20-849(CKK), 2021 WL 260112 (D.D.C. Jan. 26, 2021); *Weikert v. Elder*, No. 1:20-CV-03646-RBJ, 2021 WL 27787 (D. Colo. Jan. 4, 2021) (stipulated preliminary injunction, including requirement to comply with guidelines that track CDC guidelines); *Carranza v. Reams*, No. 20-CV-00977-PAB, 2020 WL 2320174, at *15 (D. Colo. May 11, 2020) (granting preliminary injunction relating to an outbreak in the Weld County jail, requiring (1) policy for social distancing, (2) procedure to protect medically vulnerable residents, (3) increased cleaning, (4) plan to increase mask distribution, and (5) policy to monitor medically vulnerable residents); *Martinez v. Reams*, No. 20-CV-00977-PAB-SKC, 2020 WL 8474726, at *2 (D. Colo. Dec. 4, 2020) (extending preliminary injunction entered in *Carranza v. Reams*); *Criswell v. Boudreaux*, No. 120CV01048DADSAB, 2020 WL 5235675, at *26 (E.D. Cal. Sept. 2, 2020) (granting TRO requiring (1) adoption of policy to reduce contacts between people in facility, (2) adoption of policy regarding masks, (3) memorialization in writing of policy regarding isolation, quarantine, and observation, (4) provide report to Court and plaintiffs' counsel report detailing testing to date, including the criteria for *why* certain people were tested) (TRO not extended); *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 454 (D. Conn. 2020) (granting TRO requiring that facility (1) provide list of medically vulnerable residents, (2) finalize process for expedited home-confinement screening, (3) shorten timelines for compassionate-release requests, and (4) complete home-confinement review process for identified individuals, along with reasoning therefore); *Seth v. McDonough*, 461 F. Supp. 3d 242 (D. Md. 2020) (appointment of inspector prior to TRO; granting TRO requiring that facility (1) develop process to identify medically vulnerable individuals, (2) prepare and file plan documenting training of staff on identifying symptoms, giving medical care to residents, and regular temperature checks, (3) prepare and file

plan for cohorting, (4) report back testing results, along with record of movement around facility, (5) prepare and file plan for provision of soap, social distancing measures, provision of masks, and other policies recommended in inspection report) (TRO not extended); *Coreas v. Bounds*, 451 F. Supp. 3d 407 (D. Md. 2020) ("*Coreas I*") (stating that court would release medically vulnerable detainees if there were any cases of COVID-19 at the facilities holding them, even though the facilities gave detainees "soap, hand sanitizer, and cleaning supplies," encouraged them to seek medical treatment for illness, and had implemented thorough screening measures; declining to grant relief absent any confirmed cases); *Coreas v. Bounds*, 457 F. Supp. 3d 460 (D. Md. 2020) ("*Coreas II*") (granting renewed preliminary injunction and releasing detainee upon positive test of nurse); *Coreas v. Bounds*, 458 F. Supp. 3d 352, 354 (D. Md. 2020) ("*Coreas III*") (releasing two other detainees); *Zepeda Rivas v. Jennings*, 445 F. Supp. 3d 36, 41 (N.D. Cal. 2020) (granting TRO ordering that (1) facility provide list of all detainees, along with medical vulnerabilities, to court and class counsel, and (2) court begin process of expediting bail hearings to consider habeas petitions).

**Plaintiffs seek initial relief in the form of a temporary restraining order under Counts I (jail conditions, under Section 1983) and II (habeas petition) of the Complaint.** Plaintiffs seek a temporary restraining order to require the following limited types of relief, several of which are directly set out in the CDC guidelines:

a)   An order that CDF immediately test all staff (including contractors) and residents of the facility for COVID-19 and publish those results immediately on receipt, along with the total number of staff and residents;

b)   An order placing a temporary pause on new admissions to CDF;

c)   An order that CDF implement and document appropriate cohorting, including quarantining and medical isolation procedures, as recommended by CDC guidelines and in accordance with testing results, including for new admission (if CDF continues to take new admissions);

d)      An order that CDF clean and disinfect frequently-touched surfaces in common areas several times per day, including phones;

e)      An order that CDF provide appropriate Personal Protective Equipment (PPE) to residents and CDF staff according to the CDC's recommendations, and receive appropriate instruction about how to wear and clean it;

f)      An order that CDF ensure each resident receives, free of charge: (1) an individual supply of liquid hand soap and paper towels sufficient to allow frequent hand washing and drying each day; (2) tissues; and (3) adequate access to a supply of cleaning and disinfectant products effective against COVID to allow for cleanings of frequently-touched surfaces several times per day;

g)      An order that CDF create and enforce social distancing policies that allow for adequate spacing of six feet or more between residents, without creating the functional equivalent of solitary confinement;

h)      To the extent a resident must enter lockdown or isolation to effectuate an appropriate quarantine or medical isolation procedure, an order that CDF provide appropriate mental health services, and, if that resident has a mental health condition, provide enhanced psychological services in these circumstances;

i)      An order that CDF provide a list of all medically vulnerable residents (as defined by CDC Guidelines) as well as all residents eligible for vaccination (as defined by Maryland's vaccine phases) to Plaintiffs' counsel and the Court within 24 hours;

j)      An order that CDF immediately create and implement a plan that complies with CDC Guidance to minimize transmission to and provide adequate medical monitoring and care to residents who are medically vulnerable to COVID;

k)      An order that CDF ensure that isolation, cohorted isolation, and quarantine cells are clean and sanitary, and that residents in them receive adequate medical monitoring, adequate hygiene products, reading material, reasonable access to phones, a daily change of clothes, and the opportunity to shower once daily, along with production of records showing CDF's efforts on these fronts to the Court;

l)      An inspection of CDF and its records (including medical records, movement records, and contact-tracing records) by an independent expert to be chosen by the Court with the parties' input;

m)      Any other relief (including remedies from the list below) necessary to effectuate the relief outlined above pertaining to Counts I and II, as well as any other relief that the Court deems appropriate.

**Plaintiffs seek further relief in the form of a preliminary injunction under all four**

**Counts of the Complaint, including Counts III (related to solitary confinement or its**

**functional equivalent) and IV (the lack of due process when being placed into solitary confinement)**.

Plaintiffs seek, pursuant to a preliminary injunction, the following limited types of relief—again, several of which are directly set out in the CDC guidelines:

n)   An order to CDF requiring the facility, its staff, and contractors to effectively communicate to all residents sufficient information about COVID, measures to reduce the risk of transmission, and any other information necessary to reasonably ensure that these individuals are aware of what precautions they can take to prevent infection (including information about the benefits and drawbacks of vaccinations);

o)   An order that CDF ensure that residents have adequate access to phones to contact counsel and/or family members such that residents need not congregate at the phones;

p)   An order that CDF end preemptive lockdown procedures and instead impose appropriate time-limited quarantines, with that time limit clearly communicated to residents, only when necessary due to a known or suspected case of COVID, as recommended by medical and public health professionals;

q)   An order that CDF offer appropriate mental health services to all residents;

r)   To the extent it is necessary to ensure constitutionally sufficient procedures or to protect certain residents' constitutional rights, order CDF to transfer residents to another appropriate facility;

s)   An order that Defendants immediately offer vaccinations to all members of the Medically Vulnerable Subclass who qualify as "high risk," as defined by Maryland guidance;[4]

t)   An order that CDF immediately release, pursuant to a writ or writs of habeas corpus, members of the Medically Vulnerable Subclass;

u)   If this Court does not immediately release the Medically Vulnerable Subclass, a consideration of these subclass members for release on non-monetary bond pending the outcome of their request for habeas relief; and

v)   Any other relief necessary to protect the constitutional rights of the residents of CDF and any other relief that the Court deems appropriate.

---

[4]    Currently, Maryland's vaccination phase includes "high risk" residents of jails and prisons. *See* https://coronavirus.maryland.gov/pages/vaccine.

## STATEMENT OF FACTS

Plaintiffs Sedric Catchings, Charles Couser, Collin Davis, Allen Lamin, Sirron Little, Taiwo Moultrie, and Howard Thomas are all detained pretrial at CDF. ECF Nos. 1-2 to 1-9, ECF Nos. 1-11 to 1-13. Plaintiff Howard Thomas is detained CDF post-sentencing. ECF No. 1-15. Of these residents, Mr. Catchings, Mr. Davis, Mr. Little, Mr. Moultrie, Mr. Speed, and Mr. Thomas all have preexisting conditions that render them more vulnerable to COVID. *See* ECF Nos. 1-11, 1-12, 1-13, 1-3, 1-4, 1-5, 1-15.

### A. COVID Is Highly Infectious and Dangerous

COVID is a highly infectious and dangerous disease. As recounted by Drs. Carlos Franco-Paredes and Dr. Jaimie Meyer, COVID can lead to catastrophic consequences, including lifelong medical problems or death. *See* ECF No. 1-28 ¶¶ 8-12, Expert Declaration of Carlos Franco-Paredes, M.D., M.P.H. (February 15, 2021) ("ECF No. 1-28") ¶¶ 7-19.

### B. Jails and Prisons Are Exceedingly Vulnerable to COVID Spread

Jails and prisons create a unique risk of spread and catastrophic consequences, requiring a concerted and deliberate effort to protect against COVID. ECF No. 1-28 ¶¶ 13-23; ECF No. 1-27 ¶¶ 20-27. By all medical and public health standards, however, CDF has failed miserably in implementing and executing the most basic of guidelines to protect against COVID, including those promulgated by the CDC. ECF No. 1-28 ¶¶ 13-23; ECF No. 1-27 ¶¶ 24-49.

### C. Lockdowns are an Inappropriate Response to COVID

Dr. Meyer and Dr. Craig Haney have explained at length the inappropriateness of large-scale lockdowns in response to infectious diseases. *See* ECF No. 1-27 ¶ 18; ECF No. 1-29 (February 18, 2021 Expert Declaration of Dr. Craig Haney) ¶¶ 14-29. As Dr. Haney explains, procedures that impose extended periods of isolation or restrict hygiene options (such as showers) are inappropriate, ill-conceived, and counter-productive. In fact, they could very likely

exacerbate rather than limit or alleviate the spread of COVID-19. According to Dr. Haney, instead of preemptive lockdowns, jails and prisons should institute such lockdowns only where medically necessary to resolve discrete issues, such as sanitizing dorms or contact tracing of an infected prisoner. If such lockdowns are employed, for these limited purposes, they should be reasonably time-limited. Staff also should communicate that time-limit to the affected prisoners. *Id.* ¶ 26.[5]

### D. Defendants Have Been Given Multiple Warnings of the Dangers of Not Responding Swiftly and Appropriately

Defendants are well-aware of the dangers in not planning and responding to COVID appropriately. Defendants have themselves reported the consequences of these failures, in CDF's dramatically high levels of infection. ECF No. 1-27 ¶¶ 26-27 (relying on publicly reported statistics from CDF). Defendants are also well-aware of CDC guidelines, but have chosen not to execute on those policies. *See id.* ¶ 26.

The Warden himself is personally aware of the circumstances on the ground at CDF. ECF No. 1-11. ("On Tuesday, February 2, they came to pack up the negative people to send back to the E unit, where I started quarantine when I got to CDF. The people who were negative were moved. The warden was there when they were moving us. I asked to use the phone to talk to my lawyer to talk about the situation. He told me no.").

### E. DPSCS and CDF Have Wildly Mishandled the COVID Pandemic and Thereby Caused a COVID Disaster Within the Facility

#### a. CDF's Failure to Plan for Introduction of Virus to the Facility

Although the pandemic has been ongoing since March 2020, and in spite of clear evidence that the risk posed by infectious diseases in jails and prisons is significantly higher than

---

[5]     For a more detailed discussion of the reasons that lockdown are inappropriate, see ECF No. 1 ¶¶ 71-78.

in the community, CDF has utterly failed to create a comprehensive approach—with plans for different scenarios—to handle an increase in positive cases among the resident population. *See* ECF No. 1-27 ¶¶ 13, 25, 27. As Dr. Meyer recounts, "It is also my professional judgment that this outbreak was preventable. This outbreak reflects CDF did not appropriately prepare or plan for this situation. CDF has demonstrated that it is unable to handle the current situation. Problems in implementing basic disease prevention and management strategies have persisted even after the outbreak in mid-January 2021. . . . Future outbreaks will happen at CDF without additional measures." *Id.* ¶ 42.

This lack of planning has resulted in intermixing between different groups of residents. As described by Dr. Meyer, and as recounted by multiple residents, COVID-negative residents have been forced into living quarters with COVID-positive residents. *Id.* ¶ 27; *see e.g.,* ECF No. 1-6 ("One of those two guys said, 'Be careful, I have COVID.' I asked what cell he was in. He said he was from cell 32. . . . They put me into cell 32 right after those two guys left. Nobody cleaned it out before they put me in the cell. Nobody cleaned it or sprayed it or anything. I couldn't believe they were trying to put me in this cell.").

### b. CDF Mismanagement in 2020

CDF's reckless treatment of residents long predates the 2021 outbreak, and indeed dates back to the beginning of the pandemic. In 2020, CDF housed COVID-positive residents in cells alongside COVID-negative residents in the intake unit. ECF No. 1-5 ("[T]wo other new guys came into intake. These two guys were in the same cell together. After two days or so, COs took one of the guys out the intake unit. That guy was saying that he felt sick. I never saw that guy come back. CDF did not make me quarantine or isolate after that second man was removed from the intake unit. Nobody checked my temperature until five days after the second guy was taken out. Nobody asked me if I had any symptoms."). Upon removal of the COVID-positive residents,

CDF not only failed to quarantine or test the residents who had been exposed to the virus; for several days, the facility did not even bother to take the temperatures of residents who were exposed. *Id.* In 2020, two CDF residents in a unit within the facility who experienced symptoms were tested for COVID. After these individuals tested positive, they were permitted to use the shared telephones, during normal recreation time, *while* non-symptomatic residents who had not been tested for COVID were out of their cells, *before* being removed from the unit. *Id.*

CDF also failed to clean or sanitize the telephones or other surfaces these COVID-positive residents touched *after* receiving positive test results. *Id.* DF staff likewise failed to provide soap to exposed residents, even when residents requested soap. *Id.*

### c. Moving into 2021: Intermixing Among Cohorts and Other Individuals

One of CDF's biggest failings since this outbreak began is in its evident inability or unwillingness to separate residents into different groups and to reduce the risk of spreading COVID. This process is called "cohorting." As described by Dr. Meyer, effective cohorting involves separating people into four homogenous groups based on their known disease status: (1) Intake quarantine, (2) Medical isolation, (3) Post-exposure quarantine, and (4) General population. ECF No. 1-27 ¶ 27(l).

But from 2020 and continuing to the present, CDF has—in direct contravention of best practices and scientific guidance—facilitated and encouraged the intermixing of cohorts.

Residents who have not tested positive have been forced into the uncleaned cells of residents who tested positive. *E.g.*, ECF No. 1-4. One resident was forced to remain locked in his cell with his symptomatic cellmate, who "had basically every symptom of COVID." ECF No. 1-13. Another resident was left in a cell with his cellmate for two full days *after* the cellmate had tested positive. ECF No. 1-6. This resident was then moved to another unit in the facility, where he crossed paths with *another* resident who warned he had *also* tested positive for COVID. The

resident was placed in the positive individual's cell immediately. The cell was not cleaned, nor was the resident given any materials to clean the cell himself. *Id.*

Staff reports corroborate resident reports. According to one corrections officer, "It was mass movement [February 3]. People were just walking around regularly." ECF No. 1-20 at 4.

The more recent failures at CDF are also the most striking. On February 12, 2021, CDF moved a female resident to the "cadre," which housed only males at the time. ECF No. 1-11. The woman was brand new to the facility, and at least one resident in the "cadre" had already tested positive for COVID. Beyond her potential risk of exposure to COVID, her placement in a male unit is inappropriate for health and safety protocols in a jail. ECF No. 1-27 ¶ 27(l).

This failure—placing a new admit around COVID-positive individuals—is not an isolated incident. CDF did the same exact thing in early 2021, placing a new admission, also a woman, into the "cadre." ECF No. 1-14. A few days later, CDF moved multiple positive *male* residents into the unit. These positive residents were clearly symptomatic, with one "coughing a lot." *Id.* As this woman recounted: "I asked the guards why a male was in my unit. That didn't make sense to me. That made me feel anxious and very uncomfortable. The guards said there was nothing they could do. I told them I could hear that he was sick. They told me not to worry. I could hear him talking to his family members and saying that the reason he was in the 'cadre' was because he was having symptoms of COVID and that he had to be in that unit for 14 days. His cell was right next to mine—there was just a wall in between us." *Id.*

CDF ignored her pleas for human decency and continued its approach into February 2021.

CDF has also conceded its failure to track and record the movement of various residents around the facility. CDF's "'Dash Board' record[,] which contains daily statistical information

for the facility[,] . . . *has been historically unreliable* . . . ." ECF No. 1-26 (e-mail from Sean Wolcoff of the U.S. Marshals Service dated February 18, 2021, entitled "Today's DPSCS Meeting Notes") (emphasis added).

Despite its failings, CDF has indicated that it intends on again resuming admissions by the middle of the week of February 21. ECF No. 1-26 ("CDF had originally planned to accept new prisoner intakes by Wednesday 2/24/21, but Warden Wilson is now dubious of that since yesterday's Airlift was cancelled due to weather.").

### d. Failure to Contact Trace

CDF has also failed to meaningfully contact trace, often neglecting to ask residents exposed to positive residents whether they experienced any symptoms—let alone quarantine them from other residents. ECF No. 1-27 ¶ 27(d); *see also, e.g.*, ECF No. 1-5 ("CDF did not make me quarantine or isolate after that man was removed from the unit. Nobody checked my temperature, or asked me if I had any symptoms."); ECF No. 1-6. These problems are presumably exacerbated by CDF's failure to meaningfully track the movement of residents. *See* ECF No. 1-22.

CDF also ignored symptomatic residents and trace individuals with whom those symptomatic residents had come into contact. ECF No. 1-3 ("At CDF, I heard guys coughing pretty frequently. That was happening in December. They didn't get tested until 2021. I was around those guys who were coughing. COs didn't come around and ask if we had symptoms. COs were treating us like we were all positive.")

### e. Cleaning Deficiencies

According to Dr. Meyer, until vaccination of the majority is achieved, required COVID prevention strategies must include containment procedures, like cleaning. ECF No. 1-27 ¶ 12.

But the facility has failed to provide essential personal hygiene products to residents, and has even restricted residents' access to running water for handwashing. ECF Nos. 1-3, 1-5, 1-7. One resident recounts that even if she wanted to wash her hands in her cell—which CDF staff frequently do not permit residents to do during rec time—she had no ability to do so: "From January 12 to February 2, I did not have running water in my cell. I couldn't wash my hands in the cell. I told the guards. They didn't do anything." ECF No. 1-14. CDF has been so abysmal in its provision of cleaning supplies that staff report that even they have to bring in their own cleaning supplies. ECF No. 1-20. The facility has likewise failed to consistently provide soap to residents free of charge or on a regular basis. ECF Nos. 1-3, 1-5, 1-7, 1-12. Worse, CDF has not provided hand sanitizer in place of soap. *See* ECF Nos. 1-5, 1-7, 1-9, 1-10, 1-11. Meanwhile, residents who request cleaning supplies are either ignored or told no supplies are available. ECF Nos. 1-2, 1-3, 1-4. Likewise, surfaces in common areas are not cleaned between recreation shifts. ECF Nos. 1-2, 1-3, 1-9.

In the nightmarish environment of the "cadre"—where CDF mixes newly admitted female residents with COVID-positive, symptomatic male residents—CDF does nothing to clean common areas after confirmed positive residents mill about and touch surfaces. As one female resident explained: "On January 8, a male detainee came into the 'cadre' unit. He was coughing a lot . . . . The guards said there was nothing they could do. . . . Every time the guy used the phone, he didn't wipe down the phone. . . . After those four days, another guy came into the 'cadre.' This other guy was put on the other side of me. So I had a male detainee on both sides of me. This new guy was sick too. I could hear him coughing too. Then they put another guy on G6, two cells away. They then put another guy on G5, three cells away. These other two guys had

symptoms too. . . . CDF staff never cleaned or sanitized any of the common areas on the 'cadre.'" ECF No. 1-14.

Similarly, the facility has not only failed to clean cells after positive residents are relocated, CDF staff have outright denied residents—forced to move into those contaminated cells—access to cleaning supplies so that the residents can try to disinfect the space on their own. ECF No. 1-4.

### f.   Failure to Provide Masks or Enforce Social Distancing

According to public health experts, the COVID pandemic requires *proactive* social distancing measures in correctional facilities to reduce the risk of transmission and death due to COVID within facilities. ECF No. 1-28 ¶ 43. CDF has not only failed to proactively adopt social distancing; the facility has neither required nor enforced any degree of social distancing among residents. CDF officers do not even attempt to encourage or enforce distancing among residents. ECF Nos. 1-2, 1-3, 1-5, 1-7, 1-11. Indeed, in early February, despite the outbreak across the facility, CDF let out around 20 residents to watch the Super Bowl without requiring anyone to wear a mask—a reckless decision given the positive numbers at CDF at the time. ECF No. 1-10.

According to Dr. Meyer, a key infection prevention strategy of this droplet-borne disease is the widespread use of masks. Masks should be regularly cleaned and sanitized to optimize their effectiveness. Masks only work to protect people from infection when used and when worn correctly. ECF No. 1-27 ¶ 30. But CDF fails on this count too. Neither residents nor staff at CDF wear masks correctly and consistently. ECF Nos. 1-2, 1-3, 1-5, 1-7. When outside their cells, it is "optional" for residents to wear masks. ECF Nos. 1-3, 1-4, 1-5, 1-6, 1-8, 1-10. Residents worried for their personal health and safety must try to police the mask-wearing of their fellow residents. ECF No. 1-11. Further, residents are also not able to clean the masks they do have. Contrary to CDF's claims, many residents have only one mask. *E.g.*, ECF Nos. 1-3, 1-14. To clean these

masks, residents would have to send them out with laundry, which takes at least a day (leaving the mask owner without protection while its gone) and requires that the mask owner be willing to risk having no mask at all (as laundry is routinely lost). ECF No. 1-3; *see also* ECF No. 1-27 ¶ 30(b).

### g. Inhumane Treatment of COVID-Positive Residents

As appalling as is CDF's inexplicable disregard for the risk of COVID exposure and spread, the facility's treatment of residents who test positive for COVID-19 is even more unconscionable. Some COVID-positive CDF residents are removed from CDF and sent to the Jail Industries Building ("JI"). Originally built in 1922 as an office building and retrofitted as a jail in the 1980s, JI was closed in 2017 due to what public safety officials called a "security nightmare."[6] One COVID-positive resident who was recently housed at JI saw a thermostat in the building showing that the temperature was 55 degrees. ECF No. 1-3. This is unsurprising, given the number of broken or drafty windows at the facility and the fact that January and February are two of the coldest months of the year. *Id.* Worse, Residents at JI are not given appropriate clothing to brave the cold. ECF No. 1-2. According to two JI residents, upon their arrival at JI, they were forced to turn in their clothing in exchange for paper-material hospital shorts, a t-shirt, and shower shoes. ECF No. 1-2 ("They gave us paper shorts, like what paper masks are made of. They gave us a short sleeve shirt."); ECF No. 1-3 ("When they moved me, they took all my clothes. They gave all of us at JI hospital shorts. We got a T-shirt and a pair of boxers."). Cleanliness, too, is unattainable for these COVID-positive JI residents. Not only is the facility itself dirty and not subject to regular cleaning, but the shower facilities are infested with flies. ECF No. 1-2.

---

[6]     https://www.wbaltv.com/article/i-team-looks-inside-closing-jail-facility-in-baltimore/12139786 (containing a video tour of the closed facility).

According to Dr. Meyer, the primary manifestation of severe COVID disease is pneumonia, which produces distinct lung sounds that could herald severe disease and reflect people's subjective reports of shortness of breath. Simply marking down a patient's vital signs— even with oxygen readings—is not sufficient medical care for COVID disease. ECF No. 1-27 ¶ 35(b). Yet COVID-positive JI residents receive little medical care, *despite* the fact that they are only in JI because they have contracted a deadly virus. The entirety of the medical care provided at JI is the following: residents' vital signs and temperatures are checked once every five hours. ECF Nos. 1-2, 1-3. Residents are not asked to report their symptoms. ECF No. 1-2. Nobody listens to the residents' lungs to be sure they are breathing normally. *Id.*

And those with preexisting conditions that make COVID notably more dangerous have even been denied access to previously approved medical care. According to one of two COVID-positive residents who was housed at JI, he went multiple days without his inhaler to treat his preexisting condition (one that is exacerbated by COVID)—because he was forced to leave it at CDF. ECF No. 1-3 ("I went from Tuesday, February 2, to Saturday, February 6, without my inhalers at JI.")

### h. Other Serious Deficits with Medical Care, including the Failure to Offer Vaccinations to All Eligible Residents

CDF does not sufficiently monitor for COVID symptoms in residents. ECF No. 1-3. One resident was also given the medication for *another* resident at CDF—medication that could have seriously harmed him had he not resisted the staff's instructions to take the prescription. ECF No. 1-9 ("That night [February 9], a nurse came by and told me to take my diabetes and hypertension medication. [I don't have diabetes or hypertension.] I told the nurse I wouldn't take that medication. The nurse came back at around midnight and brought me two Motrin. The nurse didn't bring me the antibiotics or any wound care. On February 10, the same thing happened--a

17

nurse came by and gave me medication that she said was for hypertension and diabetes. I called out for the captain and explained the situation and showed him my paperwork.").

Likewise, CDF does not respond to some sick calls at all. The facility is declining to take some residents to sick calls, and some don't even have the chance to file sick call requests. ECF Nos. 1-3, 1-6, 1-8.

Under Maryland's Plan for distribution of COVID vaccine,[7] vaccine is supposed to be available for all "high-risk incarcerated individuals" under "Phase 1B" of the Plan. Nonetheless, although Maryland is reportedly moving on to vaccinate persons in the general population eligible under the next phase ("Phase 1C") of the Plan, there is no indication that all "high-risk incarcerated individuals" at CDF are being offered vaccinations.[8]

### i.  Overuse of Solitary Confinement

During COVID-related lockdowns, residents (those who tested negative and positive alike) were held in their cells for 24 hours a day, even denied access to showers for multiple days—a confounding restriction, given the necessity of sanitation and hygiene to stop the spread of this virus. ECF No. 1-7. One resident recounts that "they didn't open our cell doors for 25 hours. During that time, I had no water to wash my hands or to drink." ECF No. 1-14. The same resident recounts that "We got locked down a second time, and couldn't leave our cells. The

---

[7]     Maryland Department of Health, Maryland moves into Phase 1C of its COVID-19 vaccine distribution plan, opens eligibility to all residents 65 and up (Jan. 25, 2021),
https://health.maryland.gov/newsroom/Pages/Maryland-moves-into-Phase-1C-of-its-COVID-19-vaccine-distribution-plan,-opens-eligibility-to-all-residents-65-and-up.aspx.

[8]     The Plan does not specifically define the term "high risk individuals" but includes within that category: "Persons at highest risk of developing complications from COVID-19 (ACIP high risk conditions), including persons 65 and older, staff and residents of nursing homes (SNFs), long-term care facilities (LTCFs), assisted care facilities,      and      clients      of      senior      daycare      facilities      *or      similar*." https://phpa.health.maryland.gov/Documents/10.19.2020_Maryland_COVID-19_Vaccination_Plan_CDCwm.pdf, at 13 (emphasis added).  It is clear the Plan intends to include at least a portion of the detainees at CDF within Phase 1, because the Plan goes on to estimate the population to be vaccinated in Maryland under the Plan in Phase 1 as including approximately 54,460 "people in prisons, jails, detention centers and staff." *Id.* at 13.

guard brought me some ice [because my sink in my cell did not function]. He said he wouldn't bring me water. He told me to wait for the ice to melt." *Id.*

Other residents have been held—without explanations or test results—in units where they are locked inside their cells for 23 hours a day. ECF Nos. 1-6, 1-7, 1-12 ("("They locked down CDF in late January. They didn't tell us why. They didn't tell us they locked down because of COVID."). And even for those *not* being held inside their cells for 23 or 24 hours every day, they are nonetheless confined to the cells for 20 hours every day. *E.g.*, ECF No. 1-11.

Explanations for the lockdowns have been absent at best and potentially misleading. One resident was told by a member of the U.S. Marshals Service that the "bad conditions" at CDF (perhaps lockdown measures) were because of their criminal defense attorneys trying to get them out of jail. ECF No. 1-5. Another recounts that CDF staff told residents that the unit was locking down because "there weren't enough guards to take care of us"—another example of a failure to plan on CDF's part. ECF No. 1-14.

### j.   CDF's Mismanagement has Caused a Massive Outbreak

CDF's catastrophic failure to employ even the most basic tenets of virus containment and mitigation strategies has led, predictably, to a massive COVID outbreak. As Dr. Meyer recounts, "This timeline of explosive growth of the virus, as well as CDF quickly abandoning plans to isolate or quarantine in particular areas, demonstrates a failure to plan," resulting in two residents testing positive for the *second* time. ECF No. 1-27 ¶ 27(i)-(j) (noting that "[r]e-infections with COVID-19 . . . have been reported to occur outside of those 90 days").

The grave missteps of CDF were detailed at length at a detention hearing in *United States v. Hodges,* 8:20-cr-00148-px-1 (D. Md. Feb. 17, 2021). Ms. Hodges—who is almost 70 years old, takes three medications a day for hypertension, and suffers from anxiety—was detained after an initial hearing on February 2, 2021. At that initial hearing, the United States Attorney's Office

for the District of Maryland informed the District Court that Ms. Hodges would not be sent to CDF (presumably based on assurances from CDF itself, in light of the ongoing outbreak in the facility). Despite these assurances, Ms. Hodges was nonetheless placed at CDF pending her hearing on February 17. She was placed into a male unit at CDF, with a least four other residents who had tested positive for COVID—a wildly dangerous placement that intermixed different cohorts. Like many other residents, CDF also forced Ms. Hodges to go without medication for multiple days. Ms. Hodges' experience—also reflected in the declaration of another resident, *see* ECF No. 1-9—shows the degree to which CDF has refused to change its practices in light of COVID.

## ARGUMENT

Plaintiffs seek a temporary restraining order (TRO) and preliminary injunction to address unconstitutional conditions of confinement at CDF. To obtain a TRO or a preliminary injunction, Plaintiffs must show the following: (1) Plaintiffs are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in Plaintiffs' favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, (2008). Plaintiffs satisfy all four requirements.

**I.     A Temporary Restraining Order Should Immediately Issue to Address CDF's Unconstitutional Conditions, with a More Comprehensive Preliminary Injunction to Follow.**

Over the last year, federal district courts, including this Court, have granted temporary restraining orders or granted preliminary injunctions to remedy constitutionally inadequate conditions that increase the threat of COVID-19, ordering jails to comply with the CDC Guidance and take other necessary measures to protect prisoners from infection, serious illness, and death. *See supra* at 3-5 (recounting recent decisions). Appointment of an independent inspector is particularly common at the TRO stage in these cases, with an inspection occurring in

at least one case (in this District) *prior* to any hearing on the TRO. *E.g.*, *Seth v. McDonough*, 461 F. Supp. 3d 242 (D. Md. 2020) (appointment of inspector prior to TRO hearing). Because the conditions in CDF create a substantial risk of serious future harm to the prisoners' health, this Court should grant the proposed temporary restraining order and preliminary injunction.

**A. Plaintiffs Are Likely to Succeed on the Merits of Their Eighth And Fifth / Fourteenth Amendment Claims.**

The Eighth and Fifth / Fourteenth Amendments prohibit state actors from exposing incarcerated people to conditions of confinement that threaten their health and safety. *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *see Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (stating that prison officials must take "reasonable measures to guarantee the safety of the inmates"). This is sometimes referred to as a "substantial risk of harm." While the Eighth Amendment secures the right of people convicted of a crime to be free from exposure to serious harm, *Helling*, 509 U.S. at 33, the Due Process Clauses of the Fifth and Fourteenth Amendments afford at least as much protection to pretrial detainees, *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

To establish a conditions-of-confinement violation under these amendments, plaintiff must also make a "state of mind" showing. Two different tests apply. Under the Eighth Amendment,[9] an official is liable if the official displays "deliberate indifference" to "a condition of confinement that is sure or very likely to cause serious illness and needless suffering" to someone detained, which includes "exposure of inmates to a serious, communicable disease." *Helling*, 509 U.S. at 33. The due process and Eighth Amendment analyses differ. Under the due process standard, a plaintiff can prevail in showing that the defendant "knew, or should have

---

[9]      The Eighth Amendment is applied against state actors under the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660 (1962).

known, that the [challenged] condition posed an excessive risk to health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). Under the Eighth Amendment standard, a plaintiff must show that the defendant was deliberately indifferent to the risk posed. *Helling*, 509 U.S. at 35. In other words, the Eighth Amendment calls for a subjective analysis of the defendant's intent, while the due process analysis requires only an objective analysis of whether the defendant should have known of the risks of harm.[10]

Here, there is a substantial risk of harm and. In addition, both the Eighth Amendment and due process "state of mind" tests are met.

### 1. The Jail's Conditions Create a Substantial Risk of Serious Harm.

To meet the first part of the test, CDF residents must show that they face "a substantial risk of . . . harm resulting from the prisoner's unwilling exposure to the challenged conditions." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).[11] Plaintiffs easily clear that bar.

---

[10]    This different approach for pretrial detainees versus convicted prisoners logically follows from the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389, 394 (2015), in which the Court held that an objective—not subjective—standard applied to a pretrial detainee raising an excessive-force claim. Many circuits have applied this reasoning to conditions-of-confinement claims. *Compare Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc) (adopting a new objective standard for deliberate indifference claims brought by pretrial detainees); *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (same); *Miranda v. Cty. of Lake*, 900 F.3d 335, 351-52 (7th Cir. 2018) (same) *with Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419 n. 4 (5th Cir. 2017) (declining to reconsider its earlier precedent treating Eighth and Fourteenth Amendment claims alike); *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) (same); *Nam Dang by and through Vina Dang v. Sheriff, Seminole Cty. Florida*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (same). The Fourth Circuit has yet to grapple with *Kinsley's* impact on conditions of confinement claims. *E.g.*, *Duff v. Potter*, 665 F. App'x 242, 244-45 (4th Cir. 2016) (applying objective reasonableness standard to a detainee's excessive-force claim but not his medical-need claim, which it affirmed on forfeiture grounds). Whether or not the pretrial test continues to include a subjective component, the claims in this case meet both standards, as described below.

[11]    Since Plaintiffs' claims involve inadequate medical treatment, and since a subclass of them is medically vulnerable due to preexisting conditions, Plaintiffs could also frame these claims in terms of "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see Coreas v. Bounds*, 451 F. Supp. 3d 407 (D. Md. 2020) (assessing medically vulnerable detainees' conditions claim through this lens). However, since CDF's dangerous conditions include both failures in medical care and other basic safety precautions and imperil prisoners both with and without preexisting conditions, Plaintiffs' claims are best characterized as a challenge to conditions that create a substantial risk of "serious illness and needless suffering." *Helling*, 509 U.S. at 33. Regardless, "'[w]hether one characterizes the treatment received by [the resident] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard.'" *Id.* at 32 (quotations omitted).

As detailed extensively by Dr. Franco-Paredes and Dr. Meyer, COVID-19 is highly communicable and itself creates a substantial risk of harm. The conditions at CDF only magnify this risk. As Dr. Meyer explains, "individuals placed at CDF are at a significantly higher risk of infection with COVID-19 as compared to the population in the community and that they are at a significantly higher risk of harm if they do become infected. These harms include serious illness and even death." ECF No. 1-27 ¶ 41.

These conditions satisfy the objective test. In *Coreas v. Bounds*, 451 F. Supp. 3d 407, 428 (D. Md. 2020), this Court found that detainees at two different ICE facilities had shown a substantial risk of serious harm before there were *any confirmed cases* of COVID-19 at those facilities. *Id.* (stating that it would release medically vulnerable detainees if there were any cases of COVID-19 at the facilities holding them, even though the facilities gave detainees "soap, hand sanitizer, and cleaning supplies," encouraged them to seek medical treatment for illness, and had implemented thorough screening measures); *Coreas v. Bounds*, 457 F. Supp. 3d 460 (D. Md. 2020) ("*Coreas II*") (granting renewed preliminary injunction and releasing detainee upon positive test of nurse); *Coreas v. Bounds*, 458 F. Supp. 3d 352, 354 (D. Md. 2020) ("*Coreas III*") (releasing two other detainees)*; see also Jones v. Wolf*, 467 F. Supp. 3d 74 (W.D.N.Y. 2020) (finding that the risk of COVID-19 in an immigration detention facility satisfied the objective factor even through there were no reported cases there).[12] Here, of course, an outbreak at CDF is already in progress that has infected one-third of residents and staff.

---

[12]    In other factual contexts, courts have found that far more attenuated dangers than the immediate threats here could satisfy the objective test. *See, e.g., Helling*, 509 U.S. at 35 (affirming circuit court's holding that second-hand smoke posed an unreasonable risk of serious harm to a prisoner's future health); *Johnson v. Epps*, 479 F. App'x 583, 590-91 (5th Cir. 2012) (finding that prison policy under which prisoners use unsterilized barbering instruments, which could expose them to communicate diseases, posed an unreasonable risk of future harm), *Brown v. Bargery*, 207 F.3d 863, 865, 867-68 (6th Cir. 2000) (finding that improperly installed prison bunks that created a danger that inmates could slide off of them and onto the concrete floor, as well as protruding anchor bolts "which could potentially cause an injury," could constitute a risk to their future health under the objective prong); *DeGidio v. Pung*, 920 F.2d 525, 527-29 (8th Cir. 1990) (affirming district court's conclusion that a "serious risk to the

23

In addressing the objective component, courts must also "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling*, 509 U.S. at 36.

Society has deemed the risk posed by COVID-19 intolerable: there have been unprecedented changes to American life to avoid it. Drs. Franco-Paredes and Meyer describe at length the life-changing risks of COVID, including medical complications that may be lifelong, as well as the long list of CDC guidelines—including specific guidelines for detention facilities.

Meanwhile, CDF has aggravated the risks of COVID-19 by (for example) exposing residents to extreme psychological distress through the use of punitive lockdowns and isolation conditions. *See Doe v. Barr*, No. 20-CV-02141-LB, 2020 WL 1820667, at *9 (N.D. Cal. Apr. 12, 2020), at *16 (finding that "petitioner's other diagnoses of chronic PTSD and depression compound his susceptibility" to a COVID-19 infection); *see id.* at *5-6 (detailing evidence that mental illness can depress the immune response and lead to an increased risk of infections). Further, although Plaintiffs' claims address the risk of harm imposed by the sum total of CDF's inadequate conditions, some of CDF's conditions may independently create a substantial risk of serious harm. *See*, *e.g.*, *Porter v. Clarke*, 923 F.3d 348, 357 (4th Cir. 2019*)* (finding that conditions wherein prisoners spent "between 23 and 24 hours a day 'alone in a small . . . cell' with 'no access to congregate religious, educational, or social programming'—pose[d] a 'substantial risk' of serious psychological and emotional harm.") (quotations omitted), *as amended* (May 6, 2019); *McBride v. Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001) (finding deliberate indifference where a prisoner was forced to live in a feces-covered cell for three days).

---

inmates' health existed" where a prison had an inadequate response to a tuberculosis outbreak even though "[o]nly a few infected individuals develop active tuberculosis" and the rest are asymptomatic).

### 2. Defendants Knew of, or Should Have Known of, and Disregarded the Excessive Risk to Prisoners' Health and Safety Posed by COVID-19, Particularly Absent Appropriate Precautions.

#### (a) Eighth Amendment Test

To satisfy the subjective component of deliberate indifference, a plaintiff must show that prison officials "kn[ew] of and disregard[ed] an excessive risk to [the plaintiff's] health or safety." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). "[T]he test is whether the [prison officials] kn[ew] the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quotations omitted).

The CDC's guidance for correctional and detention facilities was issued almost a year ago, explicitly warning of the specific dangers COVID-19 imposes in these institutions. *See generally* ECF No. 1-27 (describing specific dangers of COVID in detention facilities and outlining CDC guidelines, which have been updated on multiple occasions). CDF was well aware of the requirements needed to protect against an outbreak, and to ensure proper treatment of residents. ECF No. 1-16 (referring to CDC guidelines); ECF No. 1-17 (same); ECF No. 1-18 (same); ECF No. 1-19 (same); ECF No. 1-24 at 13 ("DPSCS represents that it is committed to providing all necessary precautionary measures and supportive therapies to avoid an outbreak of COVID-19, including taking all of the preventative actions advised by the CDC[.]"). *See also* Secretary's Directive, DPSCS, June 7, 2020, https://itcd.dpscs.state.md.us/PIA/ShowFile.aspx?fileID=1531, at 2 (indicating that DPSCS will follow CDC guidelines for detention facilities).[13]

---

[13]    In response to a media inquiry regarding this lawsuit, Mark Vernarelli, a spokesman for DPSCS, said in a statement that "the state's 21 detention facilities follow Maryland Health Department guidelines for containing the spread of the coronavirus inside congregate settings, including frequent testing, isolating those who are infected and restricting movement among inmates." Antonio Olivo, Coronavirus outbreak inside Maryland detention facility

But CDF failed at every turn: on cohorting, on cleaning supplies, on face masks, on medical care for vulnerable patients. On top of a complete failure to plan for and implement these protocols, CDF then turned a blind eye when an outbreak overtook the facility, placing new admissions with symptomatic COVID-positives residents and shipping out other COVID-positive residents to a wretched warehouse down the street. Defendants knew the dangers imposed by COVID-19. DPSCS (and CDF) publicly reported its COVID numbers throughout 2020 and into 2021, speaking to growing numbers at certain facilities and a rapidly growing number of positive staff members, too. *See Makdessi v. Fields*, 789 F.3d 126, 141 (4th Cir. 2015) (when danger has been "expressly noted by prison officials," this can prove that official's actual knowledge under the subjective test).

In many ways, the numbers alone demonstrate deliberate indifference on the part of Defendants: one third of residents and staff tested positive for COVID within a month. This is not a mere accident, nor mere negligence—not when the country is one year into dealing with a virus that has dramatically altered virtually every aspect of daily life.

The risks imposed by Defendants' failures are obvious. It is not challenging to predict the grim results of intermixing cohorts, denying prisoners soap, neglecting to sanitize common surfaces, locking medically vulnerable prisoners in cells with for 23-hours per day, and failing to monitor and treat symptomatic prisoners during a pandemic. *See Porter*, 923 F.3d at 348, 361

---

sparks class-action lawsuit (Feb. 20, 2021), The Washington Post, https://www.washingtonpost.com/local/public-safety/coronavirus-outbreak-inside-maryland-detention-facility-sparks-class-action-lawsuit/2021/02/21/3534ab4a-73c2-11eb-85fa-e0ccb3660358_story.html.Vernarelli stated that "CDF follows strict health-department COVID guidelines and protocols and is subject to regular compliance audits." *Id.* The Class Action Complaint (ECF No. 1), together with all exhibits, including those filed under seal (ECF Nos. 2 - 10), Plaintiffs' Motion to Seal (ECF No. 11), and the proposed Summonses (ECF No. 12) were served on the Maryland Attorney General via email to civil_service@oag.state.md.us on February 20, 2021 in accordance with Maryland Rule 1-124(j) & (k) and the procedures established by the Office of the Attorney General.

("[A]n obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate.") (quotations omitted); *Makdessi*, 789 F.3d at 141 (stating that subjective test can be satisfied where the risk of harm "was so obvious that it had to have been known").

Even if CDF has created policies that tracked CDC guidance on paper, the result does not change, because it is what CDF actually has done that matters. Unquestionably, in practice, CDF has failed to follow proper protocol. *See Banks v. Booth*, 459 F. Supp. 3d 143, 158 (D.D.C. 2020) (granting TRO, based on declarations from residents rebutting that jail implemented its own written policies: "Based on the current record, Plaintiffs have provided evidence that Defendants are aware of the risk that COVID-19 poses to Plaintiffs' health and have disregarded those risks by failing to take comprehensive, timely, and proper steps to stem the spread of the virus."); *Martinez-Brooks v. Easter*, 459 F. Supp. 3d at 443 (finding that plaintiffs were likely to succeed on Eighth Amendment claim); *Carranza v. Reams*, 2020 WL 2320174, at *10 (same, despite some efforts on part of prison facility to mitigate against COVID). The predictable result of CDF's conduct is a worsened outbreak in a facility that is failing to meet infected residents' medical needs.

Plaintiffs have thus satisfied the subjective factor and shown deliberate indifference.

### (b) Fifth / Fourteenth Amendment test

The above analysis, meanwhile, applies only to the Eighth Amendment claims raised in this suit, for convicted individuals who have already been sentenced at CDF. For residents held pretrial at CDF, their burden is lower—to show that Defendants "knew, or should have known, that they need only show that the [challenged] condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. As discussed above, Plaintiffs and proposed class members

have demonstrated that Defendants knew of the risk of COVID-19 and then recklessly disregarded that risk. By meeting their burden under the Eighth Amendment, Plaintiffs and proposed class members have, by definition, met their burden under the Fifth Amendment.

**B.  Plaintiffs Will Suffer Irreparable Harm Absent Immediate Relief**

Without this Court's relief, Plaintiffs will suffer irreparable harm for two reasons. First, "the denial of a constitutional right . . . constitutes irreparable harm." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). Second, CDF's conditions subject Plaintiffs to an increased risk that they will contract COVID-19 (or contract it again) and that they will suffer serious illness, physical harm, and death if they do. This is irreparable harm, too. *See*, *e.g.*, *Coreas v. Bounds*, 451 F. Supp. 3d at 428-29 (finding that, if there were any COVID-19 cases in the immigration facilities at issue, petitioners faced "a significant risk of death or serious illness," and that this is irreparable harm).

**C.  The Balance of Equities and the Public Interest Favor the Requested Relief**

The balance of equities favors Plaintiffs. Plaintiffs face infection and sickness in a jail that cannot protect them; they seek this injunction to avoid serious illness, long-term physical damage, and death. CDF need only comply with basic public health measures.

The relief that Plaintiffs seek is also in the public interest. CDF is not an isolated environment. Uncontrolled infection within CDF risks the health and safety of every person connected directly or indirectly to the many correctional officers, healthcare workers and others who enter and leave the Jail environment every day. *See* ECF No. 1-27 ¶ 14 ("Prison health *is* public health." (emphasis in original)); 49 ("Health in jails and prisons is community health. Protecting the health of individuals who are detained in and work in these facilities is vital to protecting not only those individuals, but the health of the wider community.").

Therefore, any remedy that will protect the Plaintiffs benefits the wider community. *Castillo v. Barr,* 449 F. Supp. 3d 915, 923 (C.D. Cal. 2020) ("[T]he emergency injunctive relief sought, here, is absolutely in the public's best interest. The public has a critical interest in preventing the further spread of the coronavirus. An outbreak at Adelanto would, further, endanger all of us."); *Ortuno v. Jennings*, No. 20-CV-02064-MMC, 2020 WL 1701724, at *4 (N.D. Cal. Apr. 8, 2020) ("[T]he public interest in promoting public health is served by efforts to contain the further spread of COVID-19, particularly in detention centers, which typically are staffed by numerous individuals who reside in nearby communities.").

## II.    This Court Should Order Release of the Medically Vulnerable Subclass of Pretrial Detainees Under 28 U.S.C. § 2241

As noted above, CDF is in the midst of an uncontrolled outbreak of COVID-19.[14] The members of the Medically Vulnerable Subclass—all of whom are pretrial detainees not convicted of any crime—each have medical conditions that worsen the effects of COVID-19.[15] For them, exposure to COVID-19 brings a meaningfully higher risk of permanent organ damage and death.

CDF has not taken adequate steps to protect these residents. *See, e.g.*, ECF Nos. 1-11, 1-12; 1-13; 1-3, 1-4; 1-5, 1-15. To the contrary, CDF deprived one resident who suffers from asthma his inhaler, *after the resident tested positive for COVID*. ECF Nos. 1-3. Like all residents at CDF, they are locked down with symptomatic cellmates, denied medical care (even when exhibiting COVID-19 symptoms), and, once infected, isolated in inhumane conditions where

---

[14]    ECF No. 1-27 ¶ 25 ("[I]t is my professional judgment that this facility is dangerously under-equipped and ill-prepared to prevent and manage the spread of COVID-19, which is currently spreading throughout the jail. The facility is also dangerously under-equipped and ill-prepared to provide adequate treatment for residents who are infected with COVID-19.").

[15]    *See* U.S. Centers for Diseases Control, "People Who Are At High Risk [for severe illness from COVID-19]," https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last reviewed Apr. 15, 2020).

their symptoms are not meaningfully monitored. ECF Nos. 1-11, 1-12, 1-13, 1-3, 1-4, 1-5, 1-15. These conditions are dangerous for everyone; for medically vulnerable prisoners, even more so. ECF No. 1-27 ¶ 30 (These measures are more important still for individuals with preexisting conditions . . . or older age. They are in even greater danger in CDF, including a meaningfully higher risk of death."). Medical experts are unequivocal: COVID-19 can escalate rapidly, ECF No. 1-27 ¶ 35 ("Progression of respiratory symptoms in COVID-19 can be extremely rapid, within 24 hours, requiring hospitalization, so people in medical isolation need to be diligently monitored for clinical worsening."), and many vulnerable prisoners are already sick.

Defendants cannot remedy CDF's many failures in time to protect these residents' lives. Therefore, their continued detention is unconstitutional, and this Court should release them pursuant to a writ of habeas corpus under 28 U.S.C. § 2241.[16] Over the last year, multiple federal courts have granted such relief where there was no other way to protect imprisoned people's rights (and lives) from COVID-19. *See, e.g.*, *Martinez-Brooks*, 459 F. Supp. at 411 (granting TRO habeas relief under Eighth Amendment to federal post-conviction prisoners at FCI Danbury); *Malam v. Adducci*, 452 F. Supp. 3d 643, 661 (E.D. Mich. 2020) (releasing immigration detainee under § 2241 because, given the "risk and severity of irreparable harm to the Petitioner and the weight of public health evidence," release was "the only reasonable option"); *Thakker v. Doll*, 451 F. Supp. 3d 358 (M.D. Pa. 2020) (finding that conditions of confinement at an immigrant detention facilities created serious risks for medically vulnerable detainees where, as here, there were unsanitary conditions, prisoners were forced to buy their own soap and share cleaning supplies, the facilities did not provide information on COVID-19

---

[16]     Because the Medically Vulnerably Subclass members are pretrial detainees, they may bring this action under § 2241. *In re Wright*, 826 F.3d 774, 782 (4th Cir. 2016) (explaining that "prisoners in . . . pre-conviction custody . . . or other forms of custody that are possible without a conviction are able to take advantage of § 2241 relief") (quotations omitted).

prevention, and detainees shared cells with others who showed COVID-19symptoms); *Basank v. Decker*, 449 F. Supp. 3d 205 (S.D.N.Y. Mar. 26, 2020) (ordering release of ten immigration detainees with underlying medical conditions including diabetes, heart disease, obesity, and asthma because facility could not ensure social distancing and had not taken steps to protect medically vulnerable detainees, although, in contrast to this case, the ICE detention facility was providing soap and hand sanitizer and substantially increased cleaning).

If this Court is not inclined to release the Medically Vulnerable Subclass as a whole, it can, as other federal courts have, order Defendants to produce a list of the members of that subclass and any other information this Court requires to make appropriate determinations as to them—and to ensure that CDF take steps to treat these individuals appropriately while in custody. *See Martinez-Brooks*, 459 F. Supp. 3d at 411 (recounting order to FCI Danbury to review all medically vulnerable residents).[17]

## III.   Additional Interim Remedies Are Available to This Court.

Courts of equity operate with flexibility, especially in emergencies of great consequence. "It is my professional opinion that these steps are both necessary and urgent. The numbers at CDF are evidence of an outbreak. . . . The time to act is now, including for residents who have already tested positive for COVID-19." ECF No. 1-27 ¶ 48 ("The numbers at CDF are evidence of an outbreak. . . . The time to act is now, including for residents who have already tested positive for COVID-19."), 42 ("Future outbreaks will happen at CDF without additional measures").

The urgency of these concerns is real; while the Court considers the issues raised by the Complaint in this case, the COVID virus moves at its own, deadly timetable. Therefore, this

---

[17]     In addition, as described below, this Court has and should exercise the authority to release members of the Medically Vulnerable Subclass on non-monetary bond pending the outcome of their habeas petition. *See infra.*

Court should institute interim remedies to protect prisoners from serious harm while it considers their constitutional claims. First, this Court can transfer prisoners to another appropriate facility if necessary to protect their rights under the Eighth and Fifth / Fourteenth Amendments. Second, this Court can release members of the Medically Vulnerable Subclass on non-monetary bond while it considers their habeas petition under § 2241.

**A. This Court Has and Should Exercise the Authority to Transfer Prisoners to Another Appropriate Facility to Remedy the Constitutional Violations or Protect Prisoners From Additional Constitutional and Physical Harms.**

Plaintiffs ask this Court to order Defendants to immediately remedy the conditions at CDF so that they do not impose a substantial risk of serious harm on the people imprisoned there. However, as the CDC and other experts recognize, it may be impossible to protect certain vulnerable prisoners without the removal of at least some prisoners.

Accordingly, Plaintiffs ask this Court to order that, to the extent Defendants cannot remedy the substantial risk of serious harm to certain prisoners, it should transfer them to home detention or another appropriate facility. Another federal court recently recognized this solution for protecting prisoners in a jail that cannot adequately address the risk of COVID-19. *See Gray v. Cty. of Riverside*, No. 5:13-CV-0444-VAP-OPX, 2020 WL 4243484, at *3 (C.D. Cal. Apr. 14, 2020) ("Should the County be unable to implement adequate social distancing within its existing jail facilities and take other necessary steps to decrease risk of infection, this Court has the authority to order the transfer of prisoners to different facilities.")

Indeed, courts have previously transferred jail and prison residents where necessary to protect their Eighth Amendment rights. For example, in *Plata v. Brown*, 427 F. Supp. 3d 1211 (N.D. Cal. 2013), the court addressed the presence of "cocci" infections at two California prisons. Cocci infections are asymptomatic for 60 percent of people, but it "can also result in serious illness and, in the most extreme cases, death." *Id.* at 1214. The court found that the

prisons' measures to abate the threat of cocci were inadequate to avoid a substantial risk of serious harm to certain high-risk inmates, and, accordingly, failure to transfer these groups of prisoners would "result in deliberate indifference under the Eighth Amendment." *Id.* at 1224. Other courts have also ordered transfers to remedy or avoid Eighth Amendment violations.[18]

If necessary to avoid a substantial risk of serious harm to some or all prisoners, this Court should do the same.

**B. This Court Has and Should Exercise the Authority to Release Medically Vulnerable Subclass Members on Non-Monetary Bond Conditions Pending Review of Their Request for Habeas Relief Under § 2241.**

A federal court has the authority to grant bail to habeas petitioners who are properly before it. *See United States v. Perkins*, 53 F. App'x 667, 669 (4th Cir. 2002) (explaining the standard "[t]o prevail on a motion for release on bail in a habeas case"); *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001) (describing "the authority of the federal courts to grant bail to habeas petitioners"); *Bolante v. Keisler*, 506 F.3d 618, 620 (7th Cir. 2007) ("Inherent judicial authority to grant bail to persons who have asked for relief in an application for habeas corpus is a natural incident of habeas corpus, the vehicle by which a person questions the government's right to detain him."). Pursuant to this authority, if this Court does not immediately release members of the Medically Vulnerable Subclass under § 2241, it should release some or all of them on non-monetary bond.

---

[18]     *See, e.g.*, *Reaves v. Dep't of Corr.*, 392 F. Supp. 3d 195, 200, 210 (D. Mass. 2019) (concluding that transfer a quadriplegic state prisoner convicted of first degree murder to a non-Department of Corrections facility where he could receive adequate care was the appropriate remedy for his Eighth Amendment claims challenging his inadequate medical care), *appeal filed*, (1st Cir. Nov 4, 2019); *United States v. Wallen*, 177 F. Supp. 2d 455, 458, 459 (D. Md. 2001) (ordering transfer of a pretrial detainee because of the Court's "grave[] concern[s] that [his] Fifth Amendment rights [against deliberate indifference to his serious medical needs] may have been violated and, more importantly, that those rights may be at continued risk if he [were] returned to [the jail]"); *Johnson v. Harris*, 479 F. Supp. 333, 338 (S.D.N.Y. 1979) (ordering the transfer of a severely diabetic prison to a facility that could meet his medical needs as a remedy for Eighth Amendment violations).

Release on bond pending habeas is appropriate where the petitioner can "show that his petition presents a substantial constitutional claim upon which he has a high probability of success, and that extraordinary circumstances warrant his release." *Perkins*, 53 F. App'x at 669. Circuit courts have defined "extraordinary circumstances" to mean that "the grant of bail [is] necessary to make the habeas remedy effective." *Mapp*, 241 F.3d at 226 (quotations omitted). *See Abdullah v. Bush*, 945 F.Supp.2d 64, 67 (D.D.C. 2013), *aff'd sub nom. Abdullah v. Obama*, 753 F.3d 193 (D.C. Cir. 2014) (same); *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (same).

Extraordinary circumstances exist here. The Medically Vulnerable Subclass seeks habeas relief because if they do not receive it, there is an unacceptable risk that they will become seriously ill and die. Rapid removal from CDF is necessary "to make the habeas remedy effective" because, with further delay, medically vulnerable prisoners may suffer the severe illness, physical damage, and death they seek habeas to avoid. *Mapp*, 241 F.3d at 226.[19]

Based on these considerations, a federal court for the District of Massachusetts released immigration detainees on non-monetary bond conditions while their class action habeas petition based on a detention center's failure to protect them from the spread of COVID-19 is pending. *See also Savino v. Souza*, 459 F. Supp. 3d 317, 320 (D. Mass. 2020) ("Before addressing the merits of the petition, the Court relied on its inherent authority expeditiously to review bail applications for all of the detainees in the class, one by one, and released almost a third of them

---

[19]     *Cf. Johnston v. Marsh*, 227 F.2d 528, 529-32 (3d Cir. 1955) (finding that a district court had the power to grant of bail pending habeas where the petitioner, "an advanced diabetic, was, under conditions of confinement, rapidly progressing toward total blindness," comparing this authority to a judge's power to issue a "stay of execution" while a petition is pending).

to house arrest under strict conditions.). Other courts have also found that the risks imposed by COVID-19 warranted release on bond while a habeas action was pending.[20]

Given the severe and unavoidable risks to the Medically Vulnerable Class, this Court can and should act quickly to do the same.

## **CONCLUSION**

As Dr. Meyer recounts:

It is [] my professional judgment that this outbreak was preventable. This outbreak reflects CDF did not appropriately prepare or plan for this situation. CDF has demonstrated that it is unable to handle the current situation. Problems in implementing basic disease prevention and management strategies have persisted even after the outbreak in mid-January 2021. . . . Future outbreaks will happen at CDF without additional measures.

As such, from a public health perspective, it is my opinion that CDF should act immediately to comply with the CDC Guidelines on the management of COVID-19 in correctional facilities. This requires not just developing (or adhering to) well written protocols, but actually ensuring that the protocols are implemented to the fullest extent.

ECF No. 1-27 ¶¶ 42-43.

Accordingly, for these reasons, Plaintiffs ask that the Court grant the relief described in this pleading, both the limited relief of the proposed temporary restraining order and the more expansive relief of the proposed preliminary injunction.

Respectfully submitted,

(Signatures follow on next page.)

---

[20] *See Avendano Hernandez v. Decker*, 450 F. Supp. 3d 443, 449 (S.D.N.Y. 2020) (releasing § 2241 habeas petitioner challenging unconstitutional conditions of confinement—"specifically, continued risk of exposure to COVID-19"—because his continued detention would expose him to the infection he seeks habeas relief to avoid and, thus, "immediate[] release [wa]s necessary to 'make the habeas remedy effective'") (quoting *Mapp*, 241 F.3d at 230); *Jimenez v. Wolf*, No. CV 18-10225-MLW, 2019 WL 7169413, at *1 (D. Mass. Dec. 24, 2019) (releasing immigration detainee who raised habeas clam: "The Motion is, in essence, a request for a temporary restraining order mandating Kim's temporary release. . . . For the reasons explained below, the court is: issuing the requested temporary restraining order . . . .").

Dated: February 22, 2021

/s/ Alec W. Farr
Alec W. Farr (Federal Bar No. 12513)
awfarr@bclplaw.com
Daniel C. Schwartz
(*pro hac vice* to be submitted)
dcschwartz@bclplaw.com
Adam L. Shaw
(*pro hac vice* to be submitted)
adam.shaw@bclplaw.com
Joscelyn T. Solomon
(Federal Bar No. 21555)
joscelyn.solomon@bclplaw.com
Brett R. Orren
(*pro hac vice* to be submitted)
brett.orren@bclplaw.com

BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street, NW
Washington, DC 20004
(202) 508-6000 Phone
(202) 508-6200 Facsimile

/s/ Tianna Mays
Tianna Mays (Bar No. 21597)
tmays@lawyerscommittee.org
Jon Greenbaum
(*pro hac vice* admission pending)
jgreenbaum@lawyerscommittee.org
Arthur Ago
(*pro hac vice* admission pending)
aago@lawyerscommittee.org
John Fowler
(*pro hac vice* admission pending)
jfowler@lawyerscommittee.org
Rochelle F. Swartz
(*pro hac vice* admission pending)
rswartz@lawyerscommittee.org

LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW Suite 900
Washington, DC 20005
Phone 202-662-8600
Fax 202-783-0857
*Attorneys for Plaintiffs*

36

## <u>CERTIFICATE OF SERVICE</u>

I, Adam L. Shaw, an attorney, hereby certify that on February 22, 2021, the foregoing

was filed using the Court's CM/ECF system. I further certify that I, or another one of Plaintiffs'

attorneys, will promptly serve a copy of the same on the Attorney General of the State of

Maryland via email at the address below.

> Brian E. Frosh
> Maryland Attorney General
> 200 St. Paul Place
> Baltimore, MD 21202
> civil_service@oag.state.md.us

> _/s/ Adam L. Shaw_____
> Adam L. Shaw