IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | |
|---|---|
| SEDRIC CATCHINGS *et al.*,<br>Plaintiffs,<br><br>v.<br><br>CALVIN WILSON *et al.*,<br>Defendants. | *<br><br>*<br><br>Case No.: 1:21-cv-00428-TSE<br><br>*<br><br>* |

**PLAINTIFFS' STATUS REPORT TO THE COURT
REGARDING DISAGREEMENTS WITH DEFENDANTS**

On March 17, 2021, as the Court ordered, the parties filed their agreement regarding the implementation of a number of conditions at the Chesapeake Detention Center ("CDF"). *See* Dkt. 50-1. On March 19, 2021, the parties filed the agreement with the signatures of both Defendants ("the Agreement"). Dkt. 52-1. Defendants also agreed to comply with certain of Plaintiffs' discovery requests, as reflected in the Agreement.

Meanwhile, the crisis continues in Defendants' facilities. Per the Defendants' own reports, as of March 15, 2021, 11 residents and staff members at the Chesapeake Detention Facility (CDF) were suffering from an "active infection." Decl. of Warden Wilson, Dkt. 51-3, ¶ 13. Despite the continued spread of the virus, Defendants will not agree to comply with certain other conditions at CDF that are critical to immediate compliance with minimum COVID-related health standards as set forth by scientifically-established protocols for isolation and quarantine. These measures are needed to bring Defendants' facilities into compliance with the Constitution and to stop the increase of positives at CDF.

As ordered by the Court, Plaintiffs now set out those conditions on which there is disagreement, in the order of their significance to creating a constitutionally safe environment for

1

the residents and staff at CDF.[1] Underneath each condition is the corresponding provision of proposed relief in the Complaint.

Unless directed by the Court to do otherwise, Plaintiffs will bring these issues, as well as outstanding discovery issues, before Magistrate Judge Nachmanoff as soon as possible.

**POINTS OF DISAGREEMENT REGARDING THE CONDITIONS AT CDF**

**(1) An order that Defendants implement appropriate cohorting, including quarantining and medical isolation procedures, as recommended by CDC guidelines.** Compl., Dkt. 1, Relief Requested "j" at p. 61.

*Point of disagreement 1:* Defendants will not agree to quarantine all residents who shared recreation time with residents who test positive for COVID-19. Instead, Defendants will agree to quarantine only the *cellmates* of COVID-positive residents. Defendants' own records for five recent COVID-positive residents from February, for example, make clear that Defendants define "close contacts" as applying only to the COVID-positive resident's *cellmate*. Defendants have not identified any other way that Defendants contract trace or otherwise identify "close contacts."

*Point of disagreement 2:* Defendants will not agree to conduct contact tracing to identify other "close contacts" of COVID-positive residents beyond a cellmate.

*Impact on health and safety:* By failing to conduct proper contract tracing by identifying "close contacts," Defendants nearly guarantee the continued spread of the virus, which in turn guarantees a constitutional violation. Given CDF's recreation schedule and the size of common areas in housing units, every resident who shares recreation time with a positive resident (up to 11 other residents) almost certainly qualifies as a "close contact." By not identifying every resident who shares recreation time as a "close contact" and then quarantining that person, Defendants

---

[1]   Counsel for the Defendants have reviewed these points of disagreement (though not the detailed argument about the impact of these issues on health and safety). Counsel for the Defendants concur that the parties have reached an impasse on these issues, at least at the present.

dramatically increase the likelihood of an exposed resident remaining on a housing unit, free to infect the other remaining residents. Relatedly, Defendants appear to be in violation of their own policies on contact tracing and "close contacts." Protocol for the Department of Public Safety and Corrections Services, of which Defendant Green is the Secretary, defines "close contacts" in its detention facilities as residents who were less than six feet away from a positive individual for at least two minutes in a bounded timeframe. DPSCS, *Covid-19 Contact Tracing Protocol for Inmates and Contractor Staff* (April 13, 2020), Ex. 1, at 1 ("Identify close contacts who were 6 feet or less from the case for a duration of 2 minutes or longer during the 7-day period preceding the onset of symptoms (if not known, then use testing date[)]"). This practice is also in violation of CDC guidance. *See* CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* ("*CDC Interim Guidance*"), ECF 1-25,[2] Definitions of Commonly Used Terms, Close Contact of Someone with COVID-19. In turn, DPSCS' own protocol requires these identified "close contacts" to be quarantined. Ex. 1, at 2 ("Inmates that met criteria for quarantine (close contact determined but asymptomatic) shall have a quarantine order."). The failure to comply with internal policies and CDC guidance nearly guarantees the continued spread of the virus.

*Point of disagreement 3:* Defendants will not agree to immediately test all residents in quarantine (because of exposure to COVID), and are not willing to agree to test such residents until the next regularly scheduled facility-wide test, which at present occur weekly.

---

[2] This Guidance was filed as an attachment to the Complaint. It is also available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

*Impact on health and safety:* Defendants are placing residents who have been exposed to the virus together in a living area, some of whom may have contracted the virus and some of whom may not. By not *immediately* testing to determine whether any of the exposed residents are in fact positive, Defendants create unnecessary risk of positive residents infecting negative residents. Defendants should be promptly moving any positive residents to medical isolation to prevent them from spreading the virus. But at present, Defendants are testing residents in quarantine only on regularly scheduled testing days for the facilities—which means that Defendants may be exposing negative residents to positive residents for more than seven days (as results take a few days to come back). This is contrary to CDC guidance. *See CDC Interim Guidance*, Testing Close Contracts.

*Point of disagreement 4:* Defendants will not agree not to stop adding residents to a quarantine cohort after the cohort is formed. Defendants also rejected Plaintiffs' proposed interim compromise by which Defendants would agree to "avoid" adding residents to a quarantine cohort after the cohort is formed.

*Impact on health and safety:* Residents who are quarantined from one housing unit have to undergo 14 days of quarantine to ensure they do not exhibit symptoms. By mixing in residents from a *different* housing unit with the first group after the group is formed, Defendants insert new residents who themselves may have the virus from a different source, i.e., introducing a new source of infection. This is an unnecessary risk. *Cf. CDC Interim Guidance*, Cohorted Quarantine for Multiple Close Contacts (who test negative) ("Do not add more individuals to an existing quarantine cohort after the 14-day quarantine clock has started. Doing so would complicate the calculation of the cohort's quarantine period, and potentially introduce new sources of infection.").

*Point of disagreement 5:* Defendants will not agree to house each resident in quarantine in a single cell, separated from others. Instead, Defendants have agreed only to *prioritize* such residents for single-cell housing, noting that "they would need 'if possible' language added based on other institutional circumstances."[3]

*Impact on health and safety:* Residents in quarantine can infect one another, as described above. The CDC recommends creating as much as space as possible across quarantined residents. *CDC Interim Guidance*, Definitions of Commonly Used Terms, Cohorting ("While cohorting those with confirmed COVID-19 is acceptable, cohorting individuals with suspected COVID-19 is not recommended due to high risk of transmission from infected to uninfected individuals.").

*Point of disagreement 6:* Defendants will not agree to immediately test any staff member exposed to a COVID-positive resident or colleague, or to prohibit exposed employees from returning to work without a confirmed negative test.

*Impact on health and safety:* If Defendants decline to immediately test their staff members after exposure, they cannot ascertain when it is safe for the staff member to return to work. And if Defendants do not require a negative test or particular timeframe in which a staff member quarantines at home, Defendants are inviting risk into their facilities.

**(2) An order that Defendants immediately create and implement a plan that complies with CDC Guidance to minimize transmission to and provide adequate medical monitoring and care to residents who are medically vulnerable to COVID.** Dkt. 1, Relief Requested "n" at p. 62.

*Point of disagreement 1:* Defendants will not agree to house all high-risk residents (whether in quarantine, isolation, or general population) in single-occupancy cells, instead only agreeing to

---

[3] This language comes from edits made by counsel for the Defendants to an overview document of the points of disagreement. *See* fn. 1.

5

*prioritize* such residents for this placement. Defendants again indicate that "they would need 'if possible' language added based on other institutional circumstances."[4]

*Impact on health and safety:* High-risk residents are at greater risk of severe illness if they were to contract COVID. Placing these residents in single cells provides correspondingly increased protection.

*Point of disagreement 2:* Defendants will not agree to house "high risk" residents *in quarantine* in a single cell. Instead, Defendants have agreed only to *prioritize* such residents for single-cell housing, noting again that "they would need 'if possible' language added based on other institutional circumstances."[5]

*Impact on health and safety:* "High risk" residents are the ones most at risk of a catastrophic outcome if they contract COVID. Defendants report that CDF is well under its maximum capacity for residents as of March 17, 2021. Dkt. 51-3 ¶ 1. Even if Defendants decline to house high- residents in general population in single cells, they should absolutely be doing so for high risk residents in quarantine. *CDC Interim Guidance*, Cohorted Quarantine for Multiple Close Contacts (who test negative) ("If cohorting close contacts is absolutely necessary, be especially mindful of those who are at increased risk for severe illness from COVID-19. Ideally, they should not be cohorted with other quarantined individuals. If cohorting is unavoidable, make all possible accommodations to reduce exposure for the individuals with increased risk of severe illness.").

*Point of disagreement 3:* Defendants will not agree to heightened monitoring of high-risk residents in its facilities, including temperature and symptom checks at least three times daily.

---

[4] *See* fn. 3.
[5] *See* fn. 3.

*Impact on health and safety:* High-risk individuals, by definition, are at an increased risk of severe illness if they were to contract COVID. Heightened monitoring of such residents would ensure that health officials will become aware of health issues and those issues can be treated. Indeed, the condition Plaintiffs proposes is less stringent than what the CDC recommends, which is monitoring of almost *all* residents in a facility when the facility has a positive test among residents or staff. *See CDC Interim Guidance*, Management Strategies for Incarcerated/Detained Persons without COVID-19 Symptoms ("If individuals with COVID-19 have been identified among staff or incarcerated/detained persons anywhere in a facility, consider implementing regular symptom screening and temperature checks in housing units that have not yet identified infections, until no additional infections have been identified in the facility for 14 days."). And as noted above, as of March 17, 2021, 11 residents and staff members currently have an "active infection."

   (3) **An order that Defendants create and enact CDC-recommended social distancing policies that allow for adequate spacing of six feet or more between residents, as well as a pause on new admissions to CDF pending control of the outbreak.** Dkt. 1, Relief Requested "f" at p. 61; Dkt. 18-1, Relief Requested "b" at p. 5.

*Point of disagreement 1:* Defendants will not agree to implementing social distancing policies (such as spacing out residents across cells in housing units), arguing that the facility does not allow for creating six feet of space between individuals with its present population. Instead of implementing such policies or spreading residents out over the facility, Defendants have agreed only to encourage social distancing of residents during recreation.

*Impact on health and safety:* Meaningful social distancing policies (particularly for housing residents) are critical to slowing and stopping the spread of the virus. *CDC Interim Guidance*, Definitions of Commonly Used Terms ("Social distancing is vital for the prevention of respiratory diseases such as COVID-19, especially because people who have been infected with SARS-CoV-2 but do not have symptoms can still spread the infection."). Small, simple measures—such as

7

single-celling (described *supra*) or leaving a cell open between occupied cells—can combat the spread of highly infectious viruses like COVID-19. *Id.*, Cohorted Quarantine for Multiple Close Contacts (who test negative) ("Employ social distancing strategies *related to housing* . . . to maintain at least 6 feet of space between individuals." (emphasis added)). As noted *supra*, Defendants report that they are well under the maximum capacity of the resident population at CDF. To the extent that space limitations nonetheless create restraints, they ignore an obvious solution: restricting the resident population size.

*Point of disagreement 2:* Related to this point, Defendants will not commit to decline to accept new admissions until 14 days after there are no new positive tests of residents or staff pursuant to facility-wide testing. Defendants indicate, however, that as of March 17, 2021, they are currently not accepting new detainees from the U.S. Marshals Service. Dkt. 51-3 ¶ 4.

*Impact on health and safety:* Pausing admissions (while the facility straightens out its policies and practices) is critical to ensure that another outbreak will not happen. CDF admitted two women within the last three months who were housed in units next to COVID-positive men—during the height of the outbreak. *See, e.g.*, Res. Decl. (Dkt. 1-14) (woman who was new admission placed next to COVID-positive men in January); Res. Decl. H (Dkt. 7-1) ¶ 28 (COVID-positive male resident placed next to a different new admission, also a woman, in February). This placement is reflected in Defendants' own housing records, too. Defendants have not implemented the types of policies necessary to protect residents and staff alike. Defendants have other facilities in which to house residents; Defendants have also indicated that the U.S. Marshals Service has other facilities that it uses to house pretrial detainees for the District of Maryland.

> **(4) To the extent it is necessary to ensure constitutionally sufficient procedures or to protect certain residents' constitutional rights, order the Warden to transfer residents to another appropriate facility.** Dkt 1, Relief Requested "o" at p. 61.

*Point of disagreement 1:* Defendants will not agree to transfer residents to other facilities that are not experiencing the problems at CDF, despite Defendants' expressed concern that the resident population size may limit their ability to comply with CDC guidance.

*Impact on health and safety:* Although transferring residents would presumably eliminate the space constraints that Defendants claim prohibit adequate social distancing and single-cell housing, Defendants do not explain why they decline to transfer residents to a different facility (and instead indicate that a court order would be necessary to begin transfer). Meanwhile, Defendants are already using their transfer authority to move residents for medical isolation to the Jail Industries Building (JIB), sometimes referred to as the Health Monitoring Facility (HMF).

*Point of disagreement 2*: Defendants will not agree to stop transferring COVID-positive residents from CDF to the Jail Industries Building.[6]

*Impact on health and safety:* As described in the Complaint, JIB is an inappropriate facility for individuals who are recovering from a dangerous virus. Dkt. 1 ¶¶ 162-179 (describing residents wearing paper clothing despite broken windows and low temperatures, absence of cleaning procedures, and deprivation of necessary medications to individuals with preexisting conditions,

---

[6] Plaintiffs' request is that Defendants stop transferring residents at CDF to JIB, not that Defendants close JIB altogether. Defendants have misunderstood Plaintiffs' requests. *See* Dkt. 51-1 at 10 ("The plaintiffs have asked this Court to order that the HMF be closed . . . "). Per Defendants' own explanations, JIB houses detainees and inmates from other of Defendants' facilities, not just from CDF. Dkt. 51-3 ¶ 6(k) (explaining that JIB is used for "inmates and detainees in the Central Region"). Per Defendants' report, JIB houses five "inmates and detainees" at present. *Id.* Plaintiffs' request is limited: that Defendants stop transferring *CDF residents* to JIB.

among other things). Medical isolation should be a safe, clean, and medically appropriate environment, not one in which residents are deprived of basic necessities.

> **(5) An order that CDF provide adequate medical care to residents, whether because of COVID symptoms, chronic health conditions, or any other medical issue.** Dkt. 1, Relief Requested "e" at p. 61.

*Point of disagreement:* Defendants will not agree to *immediately* provide all residents in isolation or quarantine with all required and / or prescribed medications and treatments that they were given prior to being moved to isolation or quarantine. Instead, Defendants have agreed to provide "clean and safe living conditions for residents in quarantine or isolation"[7] and to provide medication to residents in isolation or quarantine within 48 hours of their transfer.

*Impact on health and safety:* Residents in isolation or quarantine are *most* in need of their medications and treatments—not within two days of their being transferred, but on their normal medication schedule. An asthmatic resident in isolation, for example, is most at risk of a catastrophic outcome resulting from a lack of access to an inhaler. This problem is not hypothetical; at least one resident who was sent to isolation at the Jail Industries Building in early February was denied access to his inhaler. Res. Decl. B (Dkt. 2-1) ¶ 10 ("I went from Tuesday, February 2, to Saturday, February 6, without my inhalers at JI."). *See also, e.g.*, Res. Decl. H (Dkt. 7-1) ¶¶ 19-25, 30 (describing how a resident transferred to JI was denied prescribed antibiotics for a wound for at least two days).

> **(6) An order that CDF immediately offer vaccinations to all members of the Medically Vulnerable Subclass who qualify as "high risk," as defined by Maryland guidance.** Dkt. 1, Relief Requested "q" at p. 62).

*Point of disagreement*: Defendants will not agree to *immediately* offer vaccinations to all

---

[7] Agreement, Dkt. 52-1, p. 3, ¶ 15.

high-risk residents, instead agreeing to offer these vaccinations when available and to take reasonable steps to secure supplies. Despite Maryland having entered Phase 1B in mid-January, which makes "high-risk incarcerated individuals" eligible for vaccination, *see* Compl., Dkt. 1 ¶ 21, Defendants have declined to offer vaccinations to all "high-risk" residents. *See* Dkt. 51-3 ¶ 10 (Warden Wilson mistakenly indicating that "detainees below the age of 65 who are at increased risk of severe covid-19 [illness] are grouped in Phase Two," and noting that "[v]accinations have not yet begun for Phases 2 and 3").

*Impact on health and safety:* Vaccinating as many vulnerable residents as possible will ameliorate some of the risk to this population and lessen the burden on the facility going forward. In addition, vaccinating as many residents and staff as possible moves the facility closer to herd immunity. Vaccinations also reduce the need for single-cell placement for high-risk residents. In misunderstanding Maryland's own prioritization for vaccinations, Defendants have put residents and staff alike at grave risk, particularly those who are most vulnerable to severe illness. This misunderstanding also violates CDC guidance. *See* CDC, COVID-19 Vaccine FAQs in Correctional and Detention Centers, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/vaccine-faqs.html ("Jurisdictions are encouraged to vaccinate staff and incarcerated/detained persons of correctional or detention facilities at the same time because of their shared increased risk of disease. Outbreaks in correctional and detention facilities are often difficult to control given the inability to physically distance, limited space for isolation or quarantine, and limited testing and personal protective equipment resources. Incarcerated or detained persons living in correctional and detention facilities may also be older or *have high-risk medical conditions that place them at higher risk of experiencing severe COVID-*

*19*. COVID-19 outbreaks in correctional and detention facilities may also lead to community transmission." (emphasis added)).

> **(7) An order that CDF ensure each resident receives, free of charge: (1) an individual supply of liquid hand soap and paper towels sufficient to allow frequent hand washing and drying each day; (2) tissues; and (3) adequate access to a supply of cleaning and disinfectant products effective against COVID to allow for cleanings of frequently-touched surfaces several times per day.** Dkt. 1, Relief Requested "c" at p. 60.

*Point of disagreement:* Defendants will not agree to a periodic schedule of soap distribution, including Plaintiff's request that Defendants provide a bar of soap to each resident every two weeks and to provide a bar of soap if a resident requests one prior to the expiration of the two weeks. Instead, Defendants will agree only to provide a bar of soap to each resident and provide additional bars of soap on request if a resident runs out of soap.

*Impact on health and safety:* Defendants' proposed non-specific, non-periodic commitment is inadequate because residents report that CDF does *not* provide soap when requested by Residents. Res. Decl. B (ECF 2-1), ¶ 43 ("When I was first at CDF, they gave out soap at least once a month. But CDF hasn't given out bars of soap in two or three months."); Res. Decl. D. (ECF 4-1) ¶ 26 ("I have asked for more soap from CDF staff. They say that they are working on it, but I never hear back, and they have never given me any."); Res. Decl. F (ECF 5-1) ¶ 16 ("I buy all my hygiene items, like soap, from commissary. . . . I've requested those things before from CDF, and COs didn't get that stuff."). Some residents have had to buy soap from commissary as a result. Res. Decl. D. (ECF 4-1) ¶ 27 ("Because of that, I have had to buy soap with my own money from the commissary, even during this pandemic."); Res. Decl. K (ECF 1-12) ¶ 7 ("I had to purchase some soap from commissary this week because CDF didn't give me any soap.")  Agreeing to a particular timeframe on soap distribution avoids unnecessary disputes about Defendants' agents' responses to requests for an essential hygiene item.

> **(8) An order that CDF end preemptive lockdown procedures and instead impose appropriate time-limited lockdown-like procedures, with that time limit clearly communicated to residents, only when necessary due to a known or suspected case of COVID, as recommended by medical and public health professionals.** Dkt. 1, Relief Requested "i" at p. 61.

*Point of disagreement 1:* Defendants will not agree to limit the duration of lockdown procedures for COVID-related reasons (that is, to move residents to different cohorts, to sanitize areas, or to conduct contact tracing) to a particular timeframe, including Plaintiffs' suggestion of 24 hours. Defendants indicated that they need to retain discretion on how long these processes may take to resolve.

*Impact on health and safety:* Limitless lockdown—which has been shown to cause psychological harm to residents—is frowned upon by the Fourth Circuit. *Porter v. Clarke*, 923 F.3d 348, 357 (4th Cir. 2019) (finding that conditions wherein death-row inmates spent "between 23 and 24 hours a day alone in a small . . . cell with no access to congregate religious, educational, or social programming—pose[d] a substantial risk of serious psychological and emotional harm.") (quotations omitted), *as amended* (May 6, 2019). Defendants can and should limit the duration of these procedures. *See, e.g.* Dr. Haney Decl. (ECF 29-1) ¶ 26 ("[J]ails and prisons should institute such lockdowns only where medically necessary to resolve discrete issues, such as sanitizing dorms or contact tracing of an infected prisoner. If such lockdowns are employed, for these limited purposes, they should be reasonably time-limited.").

*Point of disagreement 2:* Defendants will not agree to provide substantially the same privileges to residents in isolation or quarantine (or to provide substitutes for the decreased recreation time or other privileges) as those in the general population.

*Impact on health and safety:* Maintaining substantially the same privileges, or providing substitutes, incentivizes residents to come forward to report symptoms of COVID, and are

therefore essential. Dr. Meyer Decl. (ECF 1-27) ¶ 29(c) ("People may be deterred from reporting symptoms out of fear of perceived punitive isolation."); Dr. Haney Decl. (ECF 29-1) ¶ 26 ("Moreover, in extreme cases in which lockdowns are employed, the jail or prison should ensure that inmates are given *enhanced access* to resources to protect their mental health, such as reading material and adequate access to phones. In addition, the jail or prison staff should regularly communicate with and monitor the physical and mental health of prisoners who are on lockdown." (emphasis added).

> (9) **To the extent a resident must enter lockdown or isolation to effectuate an appropriate quarantine or medical isolation procedure, an order that CDF provide appropriate mental health services, and, if that resident has a mental health condition, provide enhanced psychological services in these circumstances.** Dkt. 1, Relief Requested "k" at p. 61.

*Point of disagreement:* Defendants will not agree to enhanced psychological services, instead agreeing to "provide appropriate mental health services by" maintaining current mental-health services.[8]

*Impact on health and safety:* This is a problem because *enhanced* psychological services are required to protected against deterioration and decompensation. Dr. Haney Decl. (ECF 29-1) ¶ 21-22 ("Although the adverse effects of isolated confinement are widespread, and jeopardize the physical and psychological well-being of everyone exposed to them, this is especially true for prisoners with pre-existing mental health conditions. They are particularly likely to decompensate, suffer worsening depression, and even engage in self-harming and suicidal behavior in response to social isolation. . . . If they cannot be [excluded from lockdown-like procedures altogether], then they must be given access to enhanced psychological services.")

---

8   *See* fn. 3.

## CONCLUSION[9]

Unless directed by the Court to do otherwise, Plaintiffs will bring these issues, as well as outstanding discovery issues, before Magistrate Judge Nachmanoff as soon as possible.

.

Respectfully submitted on March 19, 2021,

*/s/ John Fowler*

Alec W. Farr (Federal Bar No. 12513)
awfarr@bclplaw.com
Daniel C. Schwartz (*pro hac vice*)
dcschwartz@bclplaw.com
Adam L. Shaw (*pro hac vice*)
adam.shaw@bclplaw.com
Joscelyn T. Solomon (Federal Bar No. 21555)
joscelyn.solomon@bclplaw.com
Brett R. Orren (D. Md. application pending)
brett.orren@bclplaw.com

BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street, NW
Washington, DC 20004
(202) 508-6000 Phone
(202) 508-6200 Facsimile

Tianna Mays (Bar No. 21597)
tmays@lawyerscommittee.org
Jon Greenbaum (*pro hac vice*)
jgreenbaum@lawyerscommittee.org
Arthur Ago (*pro hac vice*)
aago@lawyerscommittee.org
John Fowler (*pro hac vice*)
jfowler@lawyerscommittee.org
Rochelle F. Swartz (*pro hac vice*)
rswartz@lawyerscommittee.org

---

[9] Plaintiffs continue to seek habeas-related relief, which may only be granted by a judicial actor. Habeas-related relief has therefore not been negotiated by the parties.

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW Suite 900
Washington, DC 20005
Phone 202-662-8600
Fax 202-783-0857

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I, John Fowler, an attorney, hereby certify that on March 19, 2021, the foregoing was filed using the Court's CM/ECF system. I further certify that I, or another one of Plaintiffs' attorneys, will promptly serve a copy of the same on the Attorney General of the State of Maryland or his representative via email.

/s/ John Fowler
John Fowler