**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | | |
|---|---|---|
| SEDRIC CATCHINGS *et al.*, | * | |
| Plaintiffs, | | |
| | * | |
| v. | | Case No.: 1:21-cv-00428-TSE |
| | * | |
| CALVIN WILSON *et al.*, | | |
| Defendants. | * | |

**TERMS SHEET**

**A. Practices at CDF and HMF**. Defendants shall continue or implement the following practices and procedures arising from the COVID-19[1] outbreak at CDF to ensure the health and safety of detainees/residents[2] of CDF and HMF, in accordance with the parties' agreement and CDC recommendations. Terms that are based upon, or reflect, current CDC recommendations and/or guidelines will adopt and incorporate any changes to the CDC's recommendations.

    **1. Treatment of "high risk" residents:**

        i. Defendants shall identify "high risk" residents upon admission to the facility.

            1. "High risk" residents are defined as residents with certain medical conditions and older residents.

                a. Residents with certain medical conditions are those individuals identified by the Centers for Disease Control and Prevention who are, or might be, at increased risk of severe illness from COVID-19, lists of which are available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

                b. Older residents are residents over the age of 65, whom Maryland has classified as being eligible for vaccines in Phase 1C, see https://covidlink.maryland.gov/content/vaccine/.

---

[1] Severe acute respiratory syndrome coronavirus 2, or SARS-CoV-2, commonly called the "novel coronavirus" or "coronavirus" is a highly contagious and transmissible virus. The virus frequently results in a disease, COVID-19. The Terms Sheet and Settlement Agreement refer to both the virus and the disease as "COVID" or "COVID-19."

[2] The Terms Sheet and Settlement Agreement refer to all individuals in custody at CDF and HMF as "detainees," "residents," and "detainees/residents." These terms all refer to the same individuals and are not intended to have any different meaning.

2. "High risk" residents shall include residents on the "chronic care list," which is defined by Defendants' medical provider.

3. Medical staff shall ensure that these residents on the "chronic care" list are given, at a minimum, twice daily checks of these residents' vital signs and symptoms, while in quarantine or isolation.

ii. "High risk" residents shall be prioritized for housing in single occupancy cells, whether they are on general population, quarantine, or isolation.

**2. Isolation and quarantine**

i. When Defendants remove a resident from a housing unit for placement in isolation or quarantine, Defendants shall wait a specified period of time, then sanitize the cell of the removed resident after waiting that period of time, per the guidelines of the American Correctional Association and the CDC guidelines.

1. Defendants shall not move a resident into the cell of the removed resident prior to the passage of at least four hours and sanitization of the cell in full compliance with CDC guidelines. Sanitization shall happen after the passage of four hours.

2. Defendants shall sanitize, in full compliance with CDC guidelines, all common areas in the housing unit of the removed resident prior to residents using common areas.

3. Defendants shall maintain records of the above, if Defendants previously maintained such records.

ii. When a resident's COVID test returns as positive, Defendants shall immediately remove the positive resident from the resident's housing unit for isolation. Defendants shall ensure that the positive resident is not present in any common areas of the housing unit from which the resident is being removed except for movement out of the housing unit.

iii. Defendants shall provide clean and safe living conditions for residents in quarantine or isolation.

1. Defendants shall provide clean and sanitized fabric clothing to residents in quarantine or isolation.

2. Defendants shall provide a living environment with a temperature at or above 65 degrees for residents in quarantine or isolation.

3. Defendants shall provide a living environment with hot water for residents in quarantine or isolation.

4. Defendants shall ensure that residents on isolation or quarantine are given all required and / or prescribed medications and treatments that they were given prior to being moved to isolation or quarantine. Defendants shall ensure that that this happens no later than 48 hours after the residents are moved.

2

     5.  Defendants shall provide a pest-free living environment to residents in quarantine or isolation.

     6.  Defendants shall evaluate residents at intake for mental health issues, schedule residents for follow-up when needed, and provide sick call slips to residents to request mental health services when on quarantine or isolation.

   iv.  Defendants shall quarantine the cellmates of residents who test positive.

**3. Weekly testing, close contacts, contact tracing, and quarantine.**

    i.  Defendants shall ensure that all detainees/residents, staff, and contracted staff are administered a polymerase chain reaction (PCR) COVID test on a weekly basis, with the exception of individuals who have tested positive for COVID in the 90 days preceding the test administration. Individuals who test positive for COVID shall be exempt from weekly tests until 90 days have passed after their most recent positive test, at which point weekly testing for them will resume.

    ii.  Defendants shall identify "close contacts" of COVID-positive individuals. The parties agree to define "close contacts" as including any detainee/resident living in the same pod with a positive detainee/resident, both upper and lower tiers. This may include up to 23 other detainees/residents. Other close contacts will be defined in accordance with "COVID-19 Contact Tracing Protocol for Inmates and Contractor Staff," attached to OOS IB #2020-08.

   iii.  Upon learning of a positive test result pursuant to testing at Defendants' facilities, Defendants shall remove the positive-tested detainee/resident from the pod and place that individual in medical isolation and then quarantine detainees/residents who are "close contacts" within their existing pod.

   iv.  Defendants shall also inquire of the positive detainee/resident and review his or her medical records to determine when he or she first began experiencing symptoms, if any, to determine the appropriate exposure window and to identify other close contacts. For example, if another detainee/resident was living on the pod shortly before the positive-tested detainee/resident began experiencing symptoms, but was moved out of the pod prior to the positive test, the exposed detainee/resident shall also be considered a "close contact" and quarantined, in accordance with "COVID-19 Contact Tracing Protocol for Inmates and Contractor Staff," attached to OOS IB #2020-08.

    v.  Detainees/residents who are determined to be "close contacts" shall be quarantined for 14 days.

   vi.  Defendants shall immediately send home any staff members who are within approximately six feet of positive residents for more than 15 minutes without donning personal protective equipment.

  vii.  Defendants shall move "high risk" detainees/residents in quarantine into single cells, unless an acute mental health or other documented medical condition necessitates double-celling. If every "high risk" detainee/resident cannot be moved into a single cell, Defendants shall

3

use the ranked tier list provided by its medical contractor of all "high risk detainees/residents," which is defined as detainees/residents on the "chronic care" list. Defendants shall ensure that detainees/residents in the highest tier of risk shall be moved into single cells.

   viii. Defendants shall provide enhanced monitoring of detainees/residents on isolation or quarantine diagnosed with mental-health conditions. This enhanced monitoring shall include (1) increased monitoring of the detainee/resident with medical staff for indicators of self-harm; (2) heightened protections to ensure continuity of mental-health medications; and (3) at least one 5-minute conversation per day with medical staff, if the detainee/resident agrees to such a conversation.

**4. Testing of close contacts.**

   i. Defendants shall administer a PCR test to "close contacts" as soon as possible after Defendants learn of the positive result.

   ii. Defendants shall administer a PCR test to "close contacts" at least twice in the 7 days following the identification of the individual as a "close contact": once as soon as possible after Defendants learn of the positive result, and once during regularly scheduled, weekly facility-wide PCR testing.

   iii. Upon learning of a positive result, Defendants shall immediately remove any detainee/resident who tests positive from quarantine and place that detainee/resident in medical isolation.

**5. Maintaining quarantine cohorts.**

   i. Defendants shall house the following cohorts in housing units separate from one another:

      1. Quarantine for newly admitted residents,
      2. Quarantine for "close contacts" of COVID-positive individuals,
      3. Isolation for confirmed positive residents, and
      4. General population.

   ii. Defendants shall not add any detainees/residents to a housing unit being used for quarantine or any other quarantine cohort prior to the expiration of the 14-day quarantine period.

   iii. Defendants shall not mix together detainees/residents in quarantine from different housing units or different cohorts.

**6. Spreading out detainees/residents and single-cell placement.**

   i. Defendants shall use the space in its facilities not under construction to spread out detainees/residents as much as possible. For example, if a pod has 12 two-person cells and only 20 detainees/residents, four detainees/residents will be placed into single cells. Defendants shall offer but not require single-cell placements to residents.

   ii. Defendants will offer and, if accepted, provide single-cell placements for those most vulnerable to COVID, as determined by a forced ranking of detainees/residents on the "chronic care" list that Defendants or their contractor will produce and provide to Plaintiffs' counsel.

**7. Provision of soap.** Defendants shall provide one bar of soap to residents/detainees at least every two weeks. Defendants shall provide a bar of

4

soap upon request to residents/detainees if they run out of soap prior to the biweekly distribution.

8. **Vaccinations**.

    i. Defendants shall ensure that all high-risk detainees/residents are offered vaccinations by April 16, 2021.

    ii. Defendants shall ensure that all detainees/residents are offered vaccination by May 1, 2021.

    iii. Defendants shall ensure that all new detainees/residents are offered vaccination at intake by May 1, 2021.

    iv. Defendants shall provide educational materials to all detainees/residents prior to offering the vaccinations. These materials shall include the materials developed by AMEND at the University of California at San Francisco, including "Frequently Asked Questions about the COVID-19 Vaccines: Information for Residents of Correctional Facilities," available at https://amend.us/covid/, as well as any updated versions of the same materials.

    v. Defendants shall reoffer vaccinations to any detainees/residents who declined vaccination before Defendants started distributing educational materials. For these detainees/residents, Defendants shall provide educational materials prior to reoffering vaccinations.

    vi. Defendants shall ensure that vaccinations are offered to all staff members and contracted staff members, along with education about the vaccine, by May 1, 2021.

9. **Limitations on procedures in which residents are given two hours or less of out-of-cell time:**

    i. Defendants shall communicate to residents clearly the purpose and expected duration of any period in which residents are limited to two hours or less of out-of-cell time per day, as well as of isolation and quarantine.

        1. Defendants' agents shall maintain records of the above, if Defendants previously maintained such records.

    ii. Defendants shall not preemptively limit out-of-cell time to two hours or less per day as a response to COVID. Defendants shall limit out-of-cell time to two hours or less per day only when moving residents to different cohorts, sanitizing areas, conducting contact tracing, or when using a "lockdown" response for administrative or management purposes.

    iii. Whenever Defendants limit out-of-cell time to two hours or less per day, Defendants shall ensure that residents have access to running water and soap to wash their hands, clean water to drink, cleaning supplies (of the type described in ¶ A.12), and phones.

    iv. Whenever Defendants limit out-of-cell time to two hours or less per day, Defendants shall continue to provide psychological services to residents with diagnosed mental-health conditions for which they received services prior to out-of-cell time being limited.

**10. Enhanced screening of residents who work in the facility:**

    i. Defendants shall inquire on a daily basis of residents who work in the facility about whether they are experiencing any symptoms of COVID. Defendants shall maintain records reflecting that this inquiry was conducted for each day in which residents were on a work shift, as well as the residents' responses. Defendants shall provide "sick call" slips to residents and shall respond to any reports of residents experiencing any symptoms of COVID or any other medical issues.

**11. Education materials:**

    i. Defendants shall provide to all residents and staff up-to-date information on COVID, including symptoms, reminders to report symptoms to staff, and reminders to wear masks and socially distance.

        1. This information shall be provided in a manner that can be understood by low-literacy residents, residents with disabilities, and non-English speaking residents.

        2. Defendants shall maintain records reflecting that this information was provided to all new admissions.

**12. Cleaning:**

    i. Consistent with the recommendation of the American Correction Association (which cross-references the CDC guidelines, at http://www.aca.org/ACA_Prod_IMIS/ACA_Member/Healthcare_Prof essional_Interest_Section/Copy_of_Coronavirus_COVID.aspx?New_ ContentCollectionOrganizerCommon=4), Defendants shall make available on a daily basis EPA-registered disinfectants effective against COVID in an amount sufficient for all residents to clean their cells and common areas. If EPA-approved disinfectants are not available, Defendants shall make available on a daily basis diluted bleach (in concentrations detailed in CDC guidelines) or alcohol solutions (in concentrations detailed in CDC guidelines) in an amount sufficient for all residents to clean their cells and common areas.

        1. Defendants shall also offer on a daily basis paper towels sufficient for all residents to clean their cells and common areas.

        2. Defendants shall maintain records reflecting that sufficient cleaning supplies were distributed, if Defendants previously maintained such records.

    ii. Defendants shall sanitize, or assign residents who are appropriately trained to sanitize, common areas of each unit in between recreation sessions, including but not limited to the time between when a top tier comes out for recreation and when a bottom tier comes out for recreation.

        1. Defendants' agents shall maintain records of the above, if Defendants previously maintained such records.

     iii. Defendants shall make available hand sanitizer in a concentration detailed in CDC guidelines, free of charge, in the common areas of the housing units.

        1. Defendants shall maintain records of the above, if Defendants previously maintained such records.

**13. Mask-wearing and social distancing:**

     i. Defendants shall provide at least two reusable / washable masks to residents on admission unless a resident arrives with one or more reusable / washable masks.

        1. Defendants shall maintain records reflecting that reusable / washable masks were distributed to every new resident who did not arrive with any reusable / washable masks.

        2. If a resident loses or misplaces a reusable / washable mask, or if the mask is otherwise damaged, Defendants shall replace the mask free of charge.

        3. When staff become aware of any resident who has fewer than two reusable / washable masks, staff will provide masks as soon as practicable to restore the resident to two reusable / washable masks.

     ii. Defendants shall require proper mask-wearing (i.e., both nose and mouth covered) among staff. Defendants shall verbally remind residents to properly wear masks during recreation time and when residents are moved through the Facilities. Defendants shall maintain records of the same.

     iii. Defendants shall communicate to any staff members who have failed to properly wear a mask the importance of wearing a mask within 24 hours of learning of the non-compliance.

     iv. Defendants shall verbally remind residents to socially distance during recreation time.

**B. Monitoring**.

   **1. Records.**

     i. Defendants shall produce to Plaintiffs' counsel or person(s) designated by Plaintiffs' counsel specific records on a biweekly basis showing compliance with agreed-upon conditions, including: the number of tests administered and the number of positive tests for staff, contracted staff, and detainees/residents; the current size of detainee/resident, staff, and contracted staff populations; records of contact-tracing for these positive individuals; records showing the list of detainees/residents in quarantine or isolation; records showing distribution of cleaning supplies, paper towels, and hand sanitizer to detainees/residents; records of Defendants' requests for vaccines for detainees/residents; records of Defendants' list of detainees/residents eligible for vaccines; records of vaccinations (broken up by number of doses and manufacturer) provided to Defendants, as well as vaccinations allocated to CDF and

HMF detainees/residents; number of vaccinations offered and given to contracted staff, and detainees/residents; the ranked list of high-risk residents (including from the "chronic care" list) into tiers for prioritization for vaccinations, single-cell placement, and other treatment; and records reflecting that detainees/residents with diagnosed mental-health conditions were provided enhanced monitoring while in quarantine or isolation.

ii. Defendants shall produce to Plaintiff's counsel or person(s) designated by Plaintiffs' counsel on a bimonthly basis the number of known CDF staff vaccinations, based on staff self-reporting.

iii. Defendants shall produce the records described in B.1.i-ii—as well as those described below—for the time period spanning February 2, 2021, to February 9, 2021:

1. Medical records of Plaintiffs, including Medication Administration Records and other records of who prescribed and distributed certain medications to Plaintiffs and when (with these individuals' HIPAA-compliant consent in writing);

2. Medication Administration Records for any resident in G unit (sometimes called the "cadre") who was prescribed medication related to hypertension or diabetes for residents in G unit (with these individuals' HIPAA-compliant consent in writing);

3. Testing results of residents, including the housing units and cells of residents who tested positive;

4. Housing and transfer ("traffic") records of residents who have tested positive, subject to an appropriate protective order;

5. Traffic records of *cellmates* of residents who have tested positive, subject to an appropriate protective order;;

6. Traffic records of *other residents* who shared recreation time with residents who have tested positive, as well as any "close contacts" of such residents, subject to an appropriate protective order;

7. The date and time that auto notification e-mails (including from "smartsheet tracking") were sent regarding all residents who tested positive;

8. Testing results of staff, subject to an appropriate protective order;

9. Post assignment worksheets for staff who tested positive;

10. Contact tracing within Defendants' Facilities for staff who were "close contacts" of positive staff members or residents, subject to an appropriate protective order;

11. Plans for quarantine and isolation;
    a. including for CDF and the Health Monitoring Facility (HMF) / Jail Industries Building (JIB); and
    b. including policies or procedures for how to create groups or cohorts of residents, how to prioritize residents for quarantine, how to move residents for quarantine and

isolation, how long to wait before moving new residents into a cell from which a positive resident was removed, and which areas of the Facilities would be used for different purposes and when (including the cadre and its different uses over time);

12. Temperature checks of the Facilities, including at HMF / JIB;

13. Records of the clothing distributed to residents of HMF/ JIB, including the type of clothing (if such records are kept);

14. Policies and procedures governing COVID for these Facilities, including for contact tracing and the definition of "close contacts" of staff members and residents;

15. A list of medically vulnerable residents of CDF;

16. The number of residents to whom CDF has offered vaccinations and the number of residents who agreed to vaccination;

17. Plans of CDF to vaccinate remaining residents, including medically vulnerable residents and those eligible under Maryland guidelines, and including a ranked prioritization of residents;

18. Documentation on vaccination of staff, including:

    a. The number of CDF staff to whom CDF has offered vaccinations and those staff members' decisions;

    b. Plans of CDF to vaccinate remaining staff;

19. Documentation of the physical layouts of Facilities, including:

    a. Layouts and plans of the Facilities, subject to an appropriate protective order;

    b. Photographs of the Facilities (including of the televisions, microwaves, phones, and other commonly touched items in common areas), subject to an appropriate protective order;

20. Audit reports, performance reviews, and related documents (if these records exist and are in the possession, custody, or control of Defendants), including:

    a. Reports and results of any inspections and tests of the Facilities by the federal government;

    b. Reports and results from all performance reviews by the federal government;

    c. Records prepared for or furnished to the federal government related to the inspection system created for the federal government;

    d. Records documenting any reduction in the price of the agreement and contract with the federal government;

    e. Records of any steps demanded by the federal government to come into compliance with the agreement and contract and any steps taken to comply with the agreement contract;

       f.   Written reports or records of any other audit or inspection of the Facilities;

21. Records requested by Dr. Venters:

       a.   Other records requested by Dr. Venters through Plaintiffs' counsel's e-mail titled "RE: Answers to Dr. Venters' questions," dated March 12, 2021;

iv.   Defendants shall produce to Plaintiffs' counsel or person(s) designated by Plaintiffs' counsel on a biweekly basis video clips no longer than 10 minutes from one housing pod selected by Plaintiffs' counsel during (a) recreation time and (b) the time between the upper tier and lower tier coming out for recreation during a single recreation session (i.e., morning or afternoon session).

v.   Defendants shall make available at a mutually agreed-upon time on-site additional video for review by Plaintiffs' counsel or person(s) designated by Plaintiffs' counsel, including video from housing units in which a detainee/resident tested positive. Defendants will prepare video from particular housing units, dates, and times upon Plaintiffs' request and will have this video available on-site and ready to play upon the arrival or Plaintiffs' counsel or person(s) designated by Plaintiffs' counsel. Defendants shall produce this video within a reasonable timeframe upon request. Defendants shall not make it necessary for Plaintiffs' counsel or person(s) designated by Plaintiffs' counsel to wait an unreasonable amount of time to enter the facility or to review video.

vi.   Defendants shall facilitate phone or video visits between Plaintiffs' counsel (or person(s) designated by Plaintiffs' counsel) and detainees/residents of CDF or HMF at mutually agreed-upon times.

vii.   Defendants shall produce other documentary records or video requested by Plaintiffs' counsel or by the expert conducting the inspections after a reasonable period of time from his request.

**2. Physical inspection.**

i.   One or more experts designated by Plaintiffs' counsel shall be permitted to inspect Defendants' facilities, at least every 30 days. Once in the facilities, the expert shall be permitted to inspect lobbies, including public and inmate; vehicle sally ports; intake including holding cells; infirmary or medical units; medical clinic; HVAC systems (including observation of ventilation in all areas discussed in this paragraph, and movement of air in high traffic areas); negative pressure isolation rooms, if available; main control center and housing control center; pods and housing (including general population, special management units, housing units of all Plaintiffs, any special COVID housing, isolation unit, quarantine unit, showers and toilets, common areas); common areas of units; kitchens; laundry facilities; storage location for personal protective equipment, masks, and cleaning equipment and supplies; and program areas (including law library and inside and outside recreation areas).

ii.   Those inspections shall be unannounced.

   iii.   Defendants shall not make it necessary for the inspector to wait an unreasonable period of time after the inspector arrives to conduct his or her inspection.

   iv.   Defendants shall not in any way prepare for the expert's inspection in advance of the expert's arrival at the facility or inform staff that the expert will be conducting an inspection, except as provided in subsection vi, below.

   v.   The expert may bring laptops or other similar equipment, cameras, cell phones, writing implements, and any other equipment required to conduct and record the inspection. These items will all be subject to routine inspection by the facility. If the expert wants to take photographs or video, Defendants (or their staff) shall take those photographs or video for the expert at the expert's instruction. Photographs or video of residents or staff shall be subject to a confidentiality agreement. The expert will not be permitted to access the Internet while in the facilities.

   vi.   Defendants will inform such senior staff as are necessary via e-mail or paper memorandum that an expert may be visiting to conduct an inspection and that such senior staff may speak with the expert about the operations of CDF and HMF. This memorandum shall not be linked in time to an inspection. Rather, this memorandum shall be sent well in advance of any inspection. To avoid any unnecessary delay or confusion, senior staff may inform staff working the front entrance post that the expert is an authorized visitor. Counsel for the parties shall agree to the language to be used in the e-mail or paper memorandum prior to the distribution of the memorandum.

   vii.   Defendants shall make all facilities managers and staff available for interviews, including telephonic interviews conducted by the expert. The expert shall make reasonable accommodations for these interviews, both for the interviewees' convenience and for minimal intrusion on their work.

   viii.   The expert shall be permitted to have private conversations with staff, contracted staff, and detainees/residents of the experts' choosing outside of the presence of supervisors and other staff and contracted staff. Defendants shall not retaliate against any staff member, contracted staff member, or detainee/resident who speaks with the inspector.

   ix.   The expert shall be provided by the facilities with a sufficient supply of full personal protective equipment (PPE) to safely enable the inspection at the time of those inspection. In the alternative, the expert shall bring PPE which the expert may wear in lieu of facilities-provided equipment, if approved by the facilities.

   x.   Defendants may require that the expert submit to a rapid COVID-19 test before conducting the inspection.

   xi.   One attorney from Plaintiffs' counsel's team may join the expert on these inspections. This attorney must submit to the same PPE and testing requirements as the expert.

IN WITNESS WHEREOF, the Parties hereto knowingly, voluntarily and with full authority, execute this Term Sheet as of the date(s) set forth below.

ON BEHALF OF PLAINTIFFS (1 of 2):


_____          _____April 15, 2021_____
Alec Farr                                 Date
Brett Orren
Daniel Schwartz
Adam Shaw
Joscelyn Solomon

BRYAN CAVE LEIGHTON PAISNER

ON BEHALF OF PLAINTIFFS (2 of 2):


Arthur Ago                                                    April 15, 2021
John Fowler                                                   Date
Tianna Mays
Rochelle Swartz

Lawyers' Committee For Civil Rights Under Law

FOR DEFENDANTS (1 of 2):


_____          _____
Robert L. Green                                              4/15/21
Secretary of Public Safety and                  Date
Correctional Services

FOR DEFENDANTS (2 of 2):

_____          Date     4/15/2021
Calvin Wilson
Warden, Chesapeake Detention Facility

Approved for legal sufficiency:


_Stuart M. Nathan_

Stuart M. Nathan
Principal Counsel and Assistant Attorney General
Office of the Attorney General of Maryland
Attorney for Defendants

Approved by Chief of Litigation:

_____

Julia Doyle Bernhardt
Assistant Attorney General
Chief of Litigation
Office of the Attorney General of Maryland